UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTOINE A MACKEY,

        Petitioner,

    v.

DEBBIE ASUNCION, Warden

        Respondent.

Case No.  15-cv-03165-HSG

---

YUSEF ALI BEY, IV,

        Petitioner,

    v.

WILLIAM MUNIZ, Warden,

        Respondent.

Case No.  16-cv-03984-HSG

**ORDER DENYING PETITIONS FOR WRIT OF HABEAS CORPUS, DENYING CERTIFICATES OF APPEALABILITY**

---

Before the Court are two *pro se* petitions for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioners Antoine Mackey and Yusef Ali Bey, each challenging the validity of judgments obtained against them in state court.  On January 3, 2017, the Court related the cases. *Mackey v. Soto*, 15-cv-03165 HSG ("*Mackey*"), Dkt. No. 60; *Bey v. Muniz*, 16-03984 HSG ("*Bey*"), Dkt. No. 8.  Each respondent has filed an answer to each petition.[12]  Neither petitioner has filed a traverse, and the deadline to do so has since passed.  For the reasons set forth below, both

---

[1] In *Mackey*, the Answer is filed in the Court's electronic filing system ("ECF") at *Mackey*, Docket No. 8, and the exhibits to the answer are filed at *Mackey*, Docket Nos. 10–58.  In *Bey*, the Answer is filed in ECF at *Bey*, Docket No. 7, and relies on the exhibits to the answer filed in *Mackey*.
[2] In accordance with Habeas Rule 2(a) and Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute Warden Debbie Asuncion as Respondent in *Mackey* because she is Petitioner's current custodian.

petitions are denied.

# I. PROCEDURAL HISTORY

On April 29, 2009, the Alameda County District Attorney filed an indictment accusing Mackey and Bey[3] of murder in violation of section 187(a) of the California Penal Code[4] in counts one (murder of Chauncey Bailey), two (murder of Michael Wills), and four (murder of Odel Roberson). It was further alleged in counts one and four that a principal was armed with a firearm within the meaning of section 12022(a)(1), and in count two that Mackey personally discharged a firearm and caused great bodily injury within the meaning of sections 12022.7(a) and 12022.53(d), that Mackey personally and intentionally discharged a firearm within the meaning of section 12022.53(c), and that Mackey personally used a firearm within the meaning of sections 12022.5(a) and 12022.53(b), (g). In count three, Mackey was accused of possession of a firearm by a felon in violation of section 12021(a)(1). In count five, Bey was accused of shooting at an unoccupied vehicle, in violation of section 247(b). It was also alleged that there were special circumstances of more than one murder within the meaning of section 190.2(a)(3), and that Mackey had two prior felony convictions. Clerk's Transcript ("CT") 1–6, 2991–95.[5]

On June 9, 2011, the jury found as to count one that both Mackey and Bey were guilty of first-degree murder, a principal was armed with a firearm, and there were special circumstances. The jury found as to count two that both Mackey and Bey were guilty of first-degree murder, a principal was armed with a firearm, and there were special circumstances. However, with respect to count two, the jury found that Mackey did not personally and intentionally discharge a firearm. The jury found as to count three that Mackey was guilty of being a felon in possession of a firearm. The jury found as to count four that Bey was guilty of first-degree murder, a principal was armed with a firearm, and there were special circumstances. The jury failed to reach a verdict regarding the count four murder charge against Mackey. The trial court granted Mackey's motion

---

[3] Mackey and Bey were charged, tried, and convicted together, and they generally presented the same legal positions in the trial and reviewing courts.
[4] Statutory references in this section are to the California Penal Code unless otherwise indicated.

[5] The Clerk's Transcript has been filed as Exhibit A to the Answer filed in *Mackey*.

for a mistrial as to count four. The jury found as to count five that Bey was guilty of shooting at an unoccupied vehicle. CT 2268–74, 2276–78, 4876–80, 4882–82.

On August 26, 2011, the trial court sentenced Mackey to state prison for two consecutive terms of life without parole for counts one and two, plus one year for the firearm enhancement for count one, and sentenced Bey to state prison for three consecutive terms of life without parole, plus six years for the firearm enhancement for counts one, two and four, plus the upper term of three years for count five. CT 2944–47, 4950–53. The trial court granted the prosecution's motion to dismiss count four as to Mackey. CT 4953.

On January 14, 2015, the California Court of Appeal affirmed both petitioners' convictions in a published decision. *People v. Mackey, et al.*, 182 Cal. Rptr. 3d 401 (Cal. Ct. App. 2015) ("*Mackey, et al.*"). On April 15, 2015, the California Supreme Court denied both Mackey's petition for review and Bey's petition for review. Answer, Exs. N, O and P.

On July 8, 2015, Mackey filed a federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *Mackey*, Dkt. No. 1. On July 14, 2016, Bey filed a federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *Bey*, Dkt. No. 1.

## II. STATEMENT OF FACTS

The following factual background is taken from the January 14, 2015 opinion of the California Court of Appeal:[6]

> A. The Prosecution Evidence
> 1. Your Black Muslim Bakery and its occupants
> Bey's father, Yusuf Bey, Sr. (Yusuf, Sr.), founded Your Black Muslim Bakery (the Bakery), and for decades was the head of the Bakery and affiliated companies, which included a security business and a community school. [FN 2] Yusuf, Sr., died in September or October 2003. For some period prior to his death he was in poor health, and Waajid Bey (Waajid), an accountant and tax expert who served on multiple corporate boards of the affiliated Bakery businesses, was named chief executive officer (CEO) and president of the Bakery. Waajid died in February 2004, just a year after taking control of the Bakery.

---

[6] The Court has independently reviewed the record as required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Nasby v. Daniel*, 853 F.3d 1049, 1052–54 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2014), unless otherwise indicated in this order.

[FN 2] Several of the people involved in this case bear the surname "Bey." When we refer simply to "Bey," we are referring to defendant Yusuf Bey IV. Others named "Bey" will be designated by their first names. Not all those named "Bey" are blood relatives of Bey. It was an honorary name bestowed on those who were especially dedicated to the Bakery and the principles of Islam as practiced there.

Bey's brother Antar Bey (Antar) then took control of the Bakery, at age 23. Other Bey family members took issue with this, left the Bakery business, and filed suit to try to prove that Antar's takeover was fraudulent. Antar was killed in October 2005.

After Antar's death, Bey took control of the Bakery, becoming CEO. He was 19 years old.

The downstairs of the Bakery building consisted of a retail counter, baking area, and office area, with an entrance at 5836 San Pablo Avenue, Oakland. The upstairs was a residence that could be accessed from either front stairs or back stairs near a parking area. There was a large living room at the top of the stairs, and several bedrooms. Bey occupied the master bedroom.

A duplex in the rear of the Bakery had two units, one upstairs and one downstairs, with three bedrooms. The first lower unit bedroom was occupied by Mackey, the second bedroom by Devaughndre Broussard (Broussard), and the third by Malachi Hurst.

As will be seen, Broussard played a crucial role in this case in that he was the shooter in the Bailey and Roberson murders and one of the shooters in the car shooting. Broussard had a criminal history: he committed a strong-arm robbery with others when he was a minor, and he was convicted of assault on a bus passenger as an adult. Broussard turned state's witness in exchange for a sentence of 25 years, avoiding a life term without possibility of parole. He testified at length, for some six days, and it was largely through his testimony that the state was able to produce evidence of the details of the crimes and the roles played by various other participants.

Broussard had heard about Bey and the Bakery from a family friend, Richard Lewis (Lewis), when they were in jail together. Lewis told him Bey needed "soldiers" to serve the Black community, and in exchange Bey could ensure that his soldiers would get "good credit to buy whatever you want." When he was released from jail, Broussard went to live at the Bakery.

Broussard started working at the Bakery in July 2006, serving as a janitor and providing security. Broussard described being searched and led in military-style drills when he first arrived at the Bakery. He also testified about being introduced to Bey and his brothers, and described the security system and cameras installed in Bey's bedroom. In their initial meeting Bey talked about "eye for an eye" revenge and said that if somebody did something wrong, they deserved to get the same treatment in return. Broussard came to understand that he would be expected to commit crimes as part of his "job" at the Bakery, but he went along with it because of the credit assistance he had been promised. Broussard was told he needed to stay free of drugs and alcohol.

Bey regularly gave sermons at the Bakery, speaking on the history of the Black man and the "devils" or "White devils" who sabotaged Islam. There were also regular meetings in security training, which included military style drills.

2. Liquor store vandalism and the Mossberg shotgun

4

Bey took over the Bakery in late 2005. On November 23, 2005, about a dozen Bakery men wearing suits and bow ties, including Bey, Donald Cunningham, Dyamen Williams (Williams), and Dhakir (Zaki), vandalized two Muslim-owned West Oakland liquor stores by smashing bottles and equipment, to show their disapproval of selling alcohol in the African–American community. The men assaulted at least one liquor store employee and took a Mossberg shotgun from underneath a counter at one of the stores. It was stipulated that after the murders in this case Bey was convicted in a separate proceeding of stealing the Mossberg shotgun.

### 3. The Cook car shooting

Bey's "second wife," Jasmine Siaw (Siaw), had two children with Cameron Cook (Cook). Siaw testified that Cook did not like having his children raised at the Bakery, and on one occasion in late 2006 he made an angry phone call to Siaw, and she heard gunshots in the background. It turned out that Cook was shooting a gun into the air outside the Bakery. Bey wanted to do something in response, but Siaw did not want Cook to be hurt, so Bey decided to shoot up Cook's car.

Siaw was present on December 7, 2006, when Bey told Yusuf Bey V (Yusuf V), "Let's talk about what we're going to do." Sometime past midnight that night, Bey took Siaw in his BMW to the spot where Cook's car was parked, not far from the Bakery. Siaw saw about four or five men associated with the Bakery leave at the same time in a yellow Cadillac. Tommy Hearns (Hearns) was driving the Cadillac, with Broussard and two other Bakery men, Bey's brother Yusuf V and Dawud Bey (Dawud), with guns in the car. The men in the Cadillac wore black to make it easier to escape detection. According to Broussard, Yusuf V had organized the mission, but he told Broussard that Bey "wanted it done." Yusuf V gave Broussard the Mossberg shotgun to use in the shooting.

Bey and Siaw in the BMW met up with the Cadillac near where Cook's car was parked. Bey pulled his car alongside the Cadillac and, according to Siaw, told the men, "Y'all know what to do," and "Wait until we drive off." Bey and Siaw drove off and Siaw heard a lot of gunshots. Siaw and Bey then drove back to Cook's car and saw it riddled with bullet holes.

According to Broussard and Dawud, when Bey and Siaw drove off, the Bakery men got out of the Cadillac and fired multiple rounds from shotguns and assault rifles into Cook's car. Broussard admitted he participated in the shooting. There was a predetermined plan to put the firearms into the trunk after the shooting, which was done, and they then ran back to the Bakery, while Hearns drove the Cadillac away in the opposite direction. They wanted to get the weapons away from the scene separately from the shooters.

Police who responded to a 911 call found many casings and expended shotgun shells. The shooting was ultimately tied by ballistics evidence to firearms seized from the Bakery property (four shells from the Mossberg shotgun) and from a car owned by Bey (19 shells from an Arsenal AK-47). There were also eight shells from another rifle, identified at trial as an SKS-20, a rifle that was never recovered, but was later used in both the Wills and Roberson murders.

### 4. The Bakery's financial problems

The Bakery did not thrive under the leadership of Antar or Bey. While Antar was in charge he signed a note in December 2004, secured by the Bakery property, in the amount of $625,000. It was at 11 percent interest, with more than $5,700 payable monthly, and a balloon payment due in January 2006. As noted, Antar was killed in October 2005, and Bey took control.

In October 2006, the Bakery filed a chapter 11 bankruptcy petition, claiming $686,750 was owed on the note and $200,000 was owed to the IRS. On April 18, 2007, the bankruptcy court issued an order allowing the Bakery to retain possession of the property if it made monthly payments of $7,291.67 on the first of each month.

In early June 2007, Saleem Bey (Saleem), who was married to Bey's older sister, met with Bey and presented an offer from family members to reconfigure the Bakery corporation. The family wanted to create another board, get the Bakery out of bankruptcy, run it as a family organization, and bring in qualified people to oversee the business. Bey was to remain in control of the Bakery, but the security business, already controlled by other family members, was to remain under the control of John Bey, a spiritually adopted son of Yusuf, Sr. Bey rejected the proposal.

On June 22, 2007, the bankruptcy trustee filed a motion to convert the chapter 11 reorganization to a chapter 7 liquidation because the Bakery was not meeting payroll, paying sales taxes, or filing monthly operating reports. And on July 12, the bankruptcy court indicated it would grant the motion to convert effective August 9, to give the Bakery one last chance. On August 9, after Bey was arrested, the bankruptcy court converted the Bakery reorganization to a liquidation.

5. The Lofton kidnapping and attempted robbery [FN 3]

> FN 3: Although there was considerable testimony about the Lofton kidnapping and attempted robbery, charges related to those events were not included in the indictment in this case.

Beginning in May 2007, Bey and the Bakery men escalated their violence, embarking on a crime spree that lasted until Bey was arrested in August. In the first half of May, as the Bakery's financial pressures mounted, Bey asked Albert "Johnny" Antone (Antone), the father of a woman Bey had dated, to lend him $10,000 to save the Bakery. Antone turned him down, but suggested they could instead cooperate to rob Sylvia Lofton (Lofton), a drug dealer, of cash and drugs. Antone, himself an admitted drug dealer, targeted Lofton because he believed she was connected to a robbery at his house in which he had lost $80,000 in cash and jewelry. Antone wanted the drugs and would let Bey keep the cash. Bey's younger half-brother, Joshua Bey (Joshua), testified that Bey hoped to get $30,000 from Lofton.

On the evening of May 17, Antone spotted Lofton's car at a bingo hall in East Oakland and phoned Bey. Bey gave Joshua the keys to a Chrysler 300 owned by Bey and kept at the Bakery and told him to go with Tamon Halfin (Halfin) to look for a gold Pontiac at the bingo hall. Joshua drove, with Halfin in the rear seat with an assault rifle. They planned to communicate with Bey by walkie-talkie.

When Halfin and Joshua got to the parking lot of the bingo hall, Antone pointed out Lofton's Pontiac and said a woman would come out and get into it. Joshua's walkie-talkie failed to work, so he called Bey on his cell phone, who told him to follow the Pontiac. Two women, Lofton and her mother, got into the Pontiac and drove away. Halfin drove the Chrysler, following the Pontiac onto the freeway, while Joshua gave Bey updates by phone.

A few minutes later, the Bakery's security car, a black Ford Crown Victoria equipped with spotlights beside the side mirrors, a cage in the backseat, flashing lights, and a siren, passed the Chrysler on the freeway. The Crown Victoria activated its flashing lights, and pulled the Pontiac over to the side of the freeway. Halfin stopped the Chrysler behind the Crown Victoria.

Yusuf V and Lewis got out of the Crown Victoria. Both men wore all black clothing and had black masks covering the lower part of their faces. Lewis retrieved an SKS assault rifle with a clip from the trunk of the Chrysler, a rifle Joshua had seen under Bey's bed, where it regularly was kept. Lewis and Yusuf V approached the Pontiac, and at gunpoint moved the two women to the rear seat of the Crown Victoria and got into the seat with them. Bey, who had been driving the Crown Victoria, came to the Chrysler and told Joshua to drive the Pontiac and follow him.

With Bey driving the Crown Victoria in the lead, Halfin driving the Chrysler, and Joshua driving the Pontiac in the rear, they drove to a residential area and parked in front of a vacant house on Avenal Avenue, between 68th Avenue and Church Street, that had been owned by a member of the Bey family. Joshua stayed in the Chrysler, Halfin stayed with Lofton's mother in the Crown Victoria, and the other men took Lofton into the house.

Later, Bey came outside, searched the Pontiac, and returned to the house, taking Joshua with him. Lofton said something about getting money from someone else. Bey told Joshua to watch Lofton while they went to her house to try to get the money, and Yusuf V gave Joshua a revolver that Joshua had previously seen in the living room at the Bakery.

Just then a patrol officer searching for a stolen car pulled up in front of the house. When the men inside saw the patrol car, they broke out windows, jumped out, ran through the backyard, jumped over fences, and ran through other backyards to get away. The officer saw the Crown Victoria parked nearby and thought it looked like a police vehicle. He then heard breaking glass, crashing noises, and screams for help emanating from the vacant house. The officer found Lofton inside the house, handcuffed, bloody, and partially clothed, with a plastic trash bag over her head. Lofton was treated at the hospital for lacerations to her head and hands. Lofton's mother, found in the rear seat of the Crown Victoria, also had something over her head, but she was alive.

Police seized the Chrysler and the Crown Victoria. The Chrysler had dealership paper license plates. It contained papers regarding the Bakery with Bey's name on them, and it was registered to Ameena Bey, another name used by Siaw. The Crown Victoria was registered to Yusuf Bey III and had a "security log" in it from the Bakery. Joshua's cell phone was found outside a broken window in the house.

Zaki also testified about helping Bey and Halfin escape from the area that night. Bey called him, saying he was at Havenscourt Boulevard and Bancroft Avenue, and asked for a ride back to the Bakery. After Zaki picked up Bey, they drove back to the vicinity of the vacant house, where Bey pointed out the Chrysler and asked Zaki if he could retrieve it. They then picked up Halfin in the vicinity of 70th Street and International Boulevard, and then drove to Zaki's grandmother's house, which was on 68th Avenue near the vacant house. Zaki then gave his car keys to Bey, and Bey and Halfin drove off.

Zaki returned to the vacant house on foot to try to pick up the Chrysler, as Bey had asked. The area was swarming with police, so Zaki could not retrieve the car, and he returned to his grandmother's house for the night. The next morning, after learning that Zaki had been unable to retrieve the Chrysler, Bey instructed Zaki to falsely report the Chrysler stolen, and he did. [FN 4]

> FN 4: Joshua, Antone, and Zaki testified about the foregoing events pursuant to plea agreements or immunity agreements made in connection with these crimes.

6. Bey's Arsenal AK-47 assault rifle

On the night of June 9, 2007, Bey drove his girlfriend, Sheavon Williams (Sheavon), in his red Corvette to a San Francisco nightclub where the Bakery was providing security. After gunshots were fired by people trying to get into the club, Bey drove Sheavon back across the Bay Bridge to the Bakery. She heard him open and close the trunk, and he then drove them back to the club in San Francisco.

Bey took a rifle with a clip from the trunk and walked with the Bakery security men toward the crowd. There was more shooting, and the San Francisco police responded. As they did, Bey threw the rifle into the Corvette, and Sheavon and Bey left the Corvette in San Francisco with her purse in the trunk. They were driven in another car back to Oakland, where Sheavon was dropped off at her house.

The next morning police officers found the unlocked Corvette. Inside was an Arsenal AK-47 assault rifle with a live 7.62 x 39 millimeter rifle round in the chamber; a magazine found nearby contained more 7.62 x 39 millimeter ammunition. It was later determined this was one of the rifles used in the Cook car shooting. The police also found indicia of Bey's ownership of the car, items with possible gang symbols, and, in the trunk, a red purse.

7. The Roberson murder

Bey's brother Antar was killed by Alphonza Phillips, Jr. (Phillips), who tried to "jack him" for the rims on his BMW. Phillips was ultimately convicted of that murder. Bey took his Bakery men, dressed in suits and bow ties, to attend Phillips's court proceedings. During the proceedings, Bey pointed out Phillips's relatives to Broussard, said he wanted Phillips's father "whacked," and asked Mackey and Broussard to find an opportunity to kill him.

Mackey and Broussard drove past the elder Phillips's house several times trying to get a chance to kill him, but were not successful. [FN 5]

> FN 5: Phillips's father testified that he saw Bakery members drive past his house many times during his son's trial and felt they were trying to intimidate him.

In June 2007, Bey and Broussard were standing in front of the Bakery when Bey pointed out Odel Roberson, a drug addict who came to the Bakery for handouts of food. Bey told Broussard that Roberson was a relative of Phillips. Broussard responded, "What, and he's still walking around?" Bey replied, "That's why we need more brothers like you," and told Broussard to "keep track" of Roberson.

Around July 4, Bey told Broussard to kill Roberson: "Take him out when you get a chance, because seems like we can't get his pops." On the night of July 4, to celebrate the holiday, Bey, Broussard, Mackey, Lewis, and two other Bakery men went up on the roof of the Bakery and shot various firearms, including the Mossberg shotgun and the SKS–20.

On the night of July 7, Mackey and Broussard went out on security patrol together around the Bakery. Mackey had an assault rifle with a folding stock (which Bey had given him) hidden under his coat. While on patrol they met Roberson, who asked them if they had any "work," which meant he was trying to buy drugs. Broussard said, "Yeah, I got you. Come on," and took Roberson around a corner. Broussard turned to Mackey and said, "Pass it to me. I'm on this." Mackey said, "You want this one?" and Broussard said, "Yeah, I'm on this." Mackey pulled the rifle out of his waistband and handed it to Broussard. Broussard turned to Roberson, pointed the rifle at him, and told him to stop or he would fire. Roberson stopped. But Broussard still fired, eight or 10 shots into Roberson's face and chest as he fell to the ground. Roberson died from multiple gunshot wounds. Mackey, meanwhile, had left the scene.

A man walking his dog in the neighborhood heard seven to eight gunshots, returned to his nearby home, and called 911. A patrol officer reached the shooting location at 12:08 a.m., and was flagged down by Mackey, who told him there was a body lying on the sidewalk. Seven 7.62 x 39 millimeter cartridge casings were near the body, and it was later determined that all of the bullets that killed Roberson were fired from a single gun with class characteristics of the SKS, and as will be discussed, that the same weapon was later used to kill Wills. The SKS-20 assault rifle described by Broussard (and other witnesses) was never recovered, but Bey's brother Joshua testified that an assault rifle was normally stored under Bey's bed.

Broussard ran back to the Bakery and returned the assault rifle to Mackey. The next day Broussard showed Bey a newspaper article about Roberson's death and told Bey, "It's done." Broussard never had problems with Roberson and had no reason to kill him except that Bey told him to do it.

### 8. The Wills murder

At 3:19 a.m. on July 12, 2007, Oakland resident John Hopping called 911 to report hearing several initial gunshots, then a pause, another gunshot, another pause, and another gunshot. Hopping looked out of his window and saw a Black man with an athletic build running down the street carrying a gun with the barrel protruding from the crook of his arm. The man was approximately 20 years old, five feet, eight inches tall, 160 pounds, and was wearing khaki pants, a hooded sweatshirt, and a blue knitted cap. After calling 911, Hopping went down to the street and found the dead body of a White man.

A responding officer found identification indicating the body was that of Michael Wills. Wills had died from multiple gunshot wounds to the back. His wallet contained cash, and a cell phone was found nearby. Nine 7.62 x 39 millimeter cartridge casings were found in the area, strewn along the path leading to Wills's body, suggesting his murderer had been pursuing him down the path while firing on him. It was later confirmed through ballistics analysis that Wills had been killed with the same assault rifle used to kill Roberson. The district attorney's theory was that Mackey was the shooter.

As noted above, Broussard testified that Bey talked about "White devils" and the history of the Black man at Bakery brotherhood meetings. In the early morning hours of July 12, Broussard was at the Bakery with Khidar Bey when he heard a rifle firing three-round bursts. Broussard got a call from either Mackey or Bey to open the back gate at the Bakery; he did so, and Bey drove a Dodge Charger into the Bakery parking lot with Mackey as his passenger. Cell phone records confirmed that Bey made a call to Broussard at 3:14 a.m. As Mackey alighted from the Charger he was carrying the same assault rifle with which Broussard had shot Roberson a few days earlier.

Broussard followed Mackey into his room, where Mackey told Broussard he "got one," meaning "[h]e caught a body," i.e., killed someone. After Bey joined them in Mackey's room about 20 minutes later, Mackey said he and Bey were driving down San Pablo Avenue talking about the Zebra killers6 when they saw a "White guy." Mackey jumped out of the car, ran down the path, and shot the man as he tried to run away. The man's leg flew up in the air, as if he had kicked a field goal. Mackey joked, "It's good," put his arms up like a football official, and laughed. Bey repeated the joke. Bey did not leave the room, did not get angry, and did not disagree with, or correct, Mackey. Rather, Bey told Broussard to go see for himself what had happened. Broussard went where Mackey said the shooting had occurred and saw a White man's body.

[FN 6] For an account of the Zebra murders, *see People v. Cooks* (1983) 141 Cal.App.3d 224, 243–244, 251–257, 261–284, 190 Cal.Rptr. 211.

A couple of days later, while Bey and some other Bakery members were watching movies in Bey's room, Bey told them about the Zebra killers, who were Black men killing White people. Bey said they got caught because they robbed their victims. Bey said the Zebra killers were giving White people "a taste of their own medicine" for lynching and murdering Black people. Bey referred to White men as "White devils" and said, "We got a devil." He was excited when he said it.

9. The Bailey murder

Chauncey Bailey was a well-regarded, award-winning African–American journalist who was an editor at the Oakland Post newspaper. Bailey wrote many news articles about Yusuf, Sr., while he was alive, and in particular reported on felony criminal charges and a related civil suit pending against Yusuf, Sr., at the time of his death. The felony charges were based on allegations that Yusuf, Sr., sexually assaulted underage girls who were living at the Bakery and purportedly fathered children with some of them.

In July 2007, Saleem spoke to Bailey about a new series of articles he was going to write about the Bakery and provided information to Bailey to show fraud and other criminal conduct by Bey. Bailey later showed Saleem the article he had written, which incorporated the information Saleem had provided and accused Bey of criminal conduct. Saleem became concerned that his anonymity as a source had been compromised because Yusuf, Sr.'s wife saw him coming from Bailey's office. Sometime after that Saleem received a threatening phone call from Bey.

One night, while Bey was showing Bakery associates a video of his father's funeral, he paused the video and pointed out Bailey to Mackey and Broussard, describing him as "the motherfucker who killed my father." Bey said Bailey had written articles about his father and was going to write more articles about the Bakery, [FN 7] and that Saleem was working with Bailey.

> FN 7: Dawud evidently told police that Bey once told him that Bailey "was going to be writing some slanderous stuff about the bakery, so he had to do what he had to do." Bey said, "I have to take him out," or words to that effect. But Dawud testified at trial that this was just his opinion, and not something that Bey said.

The next day Bey told Mackey and Broussard that Bailey worked for the Oakland Post and told them to find out where he lived and learn his routine. Mackey and Broussard drove in the Dodge Charger to the Oakland Post office, and saw a dark SUV in the parking lot that belonged to Saleem. They phoned Bey, who came to the parking lot and said, "That's that motherfucker up there right now fucking with dude." Bey said they should "get [Saleem], too," but Bey's sister (Saleem's wife) might get angry.

After Bey left, Mackey and Broussard waited for Bailey to come out of his office and then followed him as he got on a bus. He got off less than 15 minutes later and walked into a residential building. Mackey and Broussard drove back to the Bakery and told Bey they found out where Bailey lived. When police interviewed Sheavon, Bey's girlfriend, she said she heard him on the phone asking for the description of a building and its surroundings. She also told the police Bey was upset about Bailey's upcoming article.

On the night of August 1, Bey asked Mackey and Broussard to come to his bedroom. He told them he wanted them to kill Bailey, to "take him out," before his article was

published, which Bey believed would happen on the coming Friday. Later that night, the three men drove the Dodge Charger to Bailey's residence and devised a plan to kill Bailey on his way to the bus the next morning, discussing the plan out of the car because Bey thought his car was bugged. Bey wanted Bailey killed the next morning and said he would arrange a "credit hook-up" for Mackey and Broussard as a reward for the Bailey murder. But, he said, the shooter "can't miss or can't mess up." Discussing who would do the shooting, Mackey told Broussard it was his "turn" "to take the hit."

Mackey and Broussard then practiced the plan: Mackey was to approach Bailey's residence and to communicate via walkie-talkie to Broussard in the parked vehicle when Bailey appeared; Broussard would then to run up as close as possible to Bailey and shoot him, while Mackey would run back to the parked vehicle to be ready to drive away when Broussard got there. After practicing the plan, they returned to the Bakery and to Bey's bedroom, where Bey gave the Mossberg shotgun to Broussard and said to wake him in the morning. [FN 8]

> FN 8: According to Sheavon, Bey asked Mackey to wake him at 5:00 a.m. so Bey could pray.

Early the next morning Mackey woke Broussard. Broussard got dressed, all in black with a hooded sweatshirt, gloves, and a mask, and they went to Bey's bedroom and woke him. They decided to use a van for the Bailey killing, and Bey had a Bakery employee phone Rigoberto Magana, a live-in handyman, to ask to use his white van. Magana said okay, but he needed it back at 7:00 a.m. to go to work. When the request was made to borrow the van, Magana could hear Bey's voice in the background, directing someone to get the keys to the van. Bey gave the keys to Mackey, who took the license plates off the van.

The walkie-talkies were not functioning, so Mackey and Broussard left them, and decided to use cell phones. Mackey drove to Bailey's residence, got out of the van, and alerted Broussard by cell phone when Bailey had left his apartment. Broussard pulled on the black mask, took the Mossberg shotgun, and ran toward where Bailey was supposed to be. Broussard did not see him, however, and returned to the van.

A woman stopped at the intersection of 1st Avenue and East 14th Street saw a man dressed all in black carrying a long rifle across the street and also saw Bailey, whom she recognized from having read his articles. She also saw someone get into the passenger side of a white van parked nearby and saw the van drive off. She continued driving, but when she phoned her husband and told him what she had seen, he told her to call the police.

After the failed attempt, Mackey and Broussard drove along the bus route until they saw Bailey walking. Mackey said that location was "too hot," so they drove ahead, parked near 14th and Alice Streets, and waited for Bailey to arrive. When Broussard saw Bailey approach that intersection, he jumped out of the van, ran across the street to where Bailey was, and shot him twice in the torso at close range and started to run back across the street. Then he remembered that Bey had made it clear they should be sure Bailey was dead, so he returned to Bailey lying on the ground, fired a third shot into Bailey's face, and ran back to the van. After the shooting Mackey drove them back to the Bakery, where they went upstairs and told Bey, "It's done."

An eyewitness confirmed that the shooter, dressed all in black, turned to run after firing two shots, but then stopped and ran back to fire a final shot into Bailey's head, and that he then jumped into a white van that sped away. A second eyewitness confirmed the same events, including that the van had no license plates.

Magana's van was not in the parking lot when he needed to leave for work, so he called Bey and simultaneously walked around the corner of the Bakery building and talked to Bey through an open window, telling him he needed the van back. Phone records showed that Magana's call was placed at 7:28 a.m. Two minutes later, Bey called Mackey, talked to him briefly, and called Magana back, telling him the van was in the parking lot. Magana checked the lot and found his van.

Bey returned the van keys to Magana and apologized for being late. When Magana got into the van to drive away he saw Mackey standing near the back stairs of the Bakery, gesturing he wanted to talk, but Magana kept driving. Magana found the license plates between the front seats of the van, and later told Bey that the plates had been taken off the van. Bey said he would put them back.

A 911 call was received on August 2 at 7:26 a.m. Officers responded, and found Bailey's body with part of his head and face missing, dead from three gunshot wounds. Two shotgun shells were found near the body; the third shell casing was not found at the scene. It was determined by ballistics examination that the shotgun shells from the scene had been fired by the Mossberg shotgun.

Later that morning, Bey saw a television news broadcast about Bailey's murder and told Sheavon to come look at it. Sheavon forgot this event at trial, but in a prior statement to police she said that Bey was "happy" and "satisfied" or "proud" about it, saying something like: "That will teach him to fuck with me."

Around 8:00 a.m., Bey, Mackey, and Broussard drove in the Dodge Charger back to the Bailey shooting scene. When they saw the murder scene marked off with crime scene tape, Bey said, "I told you I was going to be big." They then parked the Dodge Charger by the lake and got out of the car to discuss the details of the murder, doing so while walking around the lake because of Bey's fear the car was bugged. After Broussard filled Bey in on the details of the murder, Bey said, "I love y'all." Afterwards, they drove back to the Bakery, picked up Lewis, and drove to the International House of Pancakes (IHOP) on San Pablo Avenue, where they stayed only briefly, because Bey believed one of the other patrons was a police officer. While at the IHOP Bey asked Broussard what the inside of Bailey's head looked like. They then drove to the Emeryville marina and walked out on the pier. Bey told Broussard and Mackey that he would see someone the next day about getting them good credit. He also said, "The bakery [is] going to get respect now."

After they returned to the Bakery, Broussard gave the Mossberg shotgun back to Bey. Bey gave it back to Broussard again later that night to use on security patrol.

10. The Bakery raid

As part of the investigation into the Lofton kidnapping, on July 31, 2007, Oakland police obtained search warrants for the Bakery building, the duplex behind it, and Sheavon's residence. On August 3, about 5:00 a.m., the search warrants were served simultaneously. The search of Bey's bedroom turned up the VCR containing a video of Yusuf, Sr.'s funeral. It also turned up a black neoprene mask, a wallet containing Bey's identification, walkie-talkies, recordings of Phillips's arraignment, some expended ammunition, and a great quantity of live ammunition, including shotgun shells, .40-caliber cartridges, 9–millimeter cartridges, and 7.62 x 39 millimeter assault rifle cartridges, both loose and in clips. [FN 9] Of particular significance was an expended PMC nine-pellet shotgun shell that according to expert testimony had been fired by the Mossberg shotgun and matched the characteristics of the shot fired into Bailey's head. It was the prosecutor's theory that this was the third expended shell from the Bailey murder, which had not been found at the scene. She theorized that Broussard did not eject the final shell immediately after the murder. She encouraged the jury to infer it

was ejected when the shotgun was reloaded in Bey's bedroom, as there was live ammunition fitting the shotgun in Bey's bedroom but not in Broussard's, and the shotgun was loaded with six live rounds when it was seized during the raid.

> FN 9: Additional ammunition was found in other bedrooms upstairs at the Bakery, and 189 expended casings and shotgun shells were found on the roof, including seven Mossberg shotgun shells and 50 casings fired from the same rifle used to kill Wills and Roberson, believed to be the SKS-20.

When the officers came to execute the warrant at the duplex, Broussard peeked out of his bedroom door, closed the door, and threw the Mossberg shotgun loaded with six live rounds out of the window, where it was found on the ground.

In Broussard's bedroom the officers found under the television a plastic storage bin containing live rounds of large-caliber rifle ammunition, some loose and some in clips, that could be fired from the AK-47 and SKS rifles, as well as nine-millimeter Winchester and Luger cartridges. Gloves and a knit hat were found on a glass table, a neoprene mask in a dresser drawer, and a pair of handcuffs in a closet.

A Remington sawed-off shotgun loaded with three live rounds was found under Mackey's bed in the duplex. The SKS assault rifle used to kill Roberson and Wills (and also used in the Cook car shooting) was never found.

11. Broussard's arrest, his statements while in custody, and his plea bargain
Broussard was arrested on August 3, and was soon charged with the Bailey murder. He initially told the police he was not involved. Then the police told him that Bey had said Broussard had killed Bailey, without mentioning anyone else's involvement. Broussard was taken to the room where Bey was being held, and Bey repeated in front of the officers that Broussard had confessed he was the killer. Broussard asked to speak to Bey alone, so the officers left them alone for some six minutes without police monitoring or recording. Bey wanted Broussard to confess to the crime for the good of the Bakery, because "everybody can't go down for that," and said "God was testing" Broussard. After that meeting, Broussard told the police that he shot Bailey, and that he acted alone. Broussard testified he confessed to protect Bey and Mackey, and he believed Bey would reward him when he got out of prison.

Broussard claimed Bey promised to get him a good attorney, and when that did not happen, he began to feel "let down" by Bey. Broussard retained his own attorney, and upon advice of counsel granted an interview with 60 Minutes, in which, in a program aired in February 2008, Broussard said he did not shoot Bailey. Broussard also told a television news reporter in August 2007 he had nothing to do with Bailey's death. He said the police had beaten him to get him to confess and refused him an attorney when he asked for one. When asked at trial why he lied to the reporter, Broussard giggled and admitted he believed it was okay to lie if he could get some advantage from it.

Broussard eventually entered into a plea agreement under which he pled guilty to two counts of manslaughter in the Bailey and Roberson murders in exchange for a sentence of 25 years in prison, provided he testified truthfully at the trial of Bey and Mackey.

12. Ballistics evidence
A firearms expert testified that various shotgun shells were fired from the Mossberg shotgun that Bey stole from a vandalized liquor store, including shells from the Bailey shooting scene and four shells from the Cook car shooting scene. One of the expended shotgun shells found in Bey's bedroom was a PMC nine-pellet buckshot cartridge, the characteristics of which matched the wadding and pellets that had been removed from Bailey's head. This was only one of the expended shells that matched.

The police quickly found the link between Bailey's death and the article he was writing about the Bakery, as the owner of the Oakland Post told them about the article. Early on, they checked the casings found at the Bailey shooting scene against those found at the Cook car shooting, and within hours after Bailey's death knew there was a match.

The firearms expert also determined the Arsenal AK-47 rifle recovered from Bey's Corvette in San Francisco fired 7.62 x 39 millimeter casings found in various locations, including 19 from the Cook car shooting scene and 34 from the Bakery roof. An SKS-20 assault rifle, believed to be the murder weapon in the Roberson and Wills killings--which, as noted, was normally kept under Bey's bed--also fired 7.62 x 39 millimeter ammunition. Casings fired from this rifle were found at various locations, including eight at the Cook car shooting scene, seven at the Roberson shooting scene, nine at the Wills shooting scene, and 50 from the Bakery roof. Those casings had not been fired by the AK-47 and were consistent with an SKS. Seven casings on the roof of the Bakery had been fired from the Mossberg shotgun.

13. GPS tracking evidence

On June 27, while investigating the Lofton kidnapping, officers attached a GPS tracking device to the underside of Bey's Dodge Charger while it was parked in a public parking lot, to "gain intelligence" on Bey's movements. Due to transmission problems and the towing of the Dodge Charger, [FN 10] Bey's movements were being tracked for some 20 of the 38 days the GPS device was in place, including during the time of the Bailey murder. The Dodge Charger was not being tracked at the time of the Wills murder.

> FN 10: On June 30, about 12:30 a.m., a patrol officer made a traffic stop of Bey in front of the Bakery, while he was driving four Bakery men in his Dodge Charger with no license plate. When asked for identification, Bey did not produce any. After other officers arrived at the scene and one identified Bey, he was issued a citation for being an unlicensed driver, and the car was towed.

During this incident Bey told Broussard to tell Mackey to go to the back of the Bakery and fire a couple of shots. Broussard conveyed the message to Mackey. After Bey was released from the back of the patrol vehicle, his demeanor changed from polite to belligerent. Some of the Bakery men were on the roof of the Bakery, looking down on the events. As the officers walked away, there was a burst of large caliber rifle gunshots from behind the Bakery, and the officers took cover. Bey stood in front of the Bakery and said mockingly to the officers, "What's that?"

The GPS tracking device indicated the following: at 11:47 p.m. on August 1 the Dodge Charger was at the Bakery; at 12:12 a.m. on August 2 it drove from the Bakery to the area of Bailey's residence and stopped at 12:24 a.m. for about 13 or 14 minutes; it then returned to the Bakery and stayed there until morning; at 8:01 a.m. it drove to the area near the Bailey killing; it then drove to the lakeside area and stopped for about 16 minutes; at 8:27 a.m. it made a five-minute stop in the 4200 block of San Pablo Avenue, returned to the Bakery, and went back and stopped again in the 4200 block, near an IHOP; and after that stop it drove to the Emeryville marina and stopped.

14. Bey's statements after his arrest

On August 3, after the Bakery raid, police took a recorded statement from Bey after reading him his rights. Bey was 21 years old and had been CEO of the Bakery for some two years. He told the police Bailey was a reporter who wrote slanderous things about Bey's father, and he had "heard rumors" that Bailey was writing an article about the Bakery's problems with the IRS and the bankruptcy case.

Bey told the police no guns were allowed on the Bakery premises, including at the duplex behind the Bakery, which was true under the leadership of his father, his brother, and himself. He had live ammunition in his room, but not empty casings. And he did not have weapons for those bullets in his room, as weapons were not needed at the Bakery.

The next day the district attorney's office took a recorded statement from Bey after reading him his rights. Bey said his sister knew someone who worked at the Oakland Post, and his sister told him that Bailey was going to write a slanderous article about the Bakery. He knew that in 2003 Bailey had written something negative about his father that upset him. Bey said he was in litigation with the IRS in bankruptcy court and was also in litigation with older Bey family members who were contesting his ownership of the Bakery properties.

After the Bakery raid, Joshua, Bey, and Halfin were arrested for the Lofton kidnapping. The police placed them together in an interview room at the San Leandro Police Department for two hours or more and secretly video-recorded their conversation. The video recording was played for the jury.

On the recording Bey--referring to his followers as "soldiers"--was concerned that somebody told the police what happened during the kidnapping because they knew too much about what he had done. The three men then compared notes on their police questioning. Joshua said he told the police he was driving the Chrysler for Antone, and that he had hopped into the Pontiac and driven it. He told them Bey was not there and was only communicating with him on the walkie-talkie. [FN 11] Joshua also admitted going into the house, but claimed he did not know who else was there because "it was dark" and "they had masks on." Bey advised Joshua repeatedly to say that the cops forced him to make the statements he made. Joshua said he had been scared and crying when he made his statement to the police, and Bey told him to "man up." Bey later said Joshua should tell the police he was not there even though his cell phone was found at the scene.

> FN 11: Later Joshua admitted telling the police that Bey was driving.

Bey admitted to his friends he had been driving one of the cars, but said he told the police they were helping a friend collect some money owed him, so "if anything happened," the police should "blame it on Johnny" (Antone). They later discussed again possibly blaming it all on "Johnny."

Halfin was concerned that the officer who busted into the Lofton torture scene could identify him, as the officer had seen him in the Crown Victoria where he was holding Lofton's mother hostage. Bey asked Halfin why he did not shoot the officer. Halfin said he would "take the rap for everything," but Bey said the officer might not come to court because "we got some crazy hitters, trust me. And all of them ain't in jail." Bey also said the officer was "probably too scared to confront us," and that he would "sacrifice another soldier" to "make sure" the officer would not come to court. And then Bey laughed.

Halfin and Bey discussed fabricating a story about why Halfin was in the Crown Victoria. They talked about the kidnapping case, about the patrol car that stopped outside the house, and how they "panicked" by breaking out the windows and running.

Bey was worried about fingerprints. He told the others they had better get their "stories straight right now" because they might not have another chance to talk together. He counseled the others to lie to the police and not tell on each other. He said "Fifth" (Yusuf V) and "Rich" (Lewis) would not "tell on" them, and Lofton could not have

seen their faces "cause we were wearing masks." In his words, "Ain't nobody gonna tell."

Bey also said, "All this shit ... was Saleem['s] fault," and then described how Broussard had confessed to killing Bailey while he was in the room. Bey told them Broussard was "a soldier for that" because he confessed to the killing to "take all the heat off the bakery." Joshua asked if Broussard really did the crime, and Bey said, "Ah huh." Joshua then said, "Man, he a soldier for that, man."

Joshua asked which gun they had used, and Bey told them it was the Mossberg shotgun ("shotty"), which had been in his closet the night before the Bailey shooting. Joshua asked "Where they shot him at?" and Bey answered, "The head." Bey then said, "BOOM!" and snapped his head back as if he had been shot in the face. They all laughed. Joshua asked what car they had used, and Bey said "Rigo's van."

Bey told them he made sure not to be anywhere nearby when Bailey was murdered, but as soon as it was over, he went by the crime scene to see for himself, describing going in the Dodge Charger to the murder scene, the lake, IHOP, and the marina. Bey was concerned that nobody should implicate him in either the Lofton or Bailey case. Finally, Bey said people in Oakland were "terrified" of the Bakery men, who could "make anything in Oakland disappear." He said, "I'm gonna make the mayor give me some shit now," and if he was not released by the next day, "there gonna keep on being murders."

B. Bey's Evidence
Cornell Hurst, also known as Kadar (or Khidar) Bey, testified that he worked at the Bakery counter around the date of the Wills shooting and no one at the Bakery would have been working the counter at 3:00 a.m. He never heard multiple gunshots when he was with Broussard at the Bakery counter.

C. Mackey's Evidence
Mackey, who had been convicted of selling cocaine in 2006 and burglary in 2008, testified that he was not involved in the Bailey or Roberson murders and that he never told Broussard he shot Wills. Mackey had grown up in San Francisco but moved away in 2007, after suffering a serious gunshot injury for which he had been hospitalized for two and a half months. He returned to San Francisco after he turned 18, but was again shot in two incidents within two months of one another. He decided to leave San Francisco again and was thinking of returning to Atlanta, but Lewis, a childhood friend, convinced him to go to the Bakery. Mackey found the Bakery inspirational because it seemed like a family atmosphere and people were very respectful of one another, so he decided to stay. Mackey went by the name Ali at the Bakery because he did not want San Francisco people to know he was there. He worked at the counter so he could show his probation officer he was working--and show his mother he could take care of himself.

Mackey testified that Broussard was also from San Francisco and knew Lewis. Although they were generally on friendly terms at the Bakery, Mackey testified he had sex with three women Broussard was dating or was interested in, and felt Broussard was jealous of him.

The night Roberson was killed Mackey was in his room at the Bakery when he heard what he thought were doors slamming. After investigating and finding nothing amiss, he walked to the corner liquor store and bought some candy. Coming out of the store he saw nine or 10 people looking at a body on the next corner, so he flagged down a patrol car and reported the body. He gave the officer identification, but then left the scene

because he did not want to be a witness. He denied involvement in the Roberson murder.

Mackey also denied involvement in the Wills murder. He said it was a bake night at the Bakery and he was there working. He heard police sirens and went outside to see what was going on. He stood outside for few minutes with at least a dozen other members of the Bakery, but he never knew who was killed until he was charged with the murder.

Mackey testified he was working at the Bakery the morning Bailey was killed and denied involvement in that killing. He denied driving with Bey and Broussard to the area of Bailey's residence the night before the killing, and denied going the next day to the scene of the Bailey murder, the lake, IHOP, or the Emeryville marina. Mackey admitted he had awakened Bey at 5:00 a.m. that morning at his request, but testified this was nothing unusual because Bey always wanted to be up early to pray, though admitting that was the only time Bey had asked Mackey to wake him at 5:00 a.m. Mackey testified unequivocally that Bey never ordered him to kill Bailey or anyone else.

Mackey admitted he got a Remington sawed-off shotgun in San Francisco about a month before the Bakery raid and kept it under his bed for self-defense. He did not know how a shell fired from the shotgun got into a room of the Bakery, or how one shell fired by it had been found on the roof. He denied firing the Remington shotgun (or any other firearm) on the roof, and in fact said he had never been on the Bakery roof. Mackey testified he had never lent the Remington to anyone. He knew he could not possess a gun while on felony probation, but he did it anyway because he had learned from past experience that the police would not always be around to protect him.

Mackey denied waving at the white van while Magana drove away, as Magana had testified. He denied ever seeing Roberson around the Bakery or corner liquor store. He denied seeing Phillips, Sr., before the present trial or driving past his house with Broussard. He could not remember what he and Bey discussed on their cell phones at 2:57 a.m., 3:04 a.m., or 3:06 a.m. the morning Wills was killed. And he admitted a Mossberg shotgun was kept at the Bakery.

According to Mackey, Bey's sermons focused on topics such as empowering the Black community and taking care of oneself rather than seeking government welfare. He said Bey's followers encouraged each other not to let adversity be an excuse for selling drugs or snatching purses. He denied Bey said it was okay to kill Whites, and said he had not heard Bey call White people "devils," Mackey did not believe White people were devils. In fact, some of his own family members were White.

Kevin Adams testified that he coached the football team at Galileo High School in San Francisco in 2000 to 2001 when Lewis was a star running back.

Lakeya Robinson (Robinson) testified she first met Siaw in late 2008 when they were both applying for a job at Sears. Robinson told police that Siaw told her that on the order of Bey, Siaw lured Roberson to a place where Halfin, not Broussard, shot and killed Roberson.

Officer Jurrell Snyder testified that on the morning of July 17, an incident began at the Bakery that resulted in a disturbance call, to which Snyder and his partner responded near the Bakery. Six Black males were standing around an intoxicated woman whose skirt was above her waist, her hands handcuffed behind her. When Officer Snyder got out of the patrol car to investigate, the Black males advanced on him in a hostile manner. They were verbal and loud, so Snyder unholstered his firearm and called for backup, to which numerous officers responded. After the woman was taken to the

hospital, the Black men formed a line in military formation behind Lewis and more Black men in suits and bow ties continued to arrive and fall into formation behind Lewis, who appeared to be in command, until there were some 30 men in formation.

### D. Stipulations

It was stipulated that when Broussard was interviewed by a television reporter at the Oakland jail on August 9, 2007, he denied killing Bailey and said he knew nothing about Bailey's murder. Broussard also told the reporter that police denied his request for an attorney and beat him until he gave a confession. Broussard testified his prior statements were untrue.

It was further stipulated that Mackey first became associated with the Bakery on or about May 25, 2007. Thus, he could not have been involved in the liquor store vandalism, the Cook car shooting, or the Lofton kidnapping and attempted robbery.

### E. Rebuttal Evidence

Broussard testified that the police did not beat him before he gave his confession, even though he told the television reporter they had, and that he also falsely told the reporter the police would not allow him to have an attorney. He thought it would help his case if he said something that contradicted his confession. Broussard lied to the reporter because he thought he would get some advantage out of it. And, he giggled, he believed it was okay to lie if he could get some advantage out of it.

In her testimony on rebuttal, Siaw denied "completely" Robinson's testimony about having lured Roberson to his death. Siaw testified she dated Robinson's brother from around March 2007 to September or early October 2008. Siaw first learned that Robinson gave a statement about the Roberson murder when Siaw was cross-examined by Mackey's attorney in this case. Siaw testified she already knew Robinson when she applied for the Sears job.

*Mackey, et al.*, 182 Cal. Rptr. 3d at 411–426.

The following procedural background is also taken from the January 14, 2015 opinion

of the California Court of Appeal:

THE PROCEEDINGS BELOW

On April 29, 2009, Bey and Mackey were both charged by indictment with the three special-circumstance murders, as well as the additional counts and enhancement allegations detailed at the beginning of this opinion. The case was ultimately tried before The Hon. Thomas Reardon, an experienced Alameda County judge.

On August 2, 2010, defendants jointly moved for a change of venue. On October 1, 2010, following the testimony of a defense expert, the trial court acknowledged the pretrial publicity had been "substantial and inflammatory," but deferred its ruling on the venue motion until after voir dire. On February 22, 2011, after significant voir dire, and the removal of potential jurors for hardship and cause, the trial court heard further argument on the motion for change of venue and denied it. All this will be discussed in detail below.

On January 5, 2011, Bey filed a motion to suppress evidence from the GPS tracking device that had been placed on his Dodge Charger without a warrant. Mackey joined in the motion. After an evidentiary hearing, the motion was denied on January 18, 2011, on the basis that the placement of such a device did not constitute a search under the Fourth Amendment.

On January 13, 2011, Mackey filed a motion to sever his trial from that of Bey, on the basis that he only joined the Bakery in late May 2007 and was not involved in the liquor store vandalism, the Cook car shooting, or the kidnapping and attempted robbery of the Loftons, and he was not a party to the recorded San Leandro Police Department conversation. Mackey argued that evidence relating to Bey's misdeeds could have a prejudicial spillover effect, allowing the jury to convict Mackey based on guilt by association. On January 20, the court heard argument and denied the motion, reasoning that most of the negative evidence about Bey's prior misconduct would also be admissible against Mackey as circumstantial evidence of Mackey's motive for the crimes, and specifically "of Mr. Bey's role in the bakery and of the community culture there."

A jury was sworn on March 21, 2011, when opening statements also began. The state rested its case-in-chief on May 3. The defense case began on May 4. The jury began deliberating on the afternoon of May 23, and reached its verdicts on June 9, deliberating for more than 50 hours over 11 days.

The jury ultimately found Bey guilty of first degree murder of all three victims, found true the multiple-murder special circumstance allegation on each murder, found Bey guilty of shooting at Cook's car, and found true the allegations that a principal was armed with a firearm in connection with each of the murders (former § 12022, subd. (a)(1)). Mackey was found guilty of first degree murder of Bailey and Wills, with true findings on the multiple-murder special-circumstance allegations and a true finding that a principal was armed with a firearm in the Bailey murder. However, Mackey had also been charged as the actual shooter of Wills, and the jury found the personal discharge of a firearm allegation (former §§ 12022.5, subd. (a), 12022.53, subds. (b)-(d), 12022.7, subd. (a)) not true. Mackey was found guilty of being a felon in possession of a firearm. [FN 12] The jury was unable to reach a verdict with respect to the murder charge against Mackey in connection with the killing of Roberson, and that count was subsequently dismissed.

> FN 12: On May 9, 2006, Mackey had entered a guilty plea and was convicted of felony sale of a controlled substance. He was placed on probation for three years.

On August 26, 2011, Bey was sentenced to three consecutive life terms without possibility of parole for the three murders. He was also sentenced to one consecutive year for each of the three firearm allegations that had been found true, plus the upper term of three years, imposed consecutively, on the conviction for shooting at an unoccupied vehicle. That same date Mackey was sentenced to two consecutive sentences of life in prison without possibility of parole for the murders of Bailey and Wills and one consecutive year on the arming enhancement on count one. He was also sentenced to three years in prison, imposed concurrently, on the felon in possession of a firearm charge.

*Mackey, et al.*, 182 Cal. Rptr. 3d at 426–28.

### III. DISCUSSION

**A.     Standard of Review**

A petition for a writ of habeas corpus is governed by AEDPA. This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a

State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

20

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). The final state court decisions from the California Supreme Court summarily denied both petitioners' petition for review. The California Court of Appeal was the last reasoned state court decision that addressed the claims raised by both petitioners. Accordingly, in reviewing these habeas petitions, this Court reviews the California Court of Appeal's decision. *See Ylst*, 501 U.S. at 803–04; *Barker*, 423 F.3d at 1091–92.[7]

**B.      Petitioners' Claims**

Mackey alleges the following cognizable claims for habeas relief: (1) the trial court erred in denying his motion to change venue; (2) the trial court erred in denying his motion to suppress the GPS tracking evidence; (3) the trial court erred in denying his motion for severance; (4) the trial court erred in instructing that Mackey's testimony could be used against both defendants without giving a corollary instruction that it could be used in their favor; (5) the trial court erred when it refused to give Mackey's requested instruction on third party culpability evidence with respect to Lewis's testimony; (6) the instruction regarding Broussard's shackling and custody status was prejudicial error; (7) defense counsel rendered ineffective assistance by failing to request a limiting instruction with respect to Broussard's guilty plea; (8) the trial court's instructions allowed the jury to erroneously consider Broussard's testimony without corroboration to convict Mackey for the murder of Wills; and (9) cumulative error.

Bey alleges the following cognizable claims for federal habeas relief: (1) the trial court violated Bey's constitutional rights by denying his motion for a change of venue; (2) the trial court violated Bey's constitutional rights when it instructed the jury that it could consider co-defendant

---

[7] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker*, 423 F.3d at 1092 n.3 (citing *Lambert v. Blodgett*, 393 F.3d 943, 970 n.17 (9th Cir. 2004), and *Bailey v. Rae*, 339 F.3d 1107, 1112–13 (9th Cir. 2003)). The look through rule is applicable here as the Ninth Circuit has held that "it is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is 'contrary to' or 'an unreasonable application of' clearly established federal law" and "it [is] unlikely that the Supreme Court intended to disrupt this practice without making its intention clear." *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

Mackey's testimony for all purposes against either defendant; (3) the trial court violated Bey's

constitutional rights when it instructed the jury with CALCRIM No. 337; (4) the trial court

violated Bey's constitutional rights by allowing the jury to corroborate Broussard's statements

with Broussard's own pretrial statements; (5) counsel rendered ineffective assistance by failing to

request an instruction telling jurors that they could not consider accomplice Broussard's guilty

plea as substantive evidence of Bey's guilt; (6) the evidence was insufficient to convict Bey of the

Wills homicide; (7) the trial court violated Bey's constitutional rights by allowing the jury to

convict Bey of the Wills homicide based solely on Broussard's accomplice testimony; and (8) the

cumulative effect of the errors was prejudicial.  *Bey*, Dkt. No. 5 at 2.

### 1.      Motion to Change Venue

Both Mackey and Bey allege that the trial court erred in denying the motion to change

venue.  The state court rejected this claim as follows:

I. Denial of the Change of Venue Motion Was Not Error
A. The Pretrial Publicity
It took almost three years after Bailey's murder to bring the case to trial. Meanwhile, the
apparent involvement of the Bakery with the death of a local journalist generated
significant media attention, including print articles, television coverage, a 60 Minutes
segment, Web site video postings, and even a documentary film. Much of this coverage
included discussion and speculation regarding the long and controversial history of the
Bakery, including the criminal allegations of rape against Yusuf, Sr., and stories of the
Bakery's fraud, bankruptcy, and retaliatory violence, with possible religious and racial
motivations.

News articles described the Bailey murder as "one of the most shocking cases in Oakland
history," and an "attack on the ideals on which the country was founded." Bailey was
described as a "crusading reporter and devoted father and a mentor," a "role model to
many young journalists," and someone who acted as a "warrior for equality." Bailey's
death was characterized as "barbaric," a "slaying," an "ambush," and an "assassination."

Bey, on the other hand, was depicted as a violent man, "an out of control gang leader
obsessed with violence and power," "heavily involved with guns and violence," who "had
his own business plans and they included killing those who interfered with him" and
"order[ing] followers to commit crimes rather than dirty his own hands."

Though most of the unflattering articles highlighted Bey's involvement, Mackey did not
escape unscathed. He was reported to have an "extensive and violent criminal history."
One article reported that he had a past weapons violation and, at age 13, forced a girl to
perform oral sex.

In addition to regular news reporting, a group of journalists joined together as the
"Chauncey Bailey Project," pledging to "honor and continue" Bailey's work and to
"answer questions regarding his death." The Chauncey Bailey Project contributed articles
regularly to local newspapers; it also created a Web site that included links to news sources

about Bailey's murder and defendants, as well as articles about Bailey's life and achievements. Bey's counsel suggested that the Chauncey Bailey Project's work sometimes verged on advocacy rather than neutral news reporting.

Finally, a student at the University of California Berkeley Graduate School of Journalism made a documentary film about the Bailey murder: "A Day Late in Oakland" (2008). It showcased at the Pavilion Theater in Jack London Square on April 23, 2010.

In addition to actual news reporting, readers' comments posted online referred to the Bakery as a "cancer that's eating Oakland," and to defendants as "soulless assassins" whom the government ought to "fry" to save taxpayer money, or who should be "give[n] ... the needle" or "euthanized as you would a rabid dog." Bey, especially, was called a "cold blooded killer," a "racist child-raping thug," and a "gangster" comparable to Al Capone. [FN 13]

> FN 13: We give these comments little weight in our analysis. They constitute anecdotal evidence that does not reliably reflect the reactions of the community generally. Such commentators are self-selecting and, judging by their comments, may hold extreme views. Moreover, there is no evidence that any of the jurors were exposed to these comments.

B. The Defense Motion for Change of Venue

Because of the extensive publicity, defendants made a joint pretrial motion for a change of venue, arguing that the "massive" and "enduring" coverage of the Bailey murder would prevent them from receiving a fair trial in Alameda County in violation of their Sixth and Fourteenth Amendment rights, as well as their state constitutional and statutory rights. Defendants relied primarily on the findings of their expert, Dr. Bryan Edelman, [FN 14] to demonstrate the volume and intensity of coverage, arguing that the case was uniquely exposed to an overwhelming and prejudicial barrage of various forms of pretrial publicity, including inflammatory content with racial and religious overtones, as well as what they claimed was inadmissible matter.

> FN 14: Edelman was a litigation consultant who received a Ph.D. in sociology from the University of Nevada at Reno and an LL.M. from the University of Kent in Canterbury, England. He had worked for the National Jury Project and the Jury Research Institute, and his experience included research on the impact and influence of television coverage during pretrial publicity. He had never before testified in a change of venue hearing.

In support of their motion, defendants submitted Edelman's declaration describing his findings, [FN 15] as well as more than 300 pages of sample news articles and other materials. [FN 16] Defendants also submitted an exhibit showing Edelman's analysis of a comparative telephone survey conducted to determine public recognition of the crimes and prejudgment of guilt.

> FN 15: Exhibits to Edelman's declaration included analysis of the content of the newspaper articles, along with 134 sample articles. Another exhibit analyzed readers' comments on the news coverage, taken from the Internet. Defendants also submitted a declaration by expert Julie Goldberg regarding the creation of a video exhibit and the content of the Chauncey Bailey Project Web site, and several DVDs containing video news coverage, as well as additional news articles that postdated Edelman's analysis.

> FN 16: In addition to the materials submitted by defendants, the court took judicial notice of juror questionnaires from the earlier trial of Lewis in connection with the Lofton crimes, which the same judge had handled. In Lewis's case, 30 percent of

prospective jurors had no knowledge of the Bakery or the Bey family, 47 percent had some knowledge from media reports but said they could be fair, and 18 percent had knowledge and expressed concerns that it might influence their judgment. A small group had knowledge independent of media exposure.

Over a three-day period beginning September 14, 2010, the court heard testimony from Edelman regarding the extent and nature of media coverage, as well as its impact on the community. Edelman limited his research to articles that had appeared in the San Francisco Chronicle and newspapers published by the Bay Area News Group. He found more than 1,500 articles related "to the crimes of the bakery or something that's related" since the time of Bey's arrest. Edelman testified the coverage did not taper off shortly after the arrest as sometimes happens, but continued into the period immediately before trial. Edelman found prejudicial information in the pretrial coverage of the crimes--"things that could possibly be admissible at trial as well as things that certainly could be considered inadmissible." Many of the articles contained what Edelman called "loaded language," including references to Yusuf, Sr.'s lectures advocating the superiority of the Black race and Islamic religion, sensational descriptions of the Bailey murder, and references to community fear.

The court interacted extensively with Edelman during his testimony. In particular, the court asked critical questions of Edelman for failing to take into account the circulations of the various publications, noting that many of the articles were duplicates published in different newspapers. Following the court's questioning, Edelman recalculated the number of news articles, eliminating duplicate publications, and reported to the court that 500 unique articles had appeared, consisting of 185 articles in 2007, 127 in 2008, 146 in 2009, and 42 in 2010.

As noted, Edelman also arranged a telephone survey of 428 eligible jurors in Alameda County, along with a comparative group in Los Angeles County, to determine the public's prejudgment of defendants. Besides some preliminary questions on attitudes about criminal justice generally, the survey briefly described the Bailey shooting and asked whether the respondent had "read, seen, or heard anything about this incident?" [FN 17] If a respondent answered affirmatively, he or she was asked whether he or she thought Bey was "definitely guilty, probably guilty, probably not guilty, or definitely not guilty of murder" for "ordering the killing." A similar question was posed with respect to whether Mackey "drove the getaway car." However, respondents were not given a specific "no opinion" option. [FN 18] Any questions raised by a survey respondent about what was meant by "guilty" or about the burden of proof were answered by asking the respondent to apply his or her own standard. [FN 19] There were no questions as to whether a respondent could set aside his or her initial impressions and judge the defendants fairly if they were called upon to act as jurors. Edelman believed they could not.

> FN 17: If a respondent said he or she was not aware of the crime, additional details were given, including reference to the involvement of Bey and the Bakery, to possibly jog his or her memory. For respondents who had heard of the incident, there were followup questions to determine the level of detail they remembered.

> FN 18: Respondents were told at the beginning of the survey that they could answer "no opinion," but they were not given that option with each individual question.

> FN 19: The prosecution argued that Edelman's statistics were faulty in part because survey respondents were deemed to have "prejudged" defendants' guilt based on their own definition of guilt. The prosecutor suggested that if the "probably guilty" respondents were reallocated to the category of undecided under a reasonable doubt standard, then 88 percent of the respondents did not have a fixed opinion on

Mackey's guilt and 83 percent had no fixed opinion on Bey's guilt. She also suggested defendants' position was "offensive" to the efficacy of voir dire.

Edelman's analysis concluded that within Alameda County, 82.9 percent of those surveyed recognized the case, and 69.8 percent of those exposed had formed an opinion that Bey was "probably" or "definitely" guilty. In comparison, only 18.5 percent of the potential jurors surveyed in Los Angeles County recognized the case, and 40.5 percent of those answered that Bey was probably or definitely guilty. With respect to Mackey, 54.9 percent of Alameda County respondents who recognized the case thought he was probably or definitely guilty, while 44.5 percent of Los Angeles County respondents answered similarly. We emphasize that the percentage given for having reached a conclusion about guilt represented a percentage of those who recognized the case, so the overall percentage of respondents who had, in Edelman's view, prejudged Bey was approximately 57 percent in Alameda County. Edelman admitted on cross-examination that 42 percent of the Alameda County survey respondents either had not heard of the case or had an opinion that Bey was "probably" or "definitely" not guilty. The same figure with respect to Mackey was 54 percent.

Based on his analysis, Edelman opined there was a reasonable likelihood the defendants could not get a fair trial in Alameda County.

Through its own questioning, the court revealed some of its concerns about the motion, asking about heavily populated versus lightly populated counties, as well as the efficacy of careful voir dire in ferreting out juror bias. [FN 20] The court also suggested "[t]imes have changed," and "our sense of shock ain't what it used to be" due to the "24-hour news cycle" and inundation with news of crimes that by their nature are very disturbing, as well as television shows and movies that overload us with violence.

> FN 20: The court also saw a greater need for a change of venue if the defendant's crimes involved serial killing of random victims that had put members of the community in fear for their personal safety, whereas the crimes in this case did not "reach into the community at large" so as to put most people in the county in fear of being victimized by defendants.

At the conclusion of Edelman's testimony, the court heard argument and deferred ruling on the motion until after voir dire because it wanted to "hear from actual potential jurors" so as to have "as much relevant information ... as possible...." [FN 21]

> FN 21: This has long been recognized as a valid approach to a change of venue motion whereby the trial court can "take into consideration any unanticipated difficulties encountered during voir dire examination of prospective jurors." (*Maine v. Superior Court* (1968) 68 Cal.2d 375, 380, 66 Cal.Rptr. 724, 438 P.2d 372 (*Maine*)). Or, contrariwise, voir dire may "'demonstrate that pretrial publicity had no prejudicial effect.'" (*People v. Famalaro* (2011) 52 Cal.4th 1, 31, 127 Cal.Rptr.3d 40, 253 P.3d 1185 (*Famalaro*); *see People v. Jacla* (1978) 77 Cal.App.3d 878, 887, 144 Cal.Rptr. 23 [defendant cannot complain if "inferences of possible prejudice have been refuted by the 'actualities of voir dire and of trial.'"].)

## C. The Trial Court's Deferral of Decision

On September 27, defendants moved the court for a decision on the motion so that they would have time to take a writ if necessary. At a hearing on October 1, the court again refused to rule on the motion. It acknowledged the pretrial publicity was "substantial and inflammatory," but questioned "a lot of the baseline assumptions [Edelman] was making about this Court's or any court's ability to ferret out prejudice." The court noted that "a lot" of Edelman's testimony was "inconsistent with my own lived experience as a lawyer

and a judge in this county," and it also disagreed with Edelman's comments about "jurors' unwillingness to be forthright during voir dire," saying, "It's just not my experience." The court concluded it needed to "hear from actual jurors and see how deeply this runs" before ruling on the motion. In a written order, the court denied defendants' request for an immediate ruling and continued with jury selection.

D. Jury Selection

Four panels totaling 808 prospective jurors had been summoned and provided an 18-page questionnaire. In addition to basic questions regarding background information, employment, and education, the questionnaire asked detailed questions to gauge jurors' knowledge and opinions of the case. Some pertinent to the issue here included these:

"On the morning of August 2, 2007, Chauncey Bailey, the editor of the Oakland Post newspaper, was shot and killed on his way to work in downtown Oakland. Yusuf Bey IV and Antoine Mackey, two men associated with a business called Your Black Muslim Bakery on San Pablo Avenue in Oakland, are charged with Mr. Bailey's murder.

"21. Have you read, seen, or heard anything about this incident?

"22. What have you read, seen, or heard about this incident?

"It is important for the Court to know all the details you remember about the case. Please take your time to search your memory and provide a full account of what you recall (for example type of weapon(s) used, number of suspects, possible motives, manner of death, etc.)

"23. Based on what you have read, seen, or heard about the killing of Mr. Bailey, do you believe that the defendants are:

"___ Definitely not guilty

"___ Probably not guilty

"___ Probably guilty

"___ Definitely guilty

"___ Other: _____"

The questionnaire also asked in a similar fashion about jurors' knowledge of the Roberson and Wills murders.

The questionnaire also contained open-ended questions regarding jurors' personal knowledge and feelings about a wide variety of potential issues in the case, including: the Chauncey Bailey Project; Bailey's status as a journalist; race as a potential motive for murdering one of the victims; the Bakery, its members, and the surrounding neighborhood; the Islamic faith, generally; Black Muslim organizations; frequency of exposure to media sources; and attitudes about firearms.

After excusals for hardship and language difficulties, 227 of the panelists were called back for voir dire. Of these, 101 were excused by stipulation before being questioned, with the remaining 126 subject to oral voir dire. Seventeen were excused for cause, leaving 109 jurors from whom the final jury of 12, plus five alternates, would be--and was--selected.

E. The Trial Court's Ruling

On February 22, 2011, when 109 potential jurors still remained, the court again heard oral

argument on the motion to change venue and, as will be seen, ruled on it, timing its ruling to precede selection of the final jury so defendants would have an opportunity to seek a pretrial writ if they so desired.

In a supplemental submission to the court, Edelman explained his analysis of jurors' questionnaire responses for three of the four panels to whom the questionnaire had been administered--a total of 528 questionnaires. [FN 22] He found 76 percent of the 528 jurors claimed they had read, seen, or heard about the shooting death of Bailey, and of those who had knowledge, 58 percent said they thought defendants were "probably" or "definitely" guilty.

> FN 22: On February 22, 2011, defendants also submitted a supplemental collection of news articles published after Edelman testified.

Bey's counsel argued that jurors' affirmations that they could be fair should not be given much weight because jurors would have internalized their impressions from the media and could not compartmentalize that knowledge and prevent it from affecting their verdicts. He suggested that the drop in prejudgment rate from 76 percent on the telephone survey to 58 percent on the 528 questionnaires was of no moment--indeed, that the survey was more trustworthy due to its anonymity. Mackey's counsel similarly argued that "voir dire ... cannot overcome the effect of sustained and voluminous adverse pretrial publicity," and urged the court to view the jurors' subsequent statements of impartiality with skepticism.

The prosecutor argued the motion should be denied because of the large size of Alameda County and because the voir dire process had neutralized the effect of the publicity, in that the people with the most extreme views were eliminated through the questionnaires and voir dire. She calculated that 24 percent of the 109 "survivors" had never heard of the case; that 54 percent had no judgment about defendants' guilt; that although 22 percent thought defendants were "probably guilty" not one of the 109 survivors thought defendants were "definitely guilty"; and no juror who answered "definitely" on the questionnaire was even called back for questioning. The prosecutor also pointed out that much of the evidence Edelman considered inadmissible had actually been ruled admissible during in limine motions.

The court conducted its own analysis of the venire, noting it had been made up of 808 potential jurors, 412 of whom were excused for hardship or language difficulties, leaving 396. The court had set aside 12 days to voir dire those remaining, calling in from 20 to 34 jurors per day. The court and counsel found, however, that after seven days they had enough jurors remaining on the panel to accommodate peremptory challenges and so canceled the remaining days of voir dire. Of the 227 potential jurors actually called back for voir dire, the parties "stipulated off" 101 based on their questionnaires, for reasons that "ran the gamut" from unexpected hardships to concerns about Islam, guns, police officers, or other aspects of the case not related to publicity. The court had also granted 17 challenges for cause, and denied three, but noted that very "few of them were excused for cause that had anything to do with either the pretrial publicity or even the charges and the nature of this case," explaining one by one why each of the jurors was excused.

The court pointed out that at the end of each day of voir dire, counsel was given an opportunity to identify particular jurors for additional individual, in-chambers questioning regarding media exposure. The court thereby avoided contaminating other jurors and also tended to minimize or eliminate any pressure the questioned juror may have felt to say he or she could be fair. (*See Patton v. Yount* (1984) 467 U.S. 1025, 1034, fn. 10, 104 S.Ct. 2885, 81 L.Ed.2d 847 (*Yount*).)

The court itself also analyzed the questionnaires and determined that 78 percent of the 109 "survivors" either had no knowledge of, or, despite knowledge, had formed no opinion

about, the case. Twenty-four of them, or 22 percent, thought defendants were probably guilty, [FN 23] an analysis that corresponded closely to that of the prosecutor's.

> FN 23: Twenty-two of the 24 "were not even challenged for cause by counsel at the end of voir dire." And while three challenges for cause were denied, the court pointed out that "the juror with the most exhaustive knowledge of [the] case" was actually challenged by the prosecution—a challenge opposed by the defense. According to the prosecutor, this man "ran a ministry" and counted among his friends "criminals, drug dealers, drug users, [and] prostitutes." The court determined that the juror seemed "extremely objective," and the challenge was denied.

The first main difference between Edelman's calculations and the court's finding was that the court took into account a different population of potential jurors in making its calculations. But in denying the motion, the court said it did not focus exclusively on the 109 survivors, but also considered the answers of other excused jurors. Still, having conducted a "grueling process of voir dire"—a process, not incidentally, that Mackey's counsel called "masterful" and Bey's counsel called "unique and extensive and effective"-- the court expressed confidence that the parties could pick an impartial jury from the 109 remaining jurors: "These folks went through an exhaustive and exhausting process of learning about what the expectations were of jurors, what the legal rules were that govern their service ... [and to] understand what it meant to be objective about issues." And while the court acknowledged that jurors' denials of bias are "not necessarily controlling," their questionnaires and answers on voir dire do "certainly carry great weight, particularly with this Court." In fact, the court found from the juror questionnaires and the jury selection process that jurors who had knowledge of the case--especially the 109 survivors--could remember very few details, and what they remembered would not cause them to have any preconceived judgments.

The court also thought the jurors' "probably guilty" answers constituted a "natural reaction[ ]" to crime that had not necessarily become imbedded in their consciousness. It compared jurors' "probably guilty" responses to those of a large number of jurors who agreed with the statement that if someone had been "brought to trial" they were "probably guilty." Such responses are "a given that is built into any jury selection process," and merely reflect jurors' faith that "the system's working." The court believed Edelman's findings overstated the percentage of potential jurors who had truly "prejudged" defendants in the sense that they would be unable to set aside their preexisting impressions and give defendants a fair trial, observing that it had "great skepticism" about Edelman's conclusions and actually thought he was "wrong."

The other main difference between the trial court's analysis and that of Edelman was that the court credited the jury selection process and potential jurors' statements that they could set aside their initial impressions and judge the case impartially. Edelman gave no weight to such considerations, believing that jurors, even if well intentioned, simply could not eliminate from their minds the impact of such negative publicity.

The court again stated, "Times have changed," and the "vast majority" of successful changes of venue on appeal "are from the late '60s and early 70s." "These things don't make a dent anymore ... in people's conscience." The court felt much of the intensive press coverage was due to journalists' own interest in the murder of a fellow journalist and was not necessarily driven by the public appetite. The court distinguished the *Mehserle* trial (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 142 Cal.Rptr.3d 423), where there were "daily crowds, protesters, signs, picketers, a standing room only courtroom of observers every day" which "just does not exist in this case." Finding "no reasonable likelihood that the defendants won't be able to get a fair trial in this county," the court denied the motion.

Though given time to do so, defendants did not seek writ relief.

Jury selection continued, with more jurors being excused for hardship or cause. A final jury with five alternates was sworn on March 21, 2011. Fourteen peremptory challenges remained available to the defense when the 12 regular jurors were selected, and 41 additional potential jurors remained even after selection of alternates. The composition of the final jury will be discussed below.

F. Standard of Review

"Due process requires that the accused receive a trial by an impartial jury free from outside influences." (*Sheppard v. Maxwell* (1966) 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (*Sheppard*).) Change of venue is one means by which the courts may protect the defendant's due process rights, and such change must be granted "when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a).) The same standard applies as a matter of due process. (*Sheppard*, *supra*, at p. 363, 86 S.Ct. 1507.) Defendants rely upon the Sixth and Fourteenth Amendments to the United States Constitution and the state Constitution (art. I, §§ 15, 16) as grounds for reversal. We are reminded, however, that "reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception." (*Sheppard*, *supra*, at p. 363, 86 S.Ct. 1507.)

Whether on appeal or pretrial writ petition, we review the evidence presented to the trial court de novo. [FN 24] (*People v. Prince* (2007) 40 Cal.4th 1179, 1213, 57 Cal.Rptr.3d 543, 156 P.3d 1015 (*Prince*); *Martinez v. Superior Court* (1981) 29 Cal.3d 574, 577, 174 Cal.Rptr. 701, 629 P.2d 502.) If review is sought by pretrial writ, the appellate court redetermines independently whether it is reasonably likely that the defendant cannot get a fair trial in the county in which the crime occurred. (*Maine*, *supra*, 68 Cal.2d at pp. 384–385, 66 Cal.Rptr. 724, 438 P.2d 372.) If the issue is not raised until a postconviction appeal, the defendant must show both error and prejudice, specifically, (1) that at the time of the motion it was reasonably likely that a fair trial could not be had in the county, and (2) that it was reasonably likely that a fair trial was not, in fact, had. (*Famalaro*, *supra*, 52 Cal.4th at p. 21, 127 Cal.Rptr.3d 40, 253 P.3d 1185; *People v. Davis* (2009) 46 Cal.4th 539, 578, 94 Cal.Rptr.3d 322, 208 P.3d 78; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1125, 63 Cal.Rptr.3d 297, 163 P.3d 4 (*Zambrano*).) The phrase "reasonable likelihood" denotes a lesser standard of proof than "more probable than not." (*See People v. Vieira* (2005) 35 Cal.4th 264, 279, 25 Cal.Rptr.3d 337, 106 P.3d 990 (*Vieira*).)

> FN 24: The de novo standard of review was originally adopted in California as a matter of constitutional compulsion. (*Maine*, *supra*, 68 Cal.2d 375 at p. 382, 66 Cal.Rptr. 724, 438 P.2d 372; *Sheppard*, *supra*, 384 U.S. at p. 362, 86 S.Ct. 1507 ["appellate tribunals have the duty to make an independent evaluation of the circumstances"].) The United States Supreme Court has since allowed greater deference to the trial court in determination of individual jurors' bias. (*Mu'Min v. Virginia* (1991) 500 U.S. 415, 427–428, 111 S.Ct. 1899, 114 L.Ed.2d 493; *Yount*, *supra*, 467 U.S. at pp. 1036–1038, 104 S.Ct. 2885.) Of course, we are bound by the California Supreme Court's precedent (*Auto Equity Sales Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937) (*Auto Equity*), and we accept the de novo standard of review as a binding aspect of our inquiry.

"Of course, the question presented on appeal from a judgment of conviction is necessarily different from that on a petition for writ of mandate.... [¶] ... [B]ecause the prejudicial effect of publicity before jury selection is necessarily speculative, it is settled that "'any doubt as to the necessity of removal ... should be resolved in favor of a venue change.'" [Citation.] After trial, any presumption in favor of a venue change is unnecessary, for the matter may then be analyzed in light of the voir dire of the actual, available jury pool and the actual jury panel selected. The question then is whether, in light of the failure to change

venue, it is reasonably likely that the defendant in fact received a fair trial. [Citation.] [¶] Whether raised on petition for writ of mandate or on appeal from a judgment of conviction, however, the standard of review is the same.'" (*Vieira*, *supra*, 35 Cal.4th at p. 279, 25 Cal.Rptr.3d 337, 106 P.3d 990.)

California cases have distilled five factors that a court should consider when ruling on a motion for a change of venue: "'"(1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim."'" (*Famalaro*, *supra*, 52 Cal.4th at p. 21, 127 Cal.Rptr.3d 40, 253 P.3d 1185.) This analysis applies regardless of whether the issue arises pretrial or on appeal. (*See, e.g.*, *id.* at pp. 21-22, 127 Cal.Rptr.3d 40, 253 P.3d 1185.) Although, as noted above, we independently review the court's ultimate determination of the reasonable likelihood of an unfair trial, factual findings of the trial court will be sustained if supported by substantial evidence. (*Id.* at p. 21, 127 Cal.Rptr.3d 40, 253 P.3d 1185; *People v. Hart* (1999) 20 Cal.4th 546, 598, 85 Cal.Rptr.2d 132, 976 P.2d 683.) And while all factors are relevant, no single factor is dispositive. (*Maine*, *supra*, 68 Cal.2d 375, 388, 66 Cal.Rptr. 724, 438 P.2d 372.)

Moreover, we note that the five factors, while useful for analytical purposes, should not be considered exclusively. That is, the United States Supreme Court has adopted a "totality of the circumstances" approach, which we deem to be the correct standard for federal constitutional purposes. (*Murphy v. Florida* (1975) 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589; *Yount*, *supra*, 467 U.S. at p. 1031, 104 S.Ct. 2885; *Sheppard*, *supra*, 384 U.S. at p. 352, 86 S.Ct. 1507.)

G. Analysis of Pertinent Factors to Change of Venue
1. Nature and Gravity of Charged Offenses
The "nature" of the crimes charged is determined based on the "'peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community,'" while the "gravity" takes account of the seriousness of the crime "'in the law'" and the "'possible consequences to an accused in the event of a guilty verdict.'" (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1159, 259 Cal.Rptr. 701, 774 P.2d 730 (*Hamilton*).)

A trial for multiple special circumstance murders represents one of the most serious cases a defendant can face and therefore weighs in favor of a change of venue, even if the death penalty has not been sought. (*People v. Farley* (2009) 46 Cal.4th 1053, 1083, 96 Cal.Rptr.3d 191, 210 P.3d 361.) However, the fact that a defendant is charged with multiple murders is not alone dispositive, and "on numerous occasions" the California Supreme Court has upheld the denial of change of venue motions in such cases, including cases with six and 13 counts of murder. (*Ibid.*)

Defendants' specific crimes--while cold-blooded, calculated, and committed for base motives--were not particularly vulgar, gruesome, or brutal in nature. The victims were not children and they were not subjected to kidnapping, torture, or sexual assault. All three murder victims were shot on the street and left there. The most sensational aspect of the crimes was that a journalist was killed, but we consider the identity of the victim separately below. We find the nature and gravity of the crimes tips the balance only slightly in favor of a change of venue.

2. Nature and Extent of Media Coverage
Without a doubt, the strongest factor weighing in favor of a venue change was the nature and extent of the pretrial publicity. And defendants place almost exclusive emphasis on this factor on appeal. To begin with, the trial court found the publicity to be "substantial and inflammatory," an assessment with which we agree. The media reported on alleged wrongdoing by other Bakery members, past unsolved murders of Bakery employees, the

30

kidnapping-torture case involving Bey and others, past fraud of Bey, Bey's hitting a strip club bouncer with his car, and Bey's attempt to smuggle out from jail through his attorney a purported "hit list." The news articles rehashed the criminal charges against Yusuf, Sr., including the bizarre upbringing of his more than 40 children and the allegation that he defecated on his foster children and forced them to drink his urine. Based on his analysis of the extent and nature of the news coverage, Edelman testified he would put this case in the "top ten" worst publicity cases in a survey of 124 change of venue cases across the country, comparable to that of the Oklahoma City bombing case.

Still, even a case with heavy negative press coverage can survive a motion for change of venue if the other factors outweigh its significance, illustrated, for example, by *People v. Ramirez* (2006) 39 Cal.4th 398, 46 Cal.Rptr.3d 677, 139 P.3d 64, where the Supreme Court upheld the trial court's denial of a change of venue to an accused serial killer, on trial for 13 murders, even though the trial court itself had described the media coverage of the murders and defendant's arrest as "saturation." (*Id.* at p. 433, 46 Cal.Rptr.3d 677, 139 P.3d 64.)

Even giving credit to Edelman's methodology, his results were not decisive of the motion. *Famalaro, supra,* 52 Cal.4th 1, 127 Cal.Rptr.3d 40, 253 P.3d 1185 is instructive. There, the defendant was convicted of first degree murder with the special circumstance of murder committed while engaged in kidnapping and sodomy or attempted sodomy. (*Id.* at p. 5, 127 Cal.Rptr.3d 40, 253 P.3d 1185.) On appeal from a death verdict, the Supreme Court found media coverage of the case had been "heavy," including 289 newspaper articles and editorials and coverage that aired on all major television stations. (*Id.* at p. 22, 127 Cal.Rptr.3d 40, 253 P.3d 1185.) In sheer numbers, there were more news articles in this case, 500 unique articles. But in both cases the crimes may be said to have spawned media spectacles.

In *Famalaro*, a telephone survey of county residents showed that 83 percent had heard of the case, and of those nearly 70 percent admitted to believing the defendant was definitely or probably guilty. (*Famalaro, supra,* 52 Cal.4th at pp. 19–20, 31, 127 Cal.Rptr.3d 40, 253 P.3d 1185.) These numbers are remarkably similar to those in Edelman's telephone survey, where 82.9 percent of Alameda County telephone respondents had been exposed to media about the case, and 69.8 percent of those had formed an opinion that Bey was probably or definitely guilty. These statistics did not require a change of venue in *Famalaro* or in other cases. (*See, e.g., People v. Rountree* (2013) 56 Cal.4th 823, 836, 157 Cal.Rptr.3d 1, 301 P.3d 150 (*Rountree*) [81 percent recognized the case, 46 percent of whom said defendant was definitely or probably guilty]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1396, 58 Cal.Rptr.3d 368, 157 P.3d 973 [85 percent recognition with 58 percent believing defendant was probably or definitely guilty]; *People v. Ramirez, supra,* 39 Cal.4th at p. 433, 46 Cal.Rptr.3d 677, 139 P.3d 64 [94 percent recognition with 52 percent believing defendant guilty]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 45, 17 Cal.Rptr.3d 710, 96 P.3d 30 (*Coffman*) [71 percent recognition with over 80 percent believing defendants guilty].)

Likewise compelling is *Yount, supra,* 467 U.S. 1025, 104 S.Ct. 2885, where the defendant was sentenced to life in state prison for first degree murder and rape. (*Id.* at p. 1028, 104 S.Ct. 2885.) By our computation, 98.8 percent of the venire had heard of the case, and 77 percent of those had fixed opinions about the defendant's guilt that they "would carry ... into the jury box." (*Id.* at p. 1029, 104 S.Ct. 2885.) The Third Circuit granted habeas corpus relief. (*Id.* at p. 1032, 104 S.Ct. 2885.) The United States Supreme Court reversed, because the Court of Appeals had "failed to give adequate weight to other significant circumstances in this case," such as the decrease in publicity over time and the trial court's finding that the jury as a whole was impartial—even though eight of 14 seated jurors and alternates admitted to having reached an opinion of the defendant's guilt at some point in time. (*Id.* at pp. 1029–1030, 1032, 104 S.Ct. 2885.) The Supreme Court held that a trial

court's finding that a juror should or should not be disqualified is a finding of historical fact (*Id.* at pp. 1036–1037, fn. 12, 104 S.Ct. 2885), and on habeas review for constitutional error the trial judge's own "findings of [jurors'] impartiality [may] be overturned only for 'manifest error.'" (*Id.* at p. 1031, 104 S.Ct. 2885; *see also ibid.*, fn. 7; *see also*, *Irvin v. Dowd* (1961) 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751.)

Indeed, where pretrial publicity is at issue, "'primary reliance on the judgment of the trial court makes [especially] good sense'" because the judge "'sits in the locale where the publicity is said to have had its effect,'" and may base the evaluation on his "'own perception of the depth and extent of news stories that might influence a juror.'" (*Skilling v. United States* (2010) 561 U.S. 358, 386, 130 S.Ct. 2896, 177 L.Ed.2d 619.) Here, an experienced trial judge developed the "overwhelming impression ... from the questionnaires and from the jury selection process" that prospective jurors who had knowledge of the case "could remember very little of the details," and what they remembered "was not of a nature that would cause them to have any preconceived negotiations [sic] or prejudgments about this case. Certainly that's true of our 109 survivors." The trial court's findings were supported by substantial evidence, and we defer to the court's assessment of the credibility of jurors' responses on voir dire.

As in *Famalaro*, the heavy media coverage may have "weighed in favor of a change of venue, [but] did not necessarily require a change of venue." (*Famalaro*, *supra*, 52 Cal.4th at p. 23, 127 Cal.Rptr.3d 40, 253 P.3d 1185.) Here, the risks created by the pretrial publicity were significantly reduced, if not entirely eliminated, by the court's summoning of a large venire and employment of a targeted and particularly careful jury selection process.

3. Size of Community
"It is well recognized that in a small rural community in contrast to a large metropolitan area, a major crime is likely to be embedded in the public consciousness with greater effect and for a longer time." (*Hamilton*, *supra*, 48 Cal.3d at p. 1158, 259 Cal.Rptr. 701, 774 P.2d 730.) This factor weighs heavily against a change of venue.

Alameda County is the seventh largest county in California, with 1.14 million people over the age of 18. In fact, in *Zambrano*, *supra*, 41 Cal.4th at page 1125, 63 Cal.Rptr.3d 297, 163 P.3d 4, the court specifically considered the size of Alameda County, affirming the trial court's finding that "the county's size and diversity weigh strongly against a change of venue." The court reached that conclusion despite the facts that *Zambrano* was a multiple-victim death penalty case; the defendant and one of his victims were both public officials; and there had been "considerable" media attention to the "brutal details" of the crimes, which were more grisly than in this case, one victim having been decapitated and dismembered, his body parts scattered in an isolated area to impede investigation of the crime. (*Id.* at pp. 1125–1126, 1136, 1146, 63 Cal.Rptr.3d 297, 163 P.3d 4.) We find the analogy to *Zambrano* compelling--and the importance of this factor impossible to overstate.

Even in communities significantly smaller than Alameda's million-plus population, reviewing courts have found this factor to weigh against a change of venue. (*See e.g.*, *Vieira*, *supra*, 35 Cal.4th at p. 280, 25 Cal.Rptr.3d 337, 106 P.3d 990 [1990 population of Stanislaus County (approximately 370,000) did not weigh in favor of venue change]; *People v.* Hart, *supra*, 20 Cal.4th 546, 598–599, 85 Cal.Rptr.2d 132, 976 P.2d 683 [1987 population of Riverside County (approaching 900,000) did not weigh in favor of venue change]; *People v. Webb* (1993) 6 Cal.4th 494, 514, 24 Cal.Rptr.2d 779, 862 P.2d 779 [San Luis Obispo County (population almost 200,000 at time of trial) was "moderately sized county," not "relatively isolated and small" where change of venue motions have been granted]; *People v. Pride* (1992) 3 Cal.4th 195, 224, 10 Cal.Rptr.2d 636, 833 P.2d 643 [size and metropolitan nature of Sacramento County (estimated population above 875,000)

"weighed heavily against a change of venue"]; *People v. Howard* (1992) 1 Cal.4th 1132, 1167, 5 Cal.Rptr.2d 268, 824 P.2d 1315 [Tulare County, with 253,000 inhabitants, "[was] not a small community" compared to "most recent successful venue motions"].) [FN 25]

> FN 25: These generalizations are borne out by the specifics in the cases where change was required: *Maine*, *supra*, 68 Cal.2d at p. 385, fn. 10, 66 Cal.Rptr. 724, 438 P.2d 372 [change of venue ordered from Mendocino County, population 51,200]; *People v.* Williams (1989) 48 Cal.3d 1112, 1141, fn. 2, 259 Cal.Rptr. 473, 774 P.2d 146 (conc. & dis. opn. of Eagleson, J.) [Placer County, population 151,800]; *Williams v. Superior Court* (1983) 34 Cal.3d 584, 592, 194 Cal.Rptr. 492, 668 P.2d 799 [Placer County, population 117,000]; *Martinez v. Superior Court*, *supra*, 29 Cal.3d at p. 582, 174 Cal.Rptr. 701, 629 P.2d 502 [Placer County, population 106,500]; *Frazier v. Superior Court* (1971) 5 Cal.3d 287, 293, fn. 5, 95 Cal.Rptr. 798, 486 P.2d 694 [Santa Cruz County, population 123,800]; *Fain v. Superior Court* (1970) 2 Cal.3d 46, 52, fn. 1, 84 Cal.Rptr. 135, 465 P.2d 23 [Stanislaus County, population 184,600].

The reason this factor is so important was articulated by the Supreme Court: "'"[T]he larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness." ... The key is whether ... the population is of such a size that it neutralizes or dilutes the impact of adverse publicity.'" (*Prince*, *supra*, 40 Cal.4th at p. 1213, 57 Cal.Rptr.3d 543, 156 P.3d 1015.) Too, in a small community shared opinions are more likely to take root, there tends to be less diversity, assembly of a large venire is more difficult, and residents may be more shocked by heinous crimes committed in their midst than would their big city counterparts. (*See Williams v. Superior Court*, *supra*, 34 Cal.3d at pp. 592–593, 194 Cal.Rptr. 492, 668 P.2d 799.) Finally, when a large percentage of the population is disqualified based on pretrial exposure to publicity, the remaining jurors may have other relationships that cause concern about impartiality. (*See, e.g.*, *Rideau v. Louisiana* (1963) 373 U.S. 723, 725, 83 S.Ct. 1417, 10 L.Ed.2d 663 (*Rideau*) [two sheriff's deputies served on jury]; *People v. Williams*, *supra*, 48 Cal.3d at p. 1130, 259 Cal.Rptr. 473, 774 P.2d 146 [several jurors had ties to law enforcement and two knew the district attorney].)

Defendants' expert Edelman noted only two cases in which an appellate court had insisted on a change of venue from a populous county, both from Los Angeles County: (1) *Powell v. Superior Court* (1991) 232 Cal.App.3d 785, 798–802, 283 Cal.Rptr. 777, which involved White police officers charged with the videotaped beating of Black motorist Rodney King; and (2) *Smith v. Superior Court* (1969) 276 Cal.App.2d 145, 148–149, 80 Cal.Rptr. 693, involving bribery and perjury charges against a city commissioner. These cases have since been distinguished on grounds that they involved "political controvers[ies]," which we find essentially absent in the case before us. [FN 26] (*People v. Lewis* (2008) 43 Cal.4th 415, 448, 75 Cal.Rptr.3d 588, 181 P.3d 947.)

> FN 26: Although there was some indication that Bey knew some local politicians, we do not regard these as political factors pertinent to a change of venue motion. This circumstance is certainly not comparable to the political questions of police brutality and public corruption present in *Powell v. Superior Court*, *supra*, 232 Cal.App.3d 785, 283 Cal.Rptr. 777 or *Smith v. Superior Court*, *supra*, 276 Cal.App.2d 145, 80 Cal.Rptr. 693.

The trial court also discussed the trend of the case law against granting change of venue motions. This was an accurate observation, with most of the recent appellate cases affirming denials of motions, especially those originating in more populous counties. (*People v. Harris* (2013) 57 Cal.4th 804, 828, 161 Cal.Rptr.3d 364, 306 P.3d 1195 [Kern County, population 648,400]; *Famalaro*, *supra*, 52 Cal.4th at p. 19, 127 Cal.Rptr.3d 40, 253 P.3d 1185 [Orange County, population more than 2.5 million]; *People v. Lewis*, *supra*,

43 Cal.4th at p. 448, 75 Cal.Rptr.3d 588, 181 P.3d 947 [Los Angeles County, " 'largest and most populous [county] in California'"]; *Zambrano*, *supra*, 41 Cal.4th at p. 1124, 63 Cal.Rptr.3d 297, 163 P.3d 4 [Alameda County, population 1.3 million]; *Prince*, *supra*, 40 Cal.4th at p. 1213, 57 Cal.Rptr.3d 543, 156 P.3d 1015 [San Diego County, population 2 million].) As the court in *Famalaro* noted, "When, as here, there is a 'large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empanelled is hard to sustain.' [Citation.]" (*Famalaro*, *supra*, at p. 23, 127 Cal.Rptr.3d 40, 253 P.3d 1185.) We agree, and conclude the large size of Alameda County weighs strongly against a change of venue.

4. Community Status of Defendant

The community status of the defendant has most often been an important factor where the defendant was a "friendless newcomer or transient, or a despised outcast, accused of murdering a victim with 'long and extensive ties to the community.'" (*Zambrano*, *supra*, 41 Cal.4th at p. 1126, 63 Cal.Rptr.3d 297, 163 P.3d 4.) It has been especially compelling if the defendant was a member of a racial minority in a small, potentially hostile community where few of his race resided. Thus, in *People v. Williams*, *supra*, 48 Cal.3d at p. 1129, 259 Cal.Rptr. 473, 774 P.2d 146, the Supreme Court ordered a change of venue from Placer County where "the victim was a White woman whose family had '"prominence in the community,"' whereas the defendant was from Sacramento, an outsider, and a Black man in a county with less than 1 percent Blacks, resulting in 'social, racial and sexual overtones'" in the publicity. (*Vieira*, *supra*, 35 Cal.4th at p. 283, 25 Cal.Rptr.3d 337, 106 P.3d 990.)

This factor is somewhat difficult to evaluate because we are not sure of Bey's status in the community prior to the crimes charged in this indictment. Bey had received some negative publicity for activities of the Bakery prior to his arrest in the present case, such as the liquor store vandalism, and that may have resulted in a negative reputation in some segment of the community. But we do not know how widespread that negative impression was, and defendants made no attempt to develop this point in the trial court, instead repeating the negative impression of his status created by the postcrime publicity.

We suspect there was also some segment of the community that admired Bey for employing young Blacks at the Bakery, seeing that they wore suits and bow ties, instilling pride and empowerment in the Black community, and keeping his followers off alcohol and drugs. [FN 27] Bey's association with Islam also probably kindled some positive sentiment in some members of the community, and some negative sentiment in others.

> FN 27: In Edelman's telephone survey, while a majority of respondents had impressions of Bey's likely guilt, 2.6 percent of respondents in Alameda County thought Bey was probably or definitely not guilty, even though they were familiar with the publicity. No respondents from Los Angeles County thought he was not guilty. This tends to substantiate that Bey had some positive precrime status in the community.

Bey also was the chief executive of the Bakery, had at least a semblance of financial power, and may have had some connections with local politicians. This may have given him at least a veneer of respectability in some quarters. In fact, a few of the online commentators praised Bey and asserted his innocence of the charges.

The most we can say is that Bey probably enjoyed a mixed reputation or status prior to his arrest, and thus his status in the community does not weigh heavily one way or the other in assessing the need for a change of venue. And his status, good or bad, was probably a factor largely within a certain segment of his own municipality of Oakland, not throughout the county. Finally, because many of the negative details of the Bakery would come out at the trial no matter where it was held, much of the negative reaction to Bey would have

traveled with the case if venue had been changed. Because he was not a friendless stranger in a hostile environment, we consider Bey's status to be a neutral factor in our analysis, apart from the portrayal of him in pretrial publicity, which we have considered separately.

Mackey had no particular status in the community before the charged crimes, either good or bad. As to him, this factor is completely neutral.

5. Prominence of Victim
The factor of prominence of the victims hinges on Bailey's status. The other victims had no special prominence in the community.

Defendants argue that Bailey was a well-known journalist in the community, one of the best known Black journalists in the Bay Area, and a prominent writer. He also appeared on a news show on Soul Beat, a local television station. But Bailey's status seems to have been linked to his profession. He was well regarded within his profession, but whether he was well known prior to his murder in circles outside the world of professional journalists is less certain. Still, we cannot ignore the fact that the publicity surrounding the case caused him to become a "posthumous celebrity." (*Odle v. Superior Court* (1982) 32 Cal.3d 932, 940–941, 187 Cal.Rptr. 455, 654 P.2d 225.) Seven hundred people reportedly attended his funeral, where the Mayor of Oakland spoke.

We find it more significant, however, that whatever prominence Bailey may have enjoyed in Alameda County would have become apparent to jurors no matter where the case was tried. As said in *Harris*, *supra*, 57 Cal.4th at p. 829, 161 Cal.Rptr.3d 364, 306 P.3d 1195, "[A]ny features of the case that gave the victim prominence in the wake of the crimes would inevitably have become apparent no matter in which venue defendant was tried." *Famalaro* is similar, noting that the aspects of the crime that received a lot of attention in the media, and which gave the victim a degree of prominence, "would have followed the case to any county to which venue was changed." (*Famalaro*, *supra*, 52 Cal.4th at p. 24, 127 Cal.Rptr.3d 40, 253 P.3d 1185.)

Here, too, Bailey's professional prominence would have followed the case to any other venue, his profession and community status bound to come out at trial as relevant to motive. The evidence at trial itself would have aroused jurors' discomfort upon learning that a journalist was killed because he uncovered a controversial story, no matter where the case was tried. The prominence of the victims thus weighed only slightly in favor of a change of venue.

H. Error
In sum, we find the strongest factor supporting a change of venue was the nature and extent of the pretrial publicity, and the strongest factor against a change was the size and diversity of Alameda County. The other factors play no appreciable role in our analysis. After reviewing the "totality of the circumstances" here, we conclude that despite the extreme volume and inflammatory nature of the pretrial publicity, there was no reasonable likelihood that defendants could not have received a fair trial based on the state of the court's knowledge and the jury panel's composition at the time the motion was ruled upon.

In addition to the five factors identified above, we place great emphasis on the methodical and comprehensive way in which the trial court addressed the issue through the jury selection process, which we shall discuss more fully below. The trial court gave thoughtful consideration to the motion, conducting an "exhaustive and exhausting" voir dire to narrow the field to the most qualified jurors. We will not ignore that process in ruling on the appeal, as defendants would have us do--and as Edelman did. (*Cf. People v. Howard*, *supra*, 1 Cal.4th at pp. 1168–1169, 5 Cal.Rptr.2d 268, 824 P.2d 1315.)

The trial court's belief about the efficacy of voir dire reflects a deeply held and

fundamental precept of our judicial system. "'"[W]e cannot, as a general matter, simply disregard a juror's own assurances of his impartiality based on a cynical view of 'the human propensity for self-justification.' [Citation.]" '[Citation.] 'Although the jurors' assurances of impartiality are not dispositive [citations], neither are we free to ignore them [citations.]'" (*Rountree*, *supra*, 56 Cal.4th at p. 841, 157 Cal.Rptr.3d 1, 301 P.3d 150; *accord*, *Prince*, *supra*, 40 Cal.4th at p. 1219, 57 Cal.Rptr.3d 543, 156 P.3d 1015.) In *Odle*, our Supreme Court denied a pretrial writ for a change of venue, noting that "the trial court [would] be in the best position to assess [the media's] impact on the jury panel as well as to evaluate the declarations of impartiality/partiality by the individual jurors." (*Odle*, *supra*, 32 Cal.3d at p. 946, 187 Cal.Rptr. 455, 654 P.2d 225.) So, too, the United States Supreme Court in *Murphy*, finding that the defendants were not actually denied a fair trial because the seated jurors' responses that they could lay aside any prejudgment were important to consider. (*Murphy*, *supra*, 421 U.S. at pp. 800-801, 95 S.Ct. 2031.)

In light of the totality of the circumstances, we are unwilling to say that the amount and content of pretrial publicity required a change of venue. We are even more confident the ruling cannot be deemed prejudicial.

I. Presumption of Prejudice: Due Process Analysis
We begin with the observation that the parties disagree as to whether a showing of prejudice is required. Defendants argue there are "two distinct tests," one of which--called by defendants the "saturation" or "presumed prejudice" test--does not require a showing of prejudice. The Attorney General argues that the "saturation test" "does not exist" and seems to contend that prejudice must always be shown on appeal. We conclude there are two tests, but prejudice is presumed only in cases so extreme that a due process violation has occurred--a category into which this case does not fall.

As noted above, ordinarily California case law requires that "on appeal" there must be a showing of "'both error and prejudice.'" (*People v. Avila* (2014) 59 Cal.4th 496, 507, 173 Cal.Rptr.3d 718, 327 P.3d 821; *Harris*, *supra*, 57 Cal.4th at p. 822, 161 Cal.Rptr.3d 364, 306 P.3d 1195; *People v. Farley*, *supra*, 46 Cal.4th at p. 1083, 96 Cal.Rptr.3d 191, 210 P.3d 361.) But both the United States Supreme Court (e.g., *Sheppard*, *supra*, 384 U.S. at p. 352, 86 S.Ct. 1507) and the California Supreme Court have long recognized a presumption of prejudice may arise in extreme cases, whether raised on a pretrial writ (*Odle*, *supra*, 32 Cal.3d at p. 937, 187 Cal.Rptr. 455, 654 P.2d 225; *Maine*, *supra*, 68 Cal.2d at p. 383, 66 Cal.Rptr. 724, 438 P.2d 372) or on appeal. (e.g., *Vieira*, *supra*, 35 Cal.4th at p. 279, 25 Cal.Rptr.3d 337, 106 P.3d 990; *People v. Williams*, *supra*, 48 Cal.3d at p. 1126, 259 Cal.Rptr. 473, 774 P.2d 146.) As we understand the cases, that presumption arises only where the defendant has made a showing that due process was violated. Stated differently, state courts are required to indulge a presumption of prejudice upon a strong enough showing of massive and prejudicial pretrial publicity, but only if it has affected the defendant's right to a fair trial or an impartial jury.

Defendants rely almost entirely on the nature and extent of the publicity to prove "saturation," implying the presumed prejudice rule applies whenever there has been massive negative publicity surrounding a crime and its charged perpetrator, at least if it includes inflammatory or inadmissible subject matter. But "saturation" implies more than widespread, persistent, or even inflammatory, publicity; it implies absorption by the public. And while defendants have shown a vast amount of negative pretrial publicity and some degree of absorption, they have failed to establish either that the publicity was "indelibly imbedded in the minds of the jurors" (*Rideau*, *supra*, 373 U.S. at p. 730, 83 S.Ct. 1417; *see People v. Williams*, *supra*, 48 Cal.3d at p. 1129, 259 Cal.Rptr. 473, 774 P.2d 146 ["deeply embedded in the public consciousness"]) or that the publicity actually had a perceptible effect on the conduct or fairness of the trial so as to constitute a due process violation.

Our Supreme Court has recognized that in some "extraordinary" cases "adverse pretrial

36

publicity may be so strong as to create a presumption of prejudice." (*Rountree, supra*, 56 Cal.4th at p. 840, 157 Cal.Rptr.3d 1, 301 P.3d 150.) But it has also refused to "presume that exposure to publicity, by itself, causes jurors to prejudge a defendant's guilt." (*Prince, supra*, 40 Cal.4th at p. 1215, 57 Cal.Rptr.3d 543, 156 P.3d 1015.) Indeed, the category of cases where prejudice has been presumed in the face of jurors' attestations that they can act impartially has been described as "'extremely narrow.'" (*Id.* at p. 1216, 57 Cal.Rptr.3d 543, 156 P.3d 1015.) Or as the court later expounded, "The United States Supreme Court has presumed prejudicial violations of due process in cases where the influence of the media was so pervasive as to render the trial "'a hollow formality,"' 'conducted in a circus atmosphere' or in 'a courthouse given over to accommodate the public appetite for carnival.'" (*Famalaro, supra*, 52 Cal.4th at p. 33, 127 Cal.Rptr.3d 40, 253 P.3d 1185.) [FN 28]

> FN 28: The United States Supreme Court cases are similar. (*See, e.g., Murphy, supra*, 421 U.S. at p. 799, 95 S.Ct. 2031 [prior successful venue change cases were those which "entirely lack[ed] ... the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob"]; *Estes v. Texas* (1965) 381 U.S. 532, 536, 85 S.Ct. 1628, 14 L.Ed.2d 543 [reporters and television crews overran the courtroom and "bombard[ed] ... the community with the sights and sounds of" the pretrial hearing, leading to "considerable disruption" and denying defendant the "judicial serenity and calm" to which he was entitled]; *Rideau, supra*, 373 U.S. at pp. 726–727, 83 S.Ct. 1417 [broadcast of jailhouse confession of defendant, in a community of 150,000, led to "kangaroo court proceedings" in which the trial was a "hollow formality"].) So, as the Supreme Court has instructed, we look to "any indications in the totality of the circumstances that [the defendant's] trial was not fundamentally fair." (*Murphy, supra*, 421 U.S. at p. 799, 95 S.Ct. 2031; *see also, Yount, supra*, 467 U.S. at p. 1031, 104 S.Ct. 2885; *Sheppard, supra*, 384 U.S. at p. 352, 86 S.Ct. 1507.)

As to what factors may qualify a case as "extreme" or "extraordinary" so as to render it subject to a presumption of prejudice, our review of the United States Supreme Court cases suggests the presumption has been deemed to arise in two circumstances: (1) where the media coverage of the case or the public's reaction has spilled over into the conduct of the trial proceedings in such a way as to jeopardize the defendant's right to a fair trial (e.g., *Sheppard, supra*, 384 U.S. 333, 86 S.Ct. 1507); and (2) where the publicity has caused an opinion of a defendant's guilt to be so "indelibly imbedded in the minds of the [potential] jurors" that an impartial jury cannot be seated (*Rideau, supra*, 373 U.S. at p. 730, 83 S.Ct. 1417). The first of these circumstances has generally involved a trial judge who has failed to control the proceedings so as to protect the defendant's constitutional rights. The second has generally been limited to smaller communities where a near uniform hostility has developed toward the defendant.

We conclude that California precedent requires a showing of prejudice on appeal, a showing that may be excused only in the most extraordinary cases. The presumed prejudice rule operates to afford relief when a court has allowed the trial to proceed in an atmosphere that violates due process or where the jury pool has been so thoroughly poisoned by pretrial publicity that an impartial jury cannot be impaneled. This hardly describes the setting here.

In Bey's reply brief he suggests we adopt a three-factor test to identify cases in which a presumption of prejudice arises, an argument that reads as follows: "In this regard the test in determining if prejudice should be presumed involves an analysis of three factors: '(1) whether there was a "barrage of inflammatory publicity immediately prior to trial, amounting to a huge ... wave of public passion;" (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial

material not admissible at trial.' (*Daniels v. Woodford* [ (9th Cir.2005) ] 428 F.3d [1181,] 1211; quoting *Ainsworth v. Calderon* [ (9th Cir.1998) ] 138 F.3d [787,] 795.)" [FN 29] By Bey's analysis, this case meets all three criteria and raises a presumption of prejudice. We disagree with Bey--and with Daniels.

> FN 29: It is significant that the Antiterrorism and Effective Death Penalty Act (AEDPA; Pub.L. No. 104-132 (Apr. 24, 1996) 110 Stat. 1214), with its emphasis on United States Supreme Court authority, did not apply in the cases cited by Bey. (28 U.S.C. § 2254(d)(1).) It is doubtful the same result would have prevailed in a case governed by AEDPA.

*Daniels v. Woodford*, *supra*, 428 F.3d 1181 involved the 1982 killing of two police officers who came to arrest the defendant, a Black paraplegic, for a prior bank robbery. (*Id.* at pp. 1186-1187.) Daniels was convicted and sentenced to death. (*Id.* at p. 1193.) On appeal to the state Supreme Court, the judgment was affirmed, including rejection of an appellate challenge to the denial of a change of venue motion. (*People v. Daniels* (1991) 52 Cal.3d 815, 851–854, 277 Cal.Rptr. 122, 802 P.2d 906.) Although the publicity had been extensive, and included inadmissible content regarding Daniels's prior criminal history, the Supreme Court held that prejudice would not be presumed (i.e., there was no due process violation) because, although eight of the 12 jurors had been exposed to pretrial publicity, they said they could lay aside that knowledge and base their verdicts on the evidence. (*Id.* at p. 853, 277 Cal.Rptr. 122, 802 P.2d 906.) The Supreme Court also based its decision on the large size of the county (Riverside, population of more than 600,000), and especially on the fact that Daniels used only 15 of his allotted 26 peremptory challenges. (*Id.* at pp. 852-854, 277 Cal.Rptr. 122, 802 P.2d 906.) The Supreme Court found that factor "decisive," and also noted that, because Daniels did not challenge the jury as finally composed, he had waived the issue. (*Id.* at p. 854, 277 Cal.Rptr. 122, 802 P.2d 906.)

Daniels then took his case to federal court on a petition for writ of habeas corpus. (*Daniels v. Woodford*, *supra*, 428 F.3d at p. 1193.) He alleged only that his penalty trial should have been moved to a different venue. (*Id.* at p. 1212, fn. 31.) The district court granted the writ on venue and other grounds, and the Ninth Circuit, applying its three-factor test, affirmed the venue decision on appeal. (*Id.* at pp. 1211–1212.)

Not only are there several distinctions between this case and *Daniels v. Woodford*, *supra*, 428 F.3d 1181, [FN 30] we disagree with the Ninth Circuit's test and are not bound to follow it, even on constitutional questions. (*People v. Bradley* (1969) 1 Cal.3d 80, 86, 81 Cal.Rptr. 457, 460 P.2d 129.) No United States Supreme Court case has been cited as favoring the Ninth Circuit's approach, and our reading of the high court's opinions in this area leads us to conclude that "saturation"--at least insofar as it implies nothing more than an enormous amount of negative publicity--is generally not enough to establish a due process violation. To the extent defendants urge us to consider exclusively the three-factor test identified in the Ninth Circuit cases, we consider that position to be at odds with Supreme Court authority and practice. And we decline to follow the test because it analyzes only the nature and extent of the publicity, and does not inquire into the effect of that publicity on the trial. Beyond that, we think the California Supreme Court's use of the five-factor inquiry more faithfully implements the "totality of the circumstances" approach. And, of course, we are bound to follow our state Supreme Court's decisions. (*Auto Equity*, *supra*, 57 Cal.2d at p. 455, 20 Cal.Rptr. 321, 369 P.2d 937.)

> FN 30: First, only 64 prospective jurors were examined in Daniels (*People v. Daniels*, *supra*, 52 Cal.3d at p. 850, 277 Cal.Rptr. 122, 802 P.2d 906), whereas in our case nearly twice that many were subjected to oral voir dire, and 808 filled out questionnaires. Second, the population of Riverside County, though not small, was approximately half the size of Alameda County. (*Id.* at p. 852, 277 Cal.Rptr. 122, 802 P.2d 906.) Finally, one month before the trial began (on the anniversary of the

officers' murder), a nine-foot-tall statue dedicated to fallen officers was erected directly across the street from the courthouse in which Daniels was tried. (*Id.* at p. 850, 277 Cal.Rptr. 122, 802 P.2d 906; *Daniels v. Woodford*, *supra*, 428 F.3d at p. 1211.) Thus, the jury presumably was reminded each time it entered the courthouse of the special status of the victims.

We also believe that, in addition to the five factors identified in the California cases, it is especially important to consider the efforts made by the trial court to ensure defendants received a fair trial. One of the main points of *Sheppard*, after all, was that "trial courts must take strong measures to ensure" that the "accused receive[s] a trial by an impartial jury free from outside influences." (*Sheppard*, *supra*, 384 U.S. at p. 362, 86 S.Ct. 1507.) We cannot help but believe, given that admonishment, the measures adopted by the trial court to accomplish that purpose must be considered in determining whether a due process violation occurred.

We consider in totality the extensive measures taken by the trial court to neutralize the effects of the publicity, and begin with the large venire, a factor emphasized in *Famalaro*, where some 1,200 people had been summoned. (*Famalaro*, *supra*, 52 Cal.4th at pp. 19, 24, 127 Cal.Rptr.3d 40, 253 P.3d 1185.) In our case the number was 808, somewhat fewer but nonetheless comparable. The large venire in both *Famalaro* and in this case allowed for a greater probability of selecting an impartial jury. In addition to conducting a searching jury selection process from a large venire, the trial court took other measures to protect defendants' rights against runaway publicity, including issuing a gag order and denying press requests to bring television equipment and cameras into court (though a sketch artist was allowed). No public demonstrations were spawned. And as the court remarked, no crowds had gathered around the courthouse. The pretrial proceedings were attended by only a "small handful" of spectators, including the press, with no hint in the record that news crews disrupted the orderly and dignified conduct of the trial. In short, none of the earmarks of an out-of-control trial were evident.

Too, the verdict was rendered after careful and lengthy deliberation, in which Mackey was found not guilty of one enhancement and no verdict could be reached on one of the murder charges against him. It was nothing like a rush to judgment, or a "mob" verdict.

Considering the totality of the circumstances, we conclude the publicity in this case did not result in prejudgment of defendants being "indelibly imbedded" in the minds of the jury venire so as to make it impossible to seat an impartial jury, and the media's interest did not so affect the atmosphere in which the trial was conducted as to trigger a presumption of prejudice. And certainly there was no actual prejudice.

J. The Jury Selected to Try Defendants
Because they rely primarily on a presumption of prejudice, defendants do not attempt to show actual prejudice by examining the qualifications of the jurors who actually tried the case. Defendants recognize that "[s]ome cases also examine the seated jurors to see if they, too, were exposed to pretrial publicity," but they do not conduct such an analysis. Just as we refused to ignore the judge's efforts to seat an impartial jury, we will not ignore the fruit of that effort, the 12 jurors chosen to try defendants' case. We think of necessity the assessment of prejudice on appeal requires a look at the effect of pretrial publicity on those jurors. (*See Murphy*, *supra*, 421 U.S. at pp. 800–801, 95 S.Ct. 2031.)

Edelman's testimony and predictions notwithstanding, the record reflects that based on their questionnaires the jury members actually seated were remarkably impartial. Of the 12 seated jurors, three answered "no" to every single question regarding knowledge of Bailey, Roberson, Wills, the Chauncey Bailey Project, the Bakery, and the neighborhood surrounding it.

Of the remaining nine, only one (Juror No. 8) admitted to believing defendants were "probably guilty" of the Bailey and Wills murders, and he had no opinion about the Roberson murder, specifically, "not enough info to make an intelligent decision." In response to the question "What have you read, seen, or heard about [the Bailey] incident?" Juror No. 8 wrote "I recall that Mr. Bailey was killed because he was about to expose the alleged fraud, misappropriation of funds by the bakery." This same juror said he had not read, seen, or heard anything about the Roberson crime, knew "very little" about the Wills crime, and did not have knowledge of any other incidents relating to the Bakery or its members. In response to the question "What, if any, particular thoughts or feelings do you have about the defendants, the victims, or the charged crimes?" Juror No. 8 wrote "N.A." He was aware of the Chauncey Bailey Project and said it was related to Bailey's "work[ ] on exposing the criminal activities of the bakery." However, he indicated neither Bailey's status as a reporter nor the possible racial motivation for the Wills killing would affect his judgment.

Regarding the other eight seated jurors who reported having some knowledge of the crimes, six had no knowledge of the Roberson or Wills crimes. And all eight marked "Other" regarding their belief of defendants' guilt, all eight filling in these answers by hand: "Will base it on the information given at the trial"; "I don't have an opinion on this matter"; "I don't have enough information to make this type of determination"; "No feeling either way"; "I do not know"; "Innocent until proven guilty by a court of law"; "Don't [remember] enough"; and "I do not have an opinion because I do not have information to form an opinion."

Furthermore, all of the regular jurors (except Juror No. 8) and all of the alternates reported having no knowledge of the Chauncey Bailey Project, and all reported that a victim's status as a reporter or race as a potential motive for murder would not affect their ability to be a fair juror. Thus, not only were there strong and numerous assurances of impartiality by the selected jurors individually, the jury as a whole appeared to possess very little knowledge of the crimes or related issues. Regardless of how prevalent the pretrial publicity may have been, the jurors' responses reflected something much less than "saturation" and "prejudgment." Several jurors even referenced the passage of time, or of not remembering, which seems to suggest that many did not follow the media coverage much beyond the time of the crimes themselves.

Which leaves only Juror No. 8.

Juror No. 8 was an African-American man in his 60s who had lived in Oakland for 33 years. He had been married for 22 years, completed some college, had been in the Marine Corps (where he was court-martialed for fighting), and had retired from a job as an administrative services manager. He was not familiar with the Bakery, but he was familiar with the neighborhood because his daughter had been raised nearby. He believed in "religious freedom." When asked about "Black Muslim organizations," he responded, seemingly about the Bakery specifically: "Initially their objectives were laudable, but something went wrong after the father passed." However, his "N.A." answer suggests he had no strong "thoughts or feelings" about the crime or defendants' guilt. He had served on a federal grand jury for 18 months and found it "very interesting." He had been convicted of a DUI (driving under the influence) offense, and had been arrested for domestic violence the summer before the trial. His son had also served time in jail for domestic violence. He had once worked for the Fresno County Jail and witnessed "an officer beat a drunk with his nightstick in the drunk tank in Fresno." Juror No. 8 did mark on his questionnaire that he "strongly agree[d]" that "a defendant should have to prove his/her innocence" [FN 31] and "somewhat" agreed that "[i]f the government brings a person to trial, he/she is probably guilty." He had little involvement with firearms.

FN 31: The court noted during voir dire on this point that several jurors seemed to

misinterpret that question, reading it as though it asked whether a defendant should have a right to prove his innocence, not whether he should be required to do so.

Because the jurors had filled out extensive questionnaires, the court's voir dire was largely used to educate them about their role as jurors. During voir dire on the day that Juror No. 8 was present, the court reviewed with the prospective jurors a multitude of legal concepts, using concrete examples to ensure the panel understood. [FN 32] The court then had a lengthy colloquy with Juror No. 8 regarding the accomplice testimony rule, the different standards of proof at grand jury proceedings and at trial, the importance of giving a defendant the opportunity to appear with counsel at trial and present a defense, the fact that an accusation was not proof of guilt, and defendants' right not to testify. Juror No. 8 said nothing to question the court's instructions, prompting this comment, "Juror No. 8 has been very helpful, because he's nodded along. He's encouraged me in my remarks. It sounds like it all makes sense to you?" Juror No. 8 responded, "Yes."

> FN 32: The matters covered included the prosecution's burden of proof, the accusatorial system in general, a defendant's right not to testify, the necessity of relying only on admissible evidence, not information from other sources, the importance of applying the law as instructed by the court, equal treatment for all races and religions, and the beyond a reasonable doubt standard of proof.

Near the end of voir dire, when the attorneys were given a chance to ask questions of the panel members, none of them asked any individual questions of Juror No. 8. At the conclusion of the day's voir dire, the attorneys had an opportunity to identify prospective jurors they wanted to have examined further in chambers about their knowledge of pretrial publicity. Two prospective jurors were asked to stay. Juror No. 8 was not.

Based on the foregoing facts, we see no reason to doubt Juror No. 8's impartiality. He marked "probably guilty" on the jury questionnaire long before he was ever instructed on the state's burden to prove defendants guilty beyond a reasonable doubt; he also somewhat agreed on his questionnaire that most people who have been arrested and brought to trial are "probably guilty." We routinely allow jurors to serve despite such general impressions, so long as they affirm that they can set aside their preconceptions and try the defendant in accordance with the court's instructions. [FN 33] After all, the words "probably guilty" would seem to imply only a preponderance of the evidence would be required. We cannot say that believing defendants were "probably guilty" reflected a disqualifying lack of impartiality. We see no more reason to doubt Juror No. 8's affirmance of impartiality than that of any other juror. Actual prejudice has not been shown.

> FN 33: The issue arises so frequently that a standard instruction has long been used to caution jurors against placing any reliance upon such preconceptions. CALCRIM No. 220 on reasonable doubt includes the caveat: "The fact that a criminal charge has been filed against the defendant[s] is not evidence that the charge is true. You must not be biased against the defendant[s] just because (he/she/they) (has/have) been arrested, charged with a crime, or brought to trial." (*See* CALJIC No. 1.00.) We presume the jurors followed the instructions. (*See People v. Boyette* (2002) 29 Cal.4th 381, 436, 127 Cal.Rptr.2d 544, 58 P.3d 391.)

*Mackey, et al.*, 182 Cal. Rptr. 3d at 428–51.

### a.      Standard

A criminal defendant facing trial by jury is entitled to be tried by "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Accordingly, a trial judge must

41

grant a motion for a change of venue if prejudicial pretrial publicity makes it impossible to seat an impartial jury.  *See Gallego v. McDaniel*, 124 F.3d 1065, 1070 (9th Cir. 1997).  A defendant must demonstrate one of two different types of prejudice in support of a motion to transfer venue: presumed or actual.  *See id.*

Prejudice is presumed when the record demonstrates that the community where the trial was held was "saturated" with prejudicial and inflammatory media publicity about the crime.  *See id.*  However, "[p]rominence does not necessarily produce prejudice, and juror *impartiality*. . . does not require *ignorance*."  *Skilling v. United States*, 561 U.S. 358, 381 (2010) (citing *Irvin*, 366 U.S. at 722) (emphasis in original).  In *Skilling*, the Supreme Court discussed the factors which result in a presumption of prejudice, including: (1) the size and characteristics of the community in which the crime occurred; (2) the prejudicial nature of the pretrial publicity; (3) whether the publicity was contemporaneous with the trial, or separated by the passage of time; and (4) any evidence of the jury's conduct that contradicted a finding of bias, such as acquittal on certain counts.  561 U.S. at 381–84.  "A presumption of prejudice . . . attends only the extreme cases."  *Id.* at 381.  The publicity must be so pervasive and inflammatory that the jurors cannot be believed when they assert that they can be impartial.  *See United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997).  Prejudice is rarely presumed because "saturation" defines conditions found only in extreme situations.  *See Gallego*, 124 F.3d at 1070; *Croft*, 124 F.3d at 1115.

To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside.  *See Gallego*, 124 F.3d at 1070.  The focus must be on the jurors who were actually seated on the jury and it is not enough that some of them had some prior knowledge of the case.  *See id.* at 1071–72 (only publicity that operates to deprive defendant of a fair trial may cause prejudice).

When evaluating actual prejudice in a situation where "pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect'" and is better able to assess the extent to which publicity may have influenced a juror.  *Skilling*, 561 U.S. at 386 (alteration in original).  A state trial court's finding of juror impartiality is presumed to be correct.

*See Ybarra v. McDaniel*, 656 F.3d 984, 992–94 (9th Cir. 2011) (applying presumption of correctness to state court factual findings of no juror partiality where petitioner presented no clear and convincing evidence to the contrary).

### b. Analysis

After carefully reviewing the record in light of the above legal principles, the Court finds that the state court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. In deciding whether to presume prejudice, *Skilling* requires the Court to consider (1) the size and characteristics of the community in which the crime occurred; (2) the prejudicial nature of the pretrial publicity; (3) whether the publicity was contemporaneous with the trial, or separated by the passage of time; and (4) any evidence of the jury's conduct that contradicted a finding of bias, such as acquittal on certain counts.

The first factor weighed against a change of venue. Alameda County is a large metropolitan area, the seventh largest county in California, with a population of over 1.14 million people over the age of 18. Even given that approximately 37% of these people reported on the census that they spoke a language other than English at home, RT 165, there remained 718,200 potential jurors, weighing against a change of venue. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (plurality opinion) (reduced likelihood of prejudice where venire was drawn from pool of over 600,000 individuals).

With respect to the second factor, the Court agrees that the heavy pre-trial publicity weighed in favor of a change of venue.

The third factor weighed against a change of venue. After eliminating duplicate publications, petitioners' expert reported that there were 185 articles about the case in 2007, 127 articles in 2008, 149 articles in 2009, and 42 articles in 2010. The fact that more than half of the articles were published three years prior to the start of the trial, and that the number of articles decreased as time went by weighs against a change of venue.

The fourth factor weighs against a change of venue because the jury acquitted Mackey of count four, and found him not guilty of discharging the firearm in the Wills homicide.

The Court must also consider the totality of the circumstances. *Murphy v. Florida*, 421 U.S. 794, 799 (1975). Here, the trial court summoned a large jury pool and conducted an extensive and detailed voir dire to ensure that the jury seated could fairly hear the case. These efforts by the trial court were sufficient to ensure that negative pre-trial publicity did not taint the trial.

Accordingly, the Court finds that the state appellate court did not unreasonably apply clearly established federal law in rejecting this claim.

The state court's conclusions that the amount and content of the pretrial publicity did not require a change of venue, and that the denial of the change of venue motion was not prejudicial because of the court's knowledge at the time the venue change motion was ruled upon, the jury panel's composition at the time the venue change motion was ruled upon, and the "methodical and comprehensive way that the trial court addressed the issue through the jury selection process," were based on a reasonable determination of the evidence presented in the state court proceedings. *Mackey*, 182 Cal. Rptr. 3d at 442. The trial court reviewed an expert report submitted by petitioner that summarized content analysis of approximately 1,500 news articles; a phone survey of residents of Alameda County and Los Angeles County; and various television news broadcasts. CT 3088–4147. The trial court received testimony from and extensively questioned the expert, Reporter's Transcripts ("RT")[8] 30–266, and reviewed voir dire questionnaires from a related case, RT 7–12. Finally, the trial court summoned 808 prospective jurors and conducted voir dire over ten days. RT 322, 598–2286. The state court's rejection of this claim was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Habeas relief is denied on this claim.

### 2. GPS Tracking Evidence

Mackey alleges that the trial court erred in denying his motion to suppress the GPS tracking evidence. The state court rejected Mackey's claim as follows:

> II. The Motion to Suppress GPS Tracking Evidence Was Properly Denied
> A. Background

---

[8] The Reporter's Transcript has been filed as Exhibit F to the Answer filed in *Mackey*.

As mentioned, on June 27, 2007, a GPS device was placed on Bey's Dodge Charger without a search warrant having been first obtained. Both defendants raise a Fourth Amendment issue on appeal, arguing that evidence of the GPS tracking of the Charger should have been suppressed. In opposing the motion below, the prosecutor argued that the placing of the GPS device was not a search or seizure because Bey had no reasonable expectation of privacy in the exterior of his vehicle. The prosecutor did not challenge Bey's standing to assert a Fourth Amendment violation, but she did challenge Mackey's standing. [FN 34]

> FN 34: For purposes of the motion only, it was stipulated that Bey owned the Dodge Charger, even though he was not the registered owner, and that he had standing to challenge the search. No similar stipulation was entered with respect to Mackey. It was further stipulated that Mackey was in the Charger around the time of the Wills murder; when he and Broussard followed Bailey home from his office; when he, Bey, and Broussard drove to Bailey's residence the night before the Bailey murder; and when he, Bey, and Broussard drove to the Bailey murder scene and the lake and (later with Lewis) to IHOP and the Emeryville pier.

At an evidentiary hearing, an Oakland police officer testified that he placed the GPS tracking device on the undercarriage of the Dodge Charger while it was parked in a public lot in Oakland. The GPS later stopped transmitting, which the police believed was due to a dead battery. On July 17 officers found the Charger in the superior court parking lot in Vallejo and changed the battery. On July 31, the police again had to change the battery, again found the Charger in an Oakland public parking lot and changed the battery a second time. On August 3, the Charger was at the Bakery when officers executed search warrants, and the same officer removed the tracking device.

The device sent location data via satellite to a remote server, except when the battery pack lost power. Oakland police had access to the information on the server via the Internet. The data showed the whereabouts of the tracking device, and the police could track the vehicle's movement in real-time or could look at the whole history of the data from installation of the device forward. The device locations could be viewed as dots on maps showing date and time locations of the vehicle.

On January 18, 2011, the suppression motion was denied on the ground that the placement of the GPS device on the exterior of the Charger did not constitute a search or seizure under the Fourth Amendment. The court did not specifically rule on the question of Mackey's standing.

B. Discussion

On January 23, 2012, in *United States v. Jones* (2012) ─── U.S. ───, 132 S.Ct. 945, 181 L.Ed.2d 911 (*Jones*), the United States Supreme Court held that the government's attachment of a GPS tracking device to the defendant's vehicle and use of that device to monitor the vehicle's movements on public streets was a search within the meaning of the Fourth Amendment and thus required a warrant. (*Id.* at p. 949.) The Supreme Court majority based its decision on the trespassory nature of the physical placement of the GPS device on the defendant's property. (*Id.* at pp. 949–950.) The present case is materially indistinguishable from *Jones*,[FN 35] and under its authority, we would probably be compelled to find a Fourth Amendment violation if we were faced with the same police conduct occurring after the opinion was filed.

> FN 35: In *Jones*, federal agents affixed a GPS tracking device to the defendant's Jeep while it was parked in a public lot and monitored his

movements for a period of 28 days, comparable to the 20 or so days the GPS device was transmitting information to the police in this case and the 38 days it remained in place on the underside of Bey's Charger. (*Jones*, *supra*, 132 S.Ct. at p. 948.)

The Attorney General argues, however, that because *Jones* represented a change in the law, the police conduct in this case should be exempt from application of the exclusionary rule. The argument is based on *Davis v. United States* (2011) 564 U.S. 229, 131 S.Ct. 2419, 2423–2424, 180 L.Ed.2d 285, where the Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent [that is later overruled] are not subject to the exclusionary rule" "[b]ecause suppression would do nothing to deter police misconduct in [those] circumstances." (Id. at pp. 2423, 2424.) We find the argument persuasive.

"Exclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." (*Davis v. United States*, *supra*, 131 S.Ct. at p. 2426.) The exclusionary rule's "sole purpose" is "to deter future Fourth Amendment violations." (*Ibid.*) "[T]he deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue. [Citation.] ... [W]hen the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, [citation], or when their conduct involves only simple, 'isolated' negligence [citation], the '"deterrence rationale loses much of its force...."'" (*Id.* at pp. 2427–2428.) A police officer who acts in compliance with binding judicial precedent is "not culpable in any way." (*Davis v. United States*, *supra*, 131 S.Ct. at p. 2428.) If the exclusionary rule were applied in that context, it would deter "conscientious police work," not police misconduct. (*Id.* at p. 2429.)

*Jones* changed the law in California. Prior to *Jones*, California state courts and the Ninth Circuit had held that installation of a GPS device by law enforcement authorities was not a search governed by the Fourth Amendment because a vehicle operator had no reasonable expectation of privacy in a vehicle's exterior. (*People v. Zichwic* (2001) 94 Cal.App.4th 944, 953–956, 114 Cal.Rptr.2d 733 (*Zichwic*); *United States v. McIver* (9th Cir.1999) 186 F.3d 1119, 1126–1127 (*McIver*).) The prosecutor relied on *Zichwic* in arguing that the suppression motion should be denied. The trial court specifically discussed *Zichwic* during the hearing. And the Attorney General relies heavily on it here. So do we.

In *Zichwic*, the police attached a GPS tracking device to the undercarriage of a truck owned by a parolee and suspected burglar, and monitored the truck's movements for about three hours, until the suspect was arrested at the site of a burglary. (*Zichwic*, *supra*, 94 Cal.App.4th at pp. 949–950, 114 Cal.Rptr.2d 733.) The trial court denied the defendant's motion to suppress evidence obtained from the GPS device. The Court of Appeal affirmed, following the Ninth Circuit's holding that the installation of a GPS device on a vehicle is not a search because "'"[t]he undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy."'" (*Id.* at p. 955, 114 Cal.Rptr.2d 733, quoting *McIver*, *supra*, 186 F.3d at p. 1127.) In short, *Zichwic* held that "installing an electronic tracking device on the undercarriage of [a vehicle does] not amount to a search within the meaning of the Fourth Amendment." (*Zichwic*. at p. 953, 114 Cal.Rptr.2d 733.) [FN 36]

> FN 36: *McIver* had earlier examined the same issue, in a case from Montana where forest service officers, acting without a warrant, placed two electronic tracking devices, one a GPS device and one a "beeper" with a monitor, on the underside of a car driven by a couple of suspected marijuana growers. (*McIver*, *supra*, 186 F.3d at p. 1123.) Concluding that

no Fourth Amendment violation had occurred, McIver rejected both a trespass theory and a "reasonable expectation of privacy" theory. (*Id.* at pp. 1126–1127; *see generally, People v. Barnes* (2013) 216 Cal.App.4th 1508, 1514–1517, 157 Cal.Rptr.3d 853.)

Defendants argue the statement in *Zichwic* quoted above was "pure dictum" because *Zichwic* was subject to a parole search under a Fourth Amendment waiver. We read the case differently. After affirming the trial court's ruling on the parole search, the appellate court in *Zichwic* went on to observe: "If defendant was not subject to a parole search condition, we would conclude, on the record before us, that installing an electronic tracking device on the undercarriage of defendant's truck did not amount to a search within the meaning of the Fourth Amendment." (*Zichwic, supra,* 94 Cal.App.4th at p. 953, 114 Cal.Rptr.2d 733.) *Zichwic* 's analysis on this point was not mere dictum, but rather an alternative, independent holding. The court closed its discussion by saying, "For all the reasons above, we conclude that the trial court did not err in denying defendant's suppression motion." (*Id.* at p. 956, 114 Cal.Rptr.2d 733.)

Where "'two independent reasons are given for a decision, neither one is to be considered mere dictum, since there is no more reason for calling one ground the real basis of the decision than the other. The ruling on both grounds is the judgment of the court and is of equal validity.'" (*Southern Cal. Ch. of Associated Builders etc. Com. v. California Apprenticeship Council* (1992) 4 Cal.4th 422, 431, fn. 3, 14 Cal.Rptr.2d 491, 841 P.2d 1011; *accord, Varshock v. Department of Forestry & Fire Protection* (2011) 194 Cal.App.4th 635, 646, fn. 7, 125 Cal.Rptr.3d 141.) While *Zichwic* found the defendant was subject to a parole search condition, it also held that installation of a vehicular GPS device was not a search subject to Fourth Amendment protection. (*Zichwic, supra,* 94 Cal.App.4th at pp. 953–956, 114 Cal.Rptr.2d 733.) The holding in *Zichwic* was therefore binding California precedent upon which the police could reasonably rely in 2007, when they installed a GPS device on Bey's vehicle. [FN 37] (*United States v. Pineda–Moreno* (9th Cir.2012) 688 F.3d 1087, 1090–1091.)

> FN 37: Even if we agreed that *Zichwic*'s Fourth Amendment discussion was "pure dictum," we could not find police reliance unreasonable on that basis. While *McIver*'s holding in 1999 was not binding on California courts (*People v. Bradley, supra,* 1 Cal.3d at p. 86, 81 Cal.Rptr. 457, 460 P.2d 129), there is no reason to suppose that in the absence of conflicting California authority, it would not have been grounds for reasonable good faith reliance by the police under the authority of *United States v. Leon* (1984) 468 U.S. 897, 918–922, 104 S.Ct. 3405, 82 L.Ed.2d 677 and its progeny. (*See People v. Willis* (2002) 28 Cal.4th 22, 29–30, 120 Cal.Rptr.2d 105, 46 P.3d 898.)

Defendants further claim the exact rationale *Zichwic* relied on--that defendant did not have a reasonable expectation of privacy--had been, in their words, "explicitly rejected as the policy of this state" by the Legislature's enactment of section 637.7. The introductory section of the enacting legislation included the statement that "electronic tracking of a person's location without that person's knowledge violates that person's reasonable expectation of privacy." (Stats.1998, ch. 449, § 1.) And section 637.7, subdivision (a) itself makes it unlawful for anyone to "use an electronic tracking device to determine the location or movement of a person" (§ 637.7, subd. (a)), with an exception for "lawful use of an electronic tracking device by a law enforcement agency." (*Id.* subd. (c).)

The legislative statement referred to does no more than establish a general

statewide policy. It cannot define the scope of the exclusionary rule in California. That definition is contained within the "[t]ruth-in-[e]vidence" provision of the California Constitution (art. I, § 28, subd. (f)(2) [formerly subd. (d)]), which prohibits application of the exclusionary rule to evidence gathered in violation of state law unless exclusion is compelled by the federal Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 879, 210 Cal.Rptr. 631, 694 P.2d 744.) [FN 38]

> FN 38: Though it is relevant only to prejudice--an issue we need not reach-- we reject on factual grounds defendants' argument that without the GPS evidence there would have been no corroboration for Broussard's testimony about the Bailey murder. Bey's own statements and the evidence of his possession of, and control over, the Mossberg shotgun, coupled with the ballistics evidence, provided ample corroboration. Mackey's removal of the white van's license plates was corroborated by Magana, who testified the plates were tucked between the seats when the van was returned to him. Magana also testified that Mackey was present in the parking lot behind the Bakery shortly after the van was returned. Telephone records also showed that Bey called Mackey almost immediately after Magana asked for his van to be returned, and Bey then called Magana back, all strongly suggesting that Bey was calling Mackey to find out the whereabouts of the van.

*Mackey, et. al.*, 182 Cal. Rptr. 3d at 451–54.

*Stone v. Powell*, 428 U.S. 465, 481–82, 494 (1976), bars federal habeas review of Fourth Amendment claims unless the state did not provide an opportunity for full and fair litigation of those claims. Even if the state court's determination of the Fourth Amendment issues is improper, it will not be remedied in federal habeas corpus actions so long as the petitioner was provided a full and fair opportunity to litigate the issue. *See Locks v. Sumner*, 703 F.2d 403, 408 (9th Cir. 1983). All *Stone v. Powell* requires is the initial opportunity for a fair hearing. Such an opportunity for a fair hearing forecloses this Court's inquiry on a habeas petition into the trial court's subsequent course of action, including whether or not the trial court made any express findings of fact. *See Caldwell v. Cupp*, 781 F.2d 714, 715 (9th Cir. 1986).

The only question before the Court thus is whether Mackey had a fair opportunity to litigate his claim. *See Ortiz–Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996) ("The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did, in fact, do so, or even whether the claim was correctly decided.") (citations omitted). Here, Mackey filed a motion to suppress the GPS evidence, CT 1974–2002; and the state trial court and the state appellate court addressed the merits of Mackey's argument, RT 508–62 and *Mackey, et. al.*, 182 Cal. Rptr. 3d at 451–54. Mackey had an opportunity for a full and fair litigation of his Fourth Amendment claim, and the Court is barred from considering it.

48

### 3. Severance Motion

Mackey alleges that the trial court erred in denying his motion for severance. The state court rejected this claim as follows:

A. Background
On November 18, 2010, the prosecution filed in limine motion No. 6 to admit evidence of bad acts not charged in the indictment under Evidence Code section 1101, subdivision (b), listing a great number of prior bad acts it sought to introduce. Defendants each separately opposed the motion. On December 16, after hearing, the court granted the motion in part and denied it in part, ruling among other things that evidence of the liquor store vandalism and Lofton kidnapping were admissible against Bey and against Mackey for the limited purpose of showing motive, as will be discussed below.

After the court's ruling, Mackey filed a motion to sever his trial from Bey's on the basis that the uncharged acts of Bey would be admitted in a joint trial and would prejudice him before the jury. Specifically, Mackey argued the liquor store vandalism, Cook car shooting, and Lofton kidnapping all happened before he was involved with the Bakery, and he played no role in those crimes. The court denied severance, saying the "overwhelming amount" of evidence in question "would be, and is, indeed hereby ordered, if presented, to be admissible against Mr. Mackey." [FN 39] The court said the evidence was relevant to "Mr. Bey's role in the bakery and of the community culture there." The court also declined to reconsider its ruling on admissibility, as Mackey had requested, and specifically ruled that "these incidents are all admissible against both gentlemen."

> FN 39: The court noted the one exception to its ruling would be "the recovery of the Arsenal rifle in the red Corvette in San Francisco," which it would order excluded if Mackey were tried separately, not because of its "prejudicial effect," but because of undue "consumption of time."

Later in the trial, during discussions regarding the editing of the video of Bey, Joshua, and Halfin at the San Leandro Police Department, Mackey renewed his motion for severance. Mackey claimed the video should be ruled inadmissible as to him, and claims on appeal he was prejudiced by that evidence in his joint trial with Bey. The court reiterated its position that evidence of "Bey's position at the bakery, his attitude towards those who work there, his control ... over folks that work there, is relevant to the question of Mr. Mackey's participation in these alleged offenses," and it denied Mackey's renewed request for severance. The court made clear, however, that "none of the comments made by any of the three gentlemen in this recording are to be received for their truth as to Mr. Mackey under any circumstances."

Before the jury viewed the video recording, the court admonished that statements of Halfin and Joshua could not be considered against either defendant for the truth of their contents. The court also said this: "Defendant Bey's statements may be considered for all purposes as against defendant Bey himself. Defendant Bey's statements may not be considered for the truth of their contents as against defendant Mackey. [¶] As against Mackey, defendant Bey's statements may be considered only to the extent they are evidence of defendant Bey's state of mind and are otherwise evidence of his conduct toward others." This limiting instruction was drafted by the court and discussed with counsel before it was given. Counsel for Mackey proposed a slight modification to the court's original wording, and the court adopted the requested change. Neither defense counsel objected to the instruction as given. In closing argument the prosecutor herself cautioned the jury not to use Bey's statements against Mackey. And a substantially identical limiting instruction was also included in the court's closing charge to the jury.

Mackey argues the trial court erred in denying his severance motions. He claims that being forced to go to trial with Bey subjected him to an avalanche of bad character evidence relating to Bey's criminal and otherwise unsavory conduct, impairing Mackey's ability to receive a fair trial. In his words: "Rather than permitting the jury to consider this evidence against Mr. Mackey for any purpose, the court should either have excluded it entirely, or, if it was to be admitted against Yusuf Bey IV, the court should have granted Mackey's motion for separate trial."

B. The Law

Section 1098 provides in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials." Thus, there is a strong legislative preference for joint trials, stemming both from the fact that they "'promote [economy and] efficiency'" and ""'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"" (*Coffman, supra*, 34 Cal.4th at p. 40, 17 Cal.Rptr.3d 710, 96 P.3d 30, citing *Zafiro v. United States* (1993) 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (*Zafiro*).) Here, because defendants were charged with committing common crimes involving common events and victims, the matter presents a "classic case" for a joint trial. (*People v. Souza* (2012) 54 Cal.4th 90, 109, 141 Cal.Rptr.3d 419, 277 P.3d 118 (*Souza*); Coffman, *supra*, at p. 41, 17 Cal.Rptr.3d 710, 96 P.3d 30; *People v. Keenan* (1988) 46 Cal.3d 478, 499–500, 250 Cal.Rptr. 550, 758 P.2d 1081 (*Keenan*).)

It is well settled that defendants are not entitled to severance "merely because they may have a better chance of acquittal in separate trials." (*Zafiro, supra*, 506 U.S. at p. 540, 113 S.Ct. 933.) To the contrary, under section 1098, "a trial court must order a joint trial as the 'rule' and may order separate trials only as an 'exception.' [Citation.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 190, 58 Cal.Rptr.2d 385, 926 P.2d 365.) "'The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses.' [Citations.] 'Additionally, severance may be called for when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."'" (*Souza, supra*, 54 Cal.4th at p. 109, 141 Cal.Rptr.3d 419, 277 P.3d 118.) The Supreme Court has also said that severance may be granted based on "'prejudicial association with codefendants....'" (*Keenan, supra*, 46 Cal.3d at p. 500, 250 Cal.Rptr. 550, 758 P.2d 1081.)

In deciding the severance issue, the trial court must determine whether "the realistic benefits from a consolidated trial are outweighed by the likelihood of 'substantial' prejudice to defendant." (*Keenan, supra*, 46 Cal.3d at p. 500, 250 Cal.Rptr. 550, 758 P.2d 1081.) "In determining the degree of potential prejudice, the court should evaluate whether (1) consolidation may cause introduction of damaging evidence not admissible in a separate trial, (2) any such otherwise-inadmissible evidence is unduly inflammatory, and (3) the otherwise-inadmissible evidence would have the effect of bolstering an otherwise weak case or cases.' (*Ibid.*) That balancing process is a "'highly individualized exercise.'" (*Id*. at p. 501, 250 Cal.Rptr. 550, 758 P.2d 1081.) Less drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice. (*Zafiro, supra*, 506 U.S. at p. 539, 113 S.Ct. 933.)

"A court's denial of a motion for severance is reviewed for abuse of discretion, judged on the facts as they appeared at the time of the ruling." (*Coffman, supra*, 34 Cal.4th at p. 41, 17 Cal.Rptr.3d 710, 96 P.3d 30.) Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial. (*Ibid.*; *People v. Massie* (1967) 66 Cal.2d 899, 922–924, 59 Cal.Rptr. 733, 428 P.2d 869 (*Massie*)

[applying standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243 (*Watson*)].) If the court's joinder ruling was proper when made, we will reverse a judgment based on constitutional compulsion only on a showing that joinder resulted in """"gross unfairness" amounting to a denial of due process.""" (*Souza*, *supra*, 54 Cal.4th at p. 109, 141 Cal.Rptr.3d 419, 277 P.3d 118.)

C. Analysis

To begin with, Mackey argues the evidence of prior bad acts should never have been admitted, either as to Bey or as to himself. Mackey argues the evidence of Bey's misconduct could have tainted him by association and should have been excluded, rather than just subjected to a limiting instruction. But, he reasons, having decided to allow evidence of Bey's prior misconduct not involving Mackey, it was incumbent upon the court to sever Mackey's case for trial. We disagree.

All of the prior incidents involved group commission of an offense orchestrated by Bey, not just individual wrongdoing by him. Evidence of the Cook car shooting was, of course, admissible against Bey because it was one of the charged offenses. The evidence of other wrongdoing by Bey and other Bakery members, such as the liquor store vandalism and the Lofton kidnapping, was likewise admissible to show that Bey held tremendous sway with other members of the Bakery, and that he used his influence to commit crimes, including violent crimes. These were proper purposes for admitting the evidence, and the court did not abuse its discretion in admitting the evidence against Mackey as well as Bey, to show Bey's potential influence over Mackey and to explain Mackey's motive for the murders. (*Cf. People v. Williams* (1997) 16 Cal.4th 153, 193–194, 66 Cal.Rptr.2d 123, 940 P.2d 710 [gang evidence admissible to show motive and identity]; *People v. Sandoval* (1992) 4 Cal.4th 155, 175, 14 Cal.Rptr.2d 342, 841 P.2d 862 [evidence of gang affiliation relevant to prove motive].) Mackey's arguments go to the weight of the evidence, not its admissibility. Because evidence of Bey's misconduct would have been relevant to Mackey's motive even if Mackey were granted a separate trial, the trial court did not abuse its discretion in denying Mackey's severance motion.

*People v. Manson* (1976) 61 Cal.App.3d 102, 126, 132 Cal.Rptr. 265, cited by the trial court and by the Attorney General, is persuasive. In *Manson*, as here, a defendant was charged with multiple murders based on his role as the charismatic and dominant leader of a band of about 20 individuals known as "the Family" who committed crimes at his behest, including the murders for which he and several other members of the Family were on trial jointly. (*Id.* at p. 127, 132 Cal.Rptr. 265.) At trial the court admitted evidence that Manson had previously raped a woman with some of the Family present and urged others to also have sexual relations with her, which they did. Manson then instructed his followers to take off their clothes and have group sex, and they did. (*Id.* at p. 130, 132 Cal.Rptr. 265.) On another occasion he ordered a female member of the Family to orally copulate a male associate of the group, and she did. (*Ibid.*)

The Court of Appeal held the evidence "strongly supported a theory that the homicides were the product of conspiratorial relationships and activities.... The scope of these relationships in terms of time and intensity is germane." (*Manson*, *supra*, 61 Cal.App.3d at p. 126, 132 Cal.Rptr. 265.) And held the evidence of prior misconduct admissible: "Although the evidence concerning these events was indeed dramatic, it nevertheless reasonably tended to show Manson's leadership of the Family, the inference being that if Manson could induce bizarre sexual activities, he could induce homicidal conduct. While the evidence is less than flattering, its prejudicial character is outweighed by its evidentiary value showing Manson's involvement in the murders." (*Id.* at p. 131, 132 Cal.Rptr. 265 fn.omitted.)

It is true that Manson's codefendants were present during the incidents of prior misconduct (*Manson*, *supra*, 61 Cal.App.3d at p. 131, fn. 10, 132 Cal.Rptr. 265), but that goes to the

weight of the evidence, not its admissibility. And it has no bearing on the severance motion.

In *People v. Letner* and *Tobin* (2010) 50 Cal.4th 99, 152, 112 Cal.Rptr.3d 746, 235 P.3d 62, the Supreme Court held severance was properly denied where the defendants had a history of committing crimes together, which led to a reasonable inference they had together committed the crimes for which they were being tried. (*Ibid.*) Mackey distinguishes that circumstance because he did not participate in Bey's prior crimes. But *People v. Letner* and *Tobin*, *supra*, 50 Cal.4th 99, 112 Cal.Rptr.3d 746, 235 P.3d 62, did not purport to establish a hard-and-fast rule that severance may only be denied if the prior bad acts evidence relates to crimes in which both defendants participated. The question is one of relevancy, and here the evidence was relevant.

Mackey argues that evidence of Bey's prior crimes may have prejudiced him before the jury. But there is no rule that separate trials must be granted whenever evidence of the bad acts of a codefendant is admissible. (*See, e.g.*, *U.S. v. Matta-Ballesteros* (9th Cir.1995) 71 F.3d 754, 770–771 [severance not required, even though evidence was introduced at joint trial involving three homicides and marijuana enterprise with which defendant was not involved]; *U.S. v. Escalante* (9th Cir.1980) 637 F.2d 1197, 1201–1202 [upholding denial of severance, even though evidence relating to codefendant's connection to organized crime and participation in murder was admitted].) To allow severance whenever a codefendant's unsavory background might reflect poorly on another defendant would result in severance in so many cases that it would defeat the professed legislative preference for joint trials.

Indeed, the cases relied upon by Mackey suggest only that a separate trial may be ordered where a codefendant is grossly more culpable than the moving defendant, the defendant's role in the crime was minimal, and the defendant was likely to be prejudiced by his or her association with the more culpable codefendant, or where admissions made by the codefendant also implicated the less culpable defendant. None of the cases cited by Mackey involved a charismatic leader of a group that engaged in criminal conduct at his behest. None requires reversal of the trial court's decision here.

Mackey cites *People v. Chambers* (1964) 231 Cal.App.2d 23, 41 Cal.Rptr. 551 (*Chambers*), where two defendants were jointly tried on charges of abusing nursing home patients. One of them, the owner of the nursing facility, was implicated in only one incident against one patient in which he acted at his codefendant's request. The codefendant, a nurse, was charged with assaulting the same patient on three other dates, and there was "prejudice-arousing," "disgusting," and "inflammatory" evidence against her of "unrelated acts of brutality" against other patients as well. (*Id.* at pp. 27–28, 41 Cal.Rptr. 551.) Although the court gave a technically correct limiting instruction, the appellate court found it unlikely to have been effective. (*Id.* at pp. 28, 33-34, 41 Cal.Rptr. 551.)

The present case is different from *Chambers* in that Mackey did not play a small role in the crimes. Rather, he was allegedly the shooter in the Wills killing, although the jury rejected that theory. He was the driver in the hunting down and killing of Bailey, and in the escape from the scene of the Bailey murder. And he allegedly supplied the weapon in the Roberson killing, although the jury hung on that count. Based on the facts known to the trial court when it ruled on the severance motion, Mackey's role was far greater than was the defendant's in Chambers.

Mackey also relies on *People v. Biehler* (1961) 198 Cal.App.2d 290, 17 Cal.Rptr. 862 (*Biehler*), where five counts of robbery and burglary were alleged against four defendants, no single defendant was charged in all five offenses, and each offense was alleged against at most two of the defendants. The Court of Appeal referred to it as a "mass trial" (*id.* at p. 298, 17 Cal.Rptr. 862), and found "'in the very nature of things the consolidation of such

separate unconnected charges for trial could not help but be prejudicial to either or both [appealing] defendants.'" (*Id.* at p. 294, 17 Cal.Rptr. 862.) Despite appropriate limiting instructions, the court held reversal was necessary because "the jury might have formed the impression on the basis of the totality of the evidence that the defendants were a gang of depraved robbers, and based their determination of individual guilt as to each offense partly upon this impression." (*Id.* at p. 303, 17 Cal.Rptr. 862.)

*Biehler* is distinguishable in that this case involves only two defendants, both of whom were charged with three murders in common. Rather than being an amalgamation of unrelated charges against various pairings in a group of defendants, the charges in this case presented a "classic case" for joinder. (*Souza*, *supra*, 54 Cal.4th at p. 110, 141 Cal.Rptr.3d 419, 277 P.3d 118; *Coffman*, *supra*, 34 Cal.4th at p. 40, 17 Cal.Rptr.3d 710, 96 P.3d 30.) The trial was long and complicated, and much of the evidence would have had to be repeated if a separate trial had been granted, a factor entirely proper to consider in ruling on a severance motion. (*See Keenan*, *supra*, 46 Cal.3d at p. 501, 250 Cal.Rptr. 550, 758 P.2d 1081.)

Mackey also cites *Massie*, *supra*, 66 Cal.2d 899, 59 Cal.Rptr. 733, 428 P.2d 869, where the Supreme Court reversed a conviction due to the danger of guilt by association and the risk that the jury might be unable to confine its consideration of the evidence adduced on multiple counts to the particular charge upon which, and the defendant against whom, the evidence was offered. Within a span of three hours, Massie committed one murder, one attempted murder, and three armed robberies. (*Id.* at pp. 904–905, 59 Cal.Rptr. 733, 428 P.2d 869.) In confessing to the police, Massie named Vetter as the getaway driver in all three incidents. (*Id.* at p. 905, 59 Cal.Rptr. 733, 428 P.2d 869.) The Supreme Court held the trial court erred in failing altogether to exercise its discretion to grant a separate trial, evidently believing it was compelled to try the defendants jointly. (*Id.* at pp. 914–915, 917–918, 59 Cal.Rptr. 733, 428 P.2d 869.) But the Supreme Court expressed no opinion on whether denial of the motion otherwise would have required reversal. (*Id.* at pp. 917–918, 59 Cal.Rptr. 733, 428 P.2d 869.) Here, there is no contention that the court was unaware of, or failed to exercise, its discretion.

Moreover, *Massie* is distinguishable. First, there was the codefendant's confession that named Vetter, and as to which the Supreme Court concluded the "incriminating portions of the confessions could not have been effectively deleted" without prejudice to Massie. (*Massie*, *supra*, 66 Cal.2d at p. 919, 59 Cal.Rptr. 733, 428 P.2d 869.) Thus, a separate trial was dictated by *People v. Aranda* (1965) 63 Cal.2d 518, 530–531, 47 Cal.Rptr. 353, 407 P.2d 265 (*Aranda*). [FN 40] Our case does not present an *Aranda* situation. The Supreme Court also pointed out there was a realistic possibility that Massie would testify on Vetter's behalf at a separate trial, [FN 41] whereas Vetter could not compel him to testify at a joint trial. (*Massie*, *supra*, at pp. 915–916, 59 Cal.Rptr. 733, 428 P.2d 869.) [FN 42]

> FN 40: Although the case was on appeal when *Aranda* was decided, *Aranda* applied retroactively. (*Massie*, *supra*, 66 Cal.2d at p. 918, 59 Cal.Rptr. 733, 428 P.2d 869.)

> FN 41: Massie apparently had a change of heart where Vetter was concerned. At one point he stated in open court: "As God is my witness, this man is not guilty and he hasn't anything to do with it." (*Massie*, *supra*, 66 Cal.2d at p. 915, fn. 11, 59 Cal.Rptr. 733, 428 P.2d 869.) Vetter had an explanation for why Massie would have falsely implicated him, he had an alibi witness for the time of the offenses (*id.* at pp. 912–913 & fns. 6–8, 59 Cal.Rptr. 733, 428 P.2d 869), and the two defendants had a conflict as to the method of trial, since Massie had waived a jury. (*Id.* at p. 915, 59 Cal.Rptr. 733, 428 P.2d 869.)

> FN 42: Other cases cited by Mackey are inapposite. They involved either misdeeds

of someone other than a codefendant (*People v. Leonard* (1983) 34 Cal.3d 183, 188, 193 Cal.Rptr. 171, 666 P.2d 28; *People v. Long* (1970) 7 Cal.App.3d 586, 589–591, 86 Cal.Rptr. 590; *People v. Jackson* (1967) 254 Cal.App.2d 655, 660, 62 Cal.Rptr. 208); gratuitous evidence of gang membership (*People v. Cardenas* (1982) 31 Cal.3d 897, 904–905, 184 Cal.Rptr. 165, 647 P.2d 569; *In re Wing Y.* (1977) 67 Cal.App.3d 69, 76, 136 Cal.Rptr. 390 ["catastrophically prejudicial" inadmissible evidence of gang membership]); or improper profiling evidence. (*People v. Martinez* (1992) 10 Cal.App.4th 1001, 1006, 12 Cal.Rptr.2d 838 [typical conduct of car thieves]; *People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1072, 64 Cal.Rptr.2d 395 ["typical heroin dealer"].)

In sum, the trial court's ruling on severance was not an abuse of discretion, and Mackey was not subjected to "gross unfairness" so as to constitute a due process violation. (*Souza, supra*, 54 Cal.4th at p. 109, 141 Cal.Rptr.3d 419, 277 P.3d 118.)

But even assuming the court should have granted Mackey's severance motion, we would not find prejudice under the *Watson* standard. (*Massie, supra*, 66 Cal.2d at pp. 922–924, 59 Cal.Rptr. 733, 428 P.2d 869.) While we acknowledge the evidence about Bey's misdeeds was explosive, we are convinced the verdicts against Mackey were not tainted by unfairness. The court instructed the jury on the limited use of the acts of misconduct as to Mackey, limiting their admissibility to issues of: (1) whether Mackey had a motive to commit the Bailey, Wills, and Roberson murders; (2) whether, as an employee of the Bakery, Mackey was willing to follow the orders of another person of greater authority in the Bakery; and (3) whether Bey "had a position of authority and the extent of that position vis-à-vis employees of the Bakery." The court also instructed on the limited use of Bey's statements at the San Leandro Police Department: "As against Mackey, defendant Bey's statements may be considered only to the extent they are evidence of defendant Bey's state of mind and are otherwise evidence of his conduct toward others." As the Supreme Court has recognized, such limiting instructions may constitute a "less drastic measure[ ]" than severance that may "often ... suffice to cure any risk of prejudice." (*Zafiro, supra*, 506 U.S. at p. 539, 113 S.Ct. 933.)

The jury's verdicts and findings themselves--including a not true finding on the firearm use allegation against Mackey in connection with the Wills murder and the inability to reach a verdict against Mackey on the Roberson murder-- further "demonstrate a careful discrimination among the charges and between defendants," which may defeat a claim of prejudice. (*People v. Singh* (1995) 37 Cal.App.4th 1343, 1375, 44 Cal.Rptr.2d 644.) Holding a joint trial was neither an abuse of discretion nor prejudicial.

*Mackey, et al.*, 182 Cal. Rptr. 3d at 454–60.

### a.    Standard

A joinder, or denial of severance, of counts or codefendants, may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process. *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997). A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials. *Grisby*, 130 F.3d at 370. Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution. *Grisby*, 130 F.3d at 370. To prevail, therefore, the petitioner must demonstrate that

the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair. *Id.* In addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict. *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000). "[T]here is no clearly established federal law requiring severance of criminal trials in state court even when the defendants assert mutually antagonistic defenses." *Runningeagle v. Ryan*, 686 F.3d 758, 777 (9th Cir. 2012) (rejecting ineffective assistance of counsel claim premised on counsel's failure to join co-defendant's motion to sever).

### b. Analysis

Mackey argues that the denial of severance rendered his trial fundamentally unfair because the prosecution introduced evidence that tended to make Mackey appear guilty by association, and that was inflammatory and prejudicial. Dkt. No. 57-3 at 36. Specifically, the prosecution introduced evidence of uncharged crimes committed by Bey. Mackey argues that he had no association with these uncharged crimes, and that this evidence thus had little or no probative value on the question of whether Mackey was guilty of the charged crimes. The prosecution also introduced a jailhouse recording in which Bey discussed his complicity in various crimes, both charged and uncharged. *Id.* at 37.

After carefully reviewing the record, the Court finds that the state court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; nor was it based on an unreasonable determination of the facts in light of the evidence presented at the state court proceedings.

Under AEDPA, the Court may not grant Mackey relief unless he can identify one or more holdings of the United States Supreme Court that announce a constitutional rule binding on the states regarding severance. *Carey v. Musladin*, 549 U.S. 70, 75 (2006). The Court has found no such holdings, and the cases cited by Mackey, *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), and *Darden v. Wainwright*, 477 U.S. 168 (1986), do not address trial severance at all. In *Donnelly*, the petitioner was tried in a joint trial with his co-defendant. The constitutional error

alleged was unrelated to being tried jointly; rather, the alleged constitutional error was the prosecution's remarks during closing argument. *Donnelly*, 416 U.S. at 640–42. In *Darden*, the petitioner was not tried jointly, nor was the petitioner denied joinder. The constitutional errors alleged in *Darden* were juror exclusion in violation of *Wainwright v. Witt*, 469 U.S. 412 (1985), prosecutorial misconduct, and ineffective assistance of counsel. *Darden*, 477 U.S. at 170. The few Supreme Court cases addressing joinder and severance do not govern this case because their holdings address whether Rule 14 of the Federal Rules of Criminal Procedure requires severance, and when mutually antagonistic defenses require severance. *See, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 540–41 (1993) (severance not mandated by Rule 14 of the Federal Rules of Criminal Procedure or by mutually antagonistic defenses); *United States v. Lane*, 474 U.S. 438 (1986) (joinder improper under Federal Rules of Criminal Procedure but error was harmless because of overwhelming evidence of guilt). These cases do not discuss severance where the alleged prejudice arises from guilt by association.

Nor has Mackey demonstrated that the state court's denial of his severance motion rendered his trial fundamentally unfair. The jury was instructed that Bey's uncharged offenses could only be considered for certain limited purposes, such as whether a defendant had a motive to commit the charged offenses, and whether a defendant was a member of the Bakery and willing to follow orders of another greater authority within the Bakery. Because "[a] habeas court must presume that jurors follow the jury instructions," *Doe v. Busby*, 661 F.3d 1001, 1017 (9th Cir. 2011), the Court must presume that the jurors only considered Bey's uncharged offenses for the specified limited purposes and did not find Mackey guilty merely by his association with Bey. This presumption is supported by the record. The jury rejected the theory that Mackey was the shooter in the Wills killing, and hung on the count that Mackey supplied the weapon in the Roberson killing, indicating that they considered the evidence in deciding Mackey's guilt, and did not find Mackey guilty by association. Accordingly, habeas relief is denied as to this claim.

### 4. Error in Giving Instruction Regarding Mackey's Testimony Without Giving Corollary Instruction

Mackey and Bey allege that the trial court erred in instructing that Mackey's testimony

56

could be used against them without giving a corollary instruction that it could be used in their favor. The state court rejected this claim as follows:

> Defendants both contend the court erred in giving the following instruction about Mackey's testimony: "Defendant Mackey's in-court testimony may be considered for all purposes against either defendant." This was actually part of a longer instruction, a modified version of CALCRIM No. 305, as follows:

> "You have heard evidence that a defendant made statements outside of court. You may consider that evidence only *against* him, not against any other defendant. However, as provided in Instruction 357, [FN 43] there are circumstances in which you may consider the out-of-court statement of one defendant *against* another if all the requirements of that instruction are met.

> FN 43: CALCRIM No. 357 instructs on adoptive admissions.

> "Additionally as previously instructed: [¶] Defendant Bey's out-of-court statements may be considered for all purposes only *against* defendant Bey himself. Defendant Bey's out-of-court statements may not be considered for the truth of their contents as *against* defendant Mackey. [¶] As to defendant Mackey, defendant Bey's out-of-court statements may be considered to the extent they are evidence of defendant Bey's state of mind and are, otherwise, evidence of his conduct towards others.

> "Defendant Mackey's in-court testimony may be considered for all purposes against either defendant." (Italics added.)

> No objections to this instruction, nor requests for modification, were made at trial. Indeed, defendants do not argue the instruction itself misstated the law. Rather, they criticize the court for not adding words indicating that Mackey's testimony could be used either against or in favor of either defendant. We conclude the issue was forfeited.

> It is settled that "a defendant need not object to preserve a challenge to an instruction that incorrectly states the law and affects his or her substantial rights." (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156, 35 Cal.Rptr.3d 373; *see* § 1259.) Even so, "'a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or *incomplete* unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 364, 100 Cal.Rptr.3d 820 (*Tuggles*).) Because defendants advocate a modification of the instruction rather than complete rejection, the issue has been forfeited. But even on the merits defendants' arguments are unconvincing.

> Defendants claim the instruction violated the rule of "absolute impartiality" between prosecution and defense in crafting jury instructions. (*People v. Moore* (1954) 43 Cal.2d 517, 526–527, 275 P.2d 485.) We do not doubt the general proposition that jury instructions must be balanced and impartial, but the instruction, read in context, did not violate that rule. Defendants' claim of an unbalanced instruction has no merit.

> In Bey's reply brief he flatly states, "The instruction told the jury it could not consider Mackey's testimony at all in [defendants'] favor." This is an unreasonable--and contrived--reading of the instruction. On the contrary, the instruction as a whole was directed toward informing the jury how it could consider *inculpatory* evidence, and specifically inculpatory evidence that came from the mouths of defendants. It was an instruction *limiting* the use of certain types of inculpatory evidence, clarifying that the rules limiting the use of out-of-court statements by Bey did not apply to Mackey's in-court testimony. And notably, the

instruction in question did not say the jury could not use Mackey's testimony in favor of the defendants. Considering both the language used and the surrounding language, we believe the jury could *not* reasonably have understood the instruction as limiting the use of Mackey's *exculpatory* statements.

Defendants place particular emphasis on *Cool v. United States* (1972) 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (*Cool*), arguing that it "controls this case." We cannot agree.

*Cool*, a per curiam decision with three dissenting votes, reversed a counterfeiting conviction based on a faulty jury instruction concerning wholly exculpatory accomplice testimony presented by the defense. (*Cool*, *supra*, 409 U.S. at pp. 100–101, 104, 93 S.Ct. 354.) The court instructed the jury—not incidentally, over strenuous defense objection—that the testimony of an accomplice could not be considered by the jury unless the jury found beyond a reasonable doubt that the accomplice's testimony was true. [FN 44] (409 U.S. at p. 101, 93 S.Ct. 354.) The trial court further instructed the jury that an accomplice's testimony is "open to suspicion" and also "'that testimony of an accomplice may alone and uncorroborated support your verdict of guilty of the charges in the Indictment if believed by you to prove beyond a reasonable doubt the essential elements of the charges in the Indictment against the defendants.'" (*Id.* at pp. 102 & 103, fn. 4, 93 S.Ct. 354.)

> FN 44: The instruction read: "If the testimony carries conviction and you are convinced it is true beyond a reasonable doubt, the jury should give it the same effect as you would to a witness not in any respect implicated in the alleged crime and you are not only justified, but it is your duty, not to throw this testimony out because it comes from a tainted source." (*Cool*, *supra*, 409 U.S. at p. 102, 93 S.Ct. 354.) The majority admitted "the instruction was couched in positive terms. It told the jury to consider the evidence if it believed it true beyond a reasonable doubt. But the statement contained a negative pregnant as well. There is an unacceptable risk that jurors might have thought they were to reject the evidence--'throw [it] out,' in the words of the trial judge—if they had a reasonable doubt as to its veracity." (*Id.* at p. 102, fn. 3, 93 S.Ct. 354.)

*Cool* held that when an accomplice testifies for the defense to facts "completely exculpatory" of the defendant, the jury must not be instructed to view such testimony with caution, or told that it must find the testimony true beyond a reasonable doubt before relying on it, or instructed that the testimony may be used "against" the defendant but not in her favor. (*Cool*, *supra*, 409 U.S. at pp. 101 & 103, fn. 4, 93 S.Ct. 354.) And the Supreme Court found instructions that did all three of these things placed an "improper burden on the defense and allow[ed] the jury to convict despite its failure to find guilt beyond a reasonable doubt." (*Id.* at p. 103, 93 S.Ct. 354.) Believing the accomplice's testimony was both exculpatory and inculpatory of the defendant, the dissenting justices argued the accomplice testimony instruction was justified. (*Id.* at pp. 105–108, 93 S.Ct. 354 (dis. opn. of Rehnquist, J.).)

The portion of the opinion emphasized by defendants appeared in this footnote: "In light of the fact that the only accomplice testimony in the case was exculpatory, [the] instruction [quoted above] was confusing to say the least. But even if it is assumed that [the accomplice's] testimony was to some extent inculpatory, the instruction was still fundamentally unfair in that it told the jury that it could convict solely on the basis of accomplice testimony without telling it that it could acquit on this basis. Even had there been no other error, the conviction would have to be reversed on the basis of this instruction alone." (*Cool*, *supra*, 409 U.S. at p. 103, fn. 4, 93 S.Ct. 354.) Justice Rehnquist criticized the majority for ordering "reversal on the ground that one of the instructions contained a 'negative pregnant,'" arguing that the opinion "smacks more of ... scholastic jurisprudence ... than it does of [a] commonsense approach to appellate review." (*Id.* at p. 108, 93 S.Ct. 354 (dis. opn. of Rehnquist, J.).)

In this case, Mackey's testimony was not wholly exculpatory of Bey--or wholly helpful to the defense. Mackey did not claim knowledge that would have exonerated Bey, but claimed only that Bey never ordered him to kill anyone. Mackey also admitted, for instance, that a Mossberg shotgun was kept at the Bakery, that he violated probation by possessing a sawed-off shotgun while living at the Bakery, and that he had been at least loosely affiliated with a gang in San Francisco. Because his testimony was both helpful and damaging to the defense, *Cool* is not controlling.

Modified CALCRIM No. 305 as a whole was clearly intended to protect Mackey by limiting use of the damaging admissions in Bey's out-of-court statements to Bey alone. As the italicized portions of the quoted instruction show, it told the jury which evidence could not be used against each defendant. The court drew a distinction where Mackey's inculpatory in-court testimony was concerned, which was admissible against both defendants. There was no constitutional requirement that jurors be specially informed they could use the exculpatory aspects of Mackey's testimony in favor of both defendants, and we refuse to adopt the "negative pregnant" school of appellate review where the other constitutional infirmities in the *Cool* instruction were not present. (*See People v. Rivas* (2013) 214 Cal.App.4th 1410, 1431, 155 Cal.Rptr.3d 403 (*Rivas*) [rejecting similar argument where inculpatory statements were involved].)

In evaluating a challenge to a jury instruction, we must consider whether there is a "reasonable likelihood" that the jury understood the charge in the way defendants suggest. (*People v. Kelly* (1992) 1 Cal.4th 495, 525, 3 Cal.Rptr.2d 677, 822 P.2d 385; *Estelle v. McGuire* (1991) 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 [for due process purposes the question is whether there is a "reasonable likelihood" the jury has applied the instruction in a way that violates the Constitution].) "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." (*Boyde v. California* (1990) 494 U.S. 370, 380–381, 110 S.Ct. 1190, 108 L.Ed.2d 316.)

"'[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is "'whether the ailing instruction ... so infected the entire trial that the resulting conviction violates due process.'" [Citations.] "'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'"'" (*Rivas, supra,* 214 Cal.App.4th at p. 1429, 155 Cal.Rptr.3d 403.) The challenged aspect of the instruction actually was combined with other advice concerning issues of limited admissibility of inculpatory evidence. Read in context, the jury would have understood the challenged language as describing the unlimited admissibility of Mackey's inculpatory testimony, as distinguished from the limited admissibility of Bey's prior out-of-court inculpatory statements-- which, as noted, had previously been explained at the time Bey's statements recorded at the San Leandro Police Department were played for the jury. It is highly unlikely the jury would have construed the instruction as not allowing it to consider Mackey's testimony in favor of defendants. We believe the jury would have understood the commonplace fact that evidence presented as part of the defense case could be used in favor of the defense.

But even if instructional error occurred, we would not find it prejudicial, employing a *Watson* standard of prejudice, the standard the Supreme Court has applied when instructional error under *Cool* has been raised. (*People v. Lawley* (2002) 27 Cal.4th 102, 161–162, 115 Cal.Rptr.2d 614, 38 P.3d 461.) We recognize, as defendants point out, that the jury engaged in lengthy deliberations. Nevertheless, we cannot believe the jury ignored Mackey's testimony insofar as it was self-exculpatory or exculpatory of Bey. The jury requested a readback of Mackey's testimony about the Wills murder, as well as a readback

of Broussard's testimony on that topic. Because Mackey's testimony about the Wills murder was entirely exculpatory, this demonstrates the jury did consider exculpatory aspects of his testimony. After all, the jury did find the firearm discharge allegation in the Wills murder "not true." It may also have been partially Mackey's testimony that he was not involved in the Roberson murder that resulted in the deadlock on that count.

*Mackey*, 182 Cal. Rptr. 3d at 454–60.

### a.    Standard

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Id.* at 72; *see also Donnelly*, 416 U.S. at 643 ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). Finally, the defined category of infractions that violate fundamental fairness is very narrow: "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Estelle*, 502 U.S. at 73.

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & n.4. In order to show a due process violation, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt. *Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009) (internal quotations and citations omitted). A "meager 'possibility'" that the jury misapplied the instruction is not enough. *Kansas v. Carr*, 136 S. Ct. 633, 643 (2016) (quoting

*Boyde v. California*, 494 U.S. 370, 380 (1990)).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d at 475–76 (citing *Henderson v. Kibbe*, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156).

### b.    Analysis

Respondent Muniz argues that this claim is procedurally defaulted due to petitioners' failure to object to the instruction or request modification. Both Respondent Muniz and Respondent Soto also argue that the claim fails on the merits.

The Court agrees that this claim is procedurally defaulted. The state appellate court found that this claim was forfeited because neither party objected at trial to the challenged instruction or requested a modification. *Mackey, et al.*, 182 Cal. Rptr. 3d at 461. A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and that is adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). The procedural default rule is a specific instance of the more general "adequate and independent state grounds" doctrine. *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994). The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition on grounds of procedural default where there was a complete failure to object at trial. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005) ("Federal habeas claims must be dismissed where state courts have decided the claim on state procedural grounds."); *Paulino v. Castro*, 371 F.3d 1083, 1092–93 (9th Cir. 2004) (federal habeas review of jury instruction claim procedurally barred where state court clearly held that claim was barred by California's contemporaneous objection rule even though claim was addressed on the merits). Review of these claims is therefore barred by independent

and adequate state grounds.  *See Coleman*, 501 U.S. at 729–30.[9]

Regardless, this claim fails on the merits.  Neither petitioner has demonstrated that there was a "reasonable likelihood" that the jury incorrectly understood the instruction to preclude using Mackey's testimony in favor of both defendants, nor have they shown that this instruction by itself could "so infect the entire trial" as to render their convictions inconsistent with due process.  The modified version of CALCRIM 305 specified the ways in which a defendant's out-of-court statements could be used *against* the defendants.  In other words, as explained by the state appellate court,

> the instruction as a whole was directed toward informing the jury how it could consider inculpatory evidence, and specifically inculpatory evidence that came from the mouths of defendants. It was an instruction limiting the use of certain types of inculpatory evidence, clarifying that the rules limiting the use of out-of-court statements by Bey did not apply to Mackey's in-court testimony. And notably, the instruction in question did not say the jury could not use Mackey's testimony in favor of the defendants. Considering both the language used and the surrounding language, we believe the jury could not reasonably have understood the instruction as limiting the use of Mackey's exculpatory statements.

*Mackey, et al.*, 182 Cal. Rptr. 3d at 461.  Moreover, it is especially unlikely that the jury would have misunderstood the above instruction as prohibiting them from considering Mackey's testimony in his favor, since the point of that testimony was to assert his innocence.  As the Supreme Court explained in *Middleton v. McNeil*, 541 U.S. 433 (2004), the proffered possible "interpretation [of the jury instruction] would require such a rare combination of extremely refined lawyerly parsing of an instruction, and extremely gullible acceptance of a result that makes no conceivable sense, that the state court's implicit rejection of the possibility was surely not an unreasonable application of federal law."  *Middleton*, 541 U.S. at 438 (reversing grant of habeas relief with respect to jury instruction, finding that where there were three correct instructions and one contrary one, no reasonable likelihood that jury was misled).  It is similarly unlikely that the jury would have parsed the jury instruction in such a way to presume that Mackey's testimony

---

[9] If a petitioner can demonstrate both cause for the default and actual prejudice as a result of the alleged violation of federal law, or if a petitioner can demonstrate that failure to consider the claims would result in a fundamental miscarriage of justice, a federal habeas court may consider a claim that has been procedurally defaulted.  *Coleman*, 501 U.S. at 750.  However, this exception is inapplicable here where neither petitioner has suggested that there was cause for the procedural default, or that a miscarriage of justice would result absent the Court's review.

could only be considered in favor of Mackey, but not in favor of Bey.

Contrary to petitioners' argument, the Supreme Court's holding in *Cool v. United States*, 409 U.S. 100 (1972), does not compel habeas relief in this case. Petitioners argue that *Cool* mandates equality between defense and prosecution jury instructions, and claim that the allegedly one-sided instruction given here is therefore contrary to, or an unreasonable application, of clearly established federal law. *Cool* does not apply here. In *Cool*, the jury was instructed to disregard the accomplice testimony unless convinced it was true beyond a reasonable doubt. While the modified CALCRIM No. 305 instructed that Mackey's in-court testimony could be considered for all purposes against either defendant, the instruction regarding accomplice testimony was significantly different from the instruction in *Cool*. Here, the jury was instructed that accomplice testimony could be used to convict the defendant only if the accomplice testimony was supported by other evidence that was independent of the accomplice's testimony that the jury believed and that tended to connect the defendant to the commission of the crime. RT 6449. The jury was further instructed that the supporting evidence need not be enough, by itself, to prove the defendant's guilt or support every fact about which the witness has testified, and could not be provided by the testimony of another accomplice. RT 6449. The state court's rejection of the claim that modified CALCRIM No. 305 was reasonably likely to be misunderstood was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, nor did it involve an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Habeas relief is therefore denied on this claim.

### 5. Failure to Give Third Party Culpability Evidence Instruction

Mackey alleges that the trial court erred in failing to give his requested third party culpability party instruction. The state court rejected this claim as follows:

A. Background
Part of Mackey's theory of defense was that there was substantial evidence pointing to Lewis as the person who killed Wills and Halfin as the one who killed Roberson. Because Lewis was so close to Bey, Mackey's attorney even suggested that Lewis might also have been the getaway driver in the Bailey murder. Mackey's theory was based on the following evidence:

63

Hopping testified that he looked out his third- story window after hearing gunshots and saw an athletic-looking Black male running from the Wills murder scene as a football halfback might run, carrying a gun cradled in the crook of his arm. The man was five feet six to five feet eight inches tall, weighed about 160 pounds, and appeared to be in his 20s. This description, Mackey claims, matched that of Lewis, as stipulated by the parties, whereas Mackey was six feet two inches tall and weighed about 190 pounds. Lewis also had been on the football team in high school and was a star running back. (Mackey also played football in high school and was a linebacker.)

In addition, during the raid on the Bakery the police found indicia pertaining to Lewis in a bedroom where they also found a banana-style magazine containing 7.62 x 39 millimeter rounds, which matched the caliber and type of those found at the Wills and Roberson murder scenes as well as at the Cook car shooting, and two clips containing large-caliber bullets, also 7.62 x 39 millimeter. They also found in the room a reversible camouflage and black neoprene mask and a .22-caliber rifle. Further, Lewis and Bey were often seen together, and Lewis appeared to be one of the most trusted of Bey's associates. In fact, Lewis recruited both Broussard and Mackey as "soldiers" for the Bakery, and was a leader there. Lewis was also one of those involved in the Lofton kidnapping.

Based on the foregoing evidence, Mackey requested the following jury instruction on third party culpability: "Defendant Mackey has introduced circumstantial evidence that Devaughndre Broussard's cousin, Richard Lewis, shot and killed Michael Wills. You should consider such evidence with respect to your determination of whether defendant Mackey is guilty of the murder of Mr. Wills. He has also introduced evidence that Jasmin Siaw saw Tamon Halfin shoot and kill Odel Roberson. You should consider also such evidence in evaluating the credibility of Devaughndre Broussard and, therefore, in determining whether there exists a reasonable doubt that defendant Mackey committed any of the charged homicides."

The court refused the instruction, indicating it was relying on *People v. Hartsch* (2010) 49 Cal.4th 472, 504, 110 Cal.Rptr.3d 673, 232 P.3d 663.

Mackey was allowed to introduce third party culpability evidence and to argue its significance to the jury. But, he argues, the trial court's refusal to give his third party liability instruction was error both under state law and under the federal Constitution, violating his due process rights and the right to present a defense.

B. Discussion

An accused may defend against criminal charges by showing that a third person, not the defendant, committed the crime charged. He has a right to present evidence of third party culpability where such evidence is capable of raising a reasonable doubt as to his guilt of the charged crime. But evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice; there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime. (*People v. Elliott* (2012) 53 Cal.4th 535, 580, 137 Cal.Rptr.3d 59, 269 P.3d 494; *People v. Hall* (1986) 41 Cal.3d 826, 832–833, 226 Cal.Rptr. 112, 718 P.2d 99.)

The general rule is that "[t]he court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them and of the credibility of the witnesses. Either party may present to the court any written charge on the law, *but not with respect to matters of fact,* and request that it be given." (§ 1127, italics added.)

Our Supreme Court has "'suggested that "in appropriate circumstances" a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged.' (*People v. Bolden* (2002) 29 Cal.4th 515, 558 [127

Cal.Rptr.2d 802, 58 P.3d 931].)" (*People v. Moon* (2005) 37 Cal.4th 1, 30, 32 Cal.Rptr.3d 894, 117 P.3d 591.) When examining whether a court erred in not giving a pinpoint instruction, we are mindful of the general rule that "a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*Ibid.*) A proper pinpoint instructs the jury on the defendant's *theory* of the case. An instruction is properly refused if it invites the jury to draw inferences favorable to one of the parties from specified items of evidence. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1244, 171 Cal.Rptr.3d 234, 324 P.3d 88.)

In *Hartsch*, the case relied on by the trial court, the Supreme Court noted that third party culpability "instructions add little to the standard instruction on reasonable doubt"; and further, that even if such instructions "properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*Hartsch*, *supra*, 49 Cal.4th at p. 504, 110 Cal.Rptr.3d 673, 232 P.3d 663.) "It is hardly a difficult concept for the jury to grasp that acquittal is required if there is a reasonable doubt as to whether someone else committed the charged crimes." (*Ibid.*) The trial court apparently concluded Mackey's requested instruction was duplicative of the reasonable doubt instruction, not to mention argumentative. That conclusion was correct.

The trial court here did give a standard reasonable doubt instruction. (CALCRIM No. 220.) The court also instructed the jury on the law of murder, including in pertinent part: "To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person...." And it also instructed, as part of CALCRIM No. 315: "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find that the defendant is not guilty." Thus, if the jury believed that Lewis shot Wills and Mackey was not involved, it had proper instructions upon which to acquit. It evidently did believe Mackey was involved as a principal, although it believed the prosecution had not proved beyond a reasonable doubt that he was the shooter.

The trial court also properly refused the proposed pinpoint instruction because it pointed out evidence introduced by a specific party and told the jury it "should consider" that evidence. In effect, the proposed instruction would have told the jury that (1) evidence worthy of consideration had been introduced by Mackey; (2) Lewis was Broussard's cousin; (3) the jury "should consider" (i.e., "it is recommended that you consider" or "you are advised to consider") such specific evidence with respect to the Wills murder charge; and (4) it "should consider" such evidence in reaching its verdicts on all of the charged homicides, including Bailey's. Mackey's proposed instruction was "argumentative," and thus properly refused. (*Hartsch*, *supra*, 49 Cal.4th at p. 500, 504, 110 Cal.Rptr.3d 673, 232 P.3d 663 [holding pinpoint instruction "unduly argumentative, because it *told* the jury that evidence 'indicat[ed] or tend[ed] to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit, the offense(s) charged.' It is improper for an instruction to indicate an opinion favorable to the defendant regarding the effect of the evidence"].)

The instruction was also inaccurate insofar as it instructed that Lewis was Broussard's cousin, as Broussard had testified that Lewis was not a blood relative. Thus, the instruction was inaccurate, argumentative, and unbalanced. There was, after all, no duty on the jurors' part to "consider" evidence they found to be untruthful, unreliable, irrelevant, or nonprobative. And finally, as in *Hartsch*, the court's instruction on reasonable doubt (CALCRIM No. 220) precludes a finding of prejudice, especially where, as here, "closing arguments focused the jury's attention" on the prospect of third-party culpability. (*Hartsch*,

65

*supra*, 49 Cal.4th at p. 504, 110 Cal.Rptr.3d 673, 232 P.3d 663.).

Mackey also argues that *Hartsch* (and similar cases) demonstrate a pattern within the California cases in which "the right to particularized, or 'pinpoint,' instructions, is not equally applied as between defense and prosecution, which is, in itself, a violation of appellant's federal constitutional right to due process of law." In Mackey's words, it is "anomalous and unfair that the [California Supreme] Court has held that instructions directing the jury's attention to particular pieces of evidence which may benefit the prosecution's case are appropriate, but has nevertheless also held that criminal defendants are not entitled to instructions calling the jury's attention to evidence which supports the defense arguments, ruling that when requested by the defense such instructions are improper because they are 'unduly argumentative.' "

Mackey gives as an example the consciousness of guilt instructions, which tell the jury that a defendant's flight after a crime or efforts to suppress or fabricate evidence "may show that (he/she) was aware of (his/her) guilt." (CALCRIM Nos. 371 [suppression or fabrication of evidence], 372 [flight]; *see also* CALJIC Nos. 2.03 [willfully false statements], 2.06 [attempts to suppress evidence], 2.52 [flight].) He complains these are pro-prosecution instructions, the allowance of which causes a due process problem if pinpoint instructions such as Mackey's are not also allowed. Such claimed instructional disparity, he asserts, violates the principle of "absolute impartiality" between prosecution and defense in crafting jury instructions. We reject the argument.

Preliminarily, we note that none of the so-called proprosecution instructions was given in this case, so the claimed disparity in treatment between prosecution and defense is strictly academic and does not exist in the record before us.

But the comparison of the two types of jury instructions--consciousness of guilt versus third party culpability--is also imperfect. The consciousness of guilt instructions also include language such as, "it is up to you to decide the meaning and importance of" such conduct or evidence. (CALCRIM Nos. 371, 372.) In other words, those instructions describe a permissible inference, but leave it to the jury to decide (1) whether any evidence giving rise to such an inference was presented; (2) whether the inference should be drawn in light of the whole record; and (3) how the evidence is to be weighed. Mackey's proposed instruction, on the other hand, did not describe a permissible inference, but rather advised the jury to consider any evidence presented by Mackey (no matter how weak) that could possibly lead to an inference that someone else killed Wills and Roberson--and perhaps also Bailey.

Beyond all that, prejudice is lacking. The jury asked for a readback of Mackey's testimony about the Wills murder, as well as that of Broussard. This shows the jury did consider Mackey's evidence very carefully. It ultimately found "not true" the allegation that Mackey shot Wills, and therefore appears to have credited Mackey's evidence about Lewis to that extent. If the jury actually credited the evidence, the fact that it was not instructed to do so simply does not matter. There could be no prejudice.

*Mackey*, 182 Cal. Rptr. 3d at 464–67.

### a.    Standard

As discussed *supra* in Section III.B.4.a, to obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Estelle*, 502 U.S. at 72. The instruction may not

be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72.

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id.*

Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of the case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnapping where such instruction was supported by the evidence). The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996); *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979).

Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Duckett v. Godinez*, 67 F.3d 734, 745 (1995). To determine whether the instruction given was so prejudicial as to infect the entire trial and deny due process, the Court must examine the record to determine precisely what was given and what was refused, and assess whether the given instructions adequately embodied the defendant's theory. *See Tsinnijinnie*, 601 F.2d at 1040.

### b.    Analysis

The state trial court's determination that Mackey's proffered instruction was inappropriate, and the state appellate court's affirmance of that decision, were based on the interpretation of state law. *See* RT 5964 and *Mackey, et al.*, 182 Cal. Rptr. 3d at 465–67. Any error in the state courts' determination as to whether the instruction should have been given under state law cannot form the basis for federal habeas relief. *Estelle*, 502 U.S. at 67–68.

To the extent that Mackey argues that the trial court's decision not to give the third-party

culpability instruction violated his due process rights, after carefully reviewing the record, the Court finds that the state court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor did the state court's rejection of this claim result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Mackey was afforded the opportunity to present a complete defense in that he was allowed to introduce third party culpability evidence in support of his theory that Richard Lewis killed Wills, RT 5753–55 (witness testifying to Lewis' history as a football player) and RT 5824–25 (Officer Snyder testifying that Bakery employees followed Lewis' commands), and his theory that Tamon Halfin killed Roberson, RT 5767. Mackey argued these theories in his closing argument. RT 6366, 6385. In addition, the jury instructions on reasonable doubt, RT 6446, and how to weigh conflicting evidence, RT 6443–44, adequately embodied the defense theory that there was reasonable doubt that Mackey committed the charged crimes, based on the evidence the defense claimed suggested that Lewis and Halfin committed some of the crimes. Accordingly, the trial court's refusal to give Mackey's requested third-party culpability instruction did not violate due process.[10]

---

[10] Mackey misleadingly argues that the trial court's rejection of his third–party culpability instruction violates the principle that there be absolute impartiality between the prosecution and defendant with respect to jury instructions. Mackey cites to *Reagan v. United States*, 157 U.S. 301 (1895) in support of this principle. In *Reagan*, the question was whether a jury instruction that called attention to the possibility that the defendant's self-interest could affect his credibility violated the principle of impartiality. 157 U.S. at 310–11. The *Reagan* court ultimately found that the instructions given were fairly balanced because the challenged jury instruction followed a general instruction stating that all witnesses' self-interests should be considered in assessing credibility. *Id.* Here, Mackey has not identified any jury instruction that favors the prosecution and must be balanced by a third–party culpability instruction, and the Court's review of the jury instructions reveals no such instruction that unconstitutionally favors the prosecution.

Mackey also cites to *Wardius v. Oregon*, 412 U.S. 470 (1973); *Washington v. Texas*, 388 U.S. 14, 22 (1967); *Gideon v. Wainwright*, 372 U.S. 335 (1963); and *Williams v. Florida*, 399 U.S. 78 (1970), in support of his argument that the failure to give the requested third-party culpability instruction violated the absolute impartiality principle. None of these cases are applicable to Mackey's claim. In *Wardius* and *Williams*, the principle of absolute impartiality between prosecution and defendant was applied in the context of state trial rules, not jury instructions. *Wardius*, 412 U.S. at 472 (finding that Oregon's alibi rule violated Due Process Clause because it did not provide reciprocal discovery rights for criminal defendants); *Williams*, 399 U.S. at 81–82 (upholding constitutionality of Florida's notice-of-alibi rule). Neither *Washington* nor *Gideon*

**6.    Instruction Regarding Broussard's Shackling and Custody Status**

Both petitioners allege that the instruction regarding Broussard's shackling and custody

status was prejudicial error. The state court rejected their claim as follows:

> The trial court instructed the jury: "When Devaughndre Broussard testified, he was
> physically restrained. Do not speculate about the reason. You must completely disregard
> this circumstance in deciding the issues in this case. Do not consider it for any purpose or
> discuss it during your deliberations. Evaluate the witness's testimony according to the
> instructions I have given you. [¶] When Devaughndre Broussard and Joshua Bey testified,
> they were in custody. The fact that a witness is in custody does not by itself make a witness
> more or less believable. Evaluate the witness's testimony according to the instructions I
> have given you."

> The instruction was patterned on CALCRIM No. 337. And according to the Bench Notes
> to CALCRIM No. 337, the court had a sua sponte duty to give this instruction if the
> witness was physically restrained in a manner that was visible to the jury. (*See People v.
> Duran* (1976) 16 Cal.3d 282, 291–292, 127 Cal.Rptr. 618, 545 P.2d 1322 (*Duran*).) The
> rules articulated in *Duran* regarding physical restraints of a defendant at trial also apply to
> physical restraint of a defense witness. (*Id.* at p. 288, fn. 4, 127 Cal.Rptr. 618, 545 P.2d
> 1322.) The CALCRIM Bench Notes would seem to require the same treatment of a
> shackled prosecution witness.

> We begin by noting that the shackling instruction and the "in custody" instruction were
> somewhat different. While the jury was told to "completely disregard" the shackling and
> not to "consider it for any purpose or discuss it during deliberations," it was told "[t]he fact
> that a witness is in custody does not *by itself* make a witness more or less believable."
> (Italics added.) The court deliberately omitted language from the pattern instruction that
> would have told the jury not to "speculate" about the reason for the custody. (CALCRIM
> No. 337.) The jury did know why the witnesses were in custody and was not told that it
> could not discuss the reasons for their being in custody, or the effect that the underlying
> crimes might have on their credibility assessment of each witness.

> CALCRIM No. 337 is essential to preserve the presumption of innocence when criminal
> defendants or defense witnesses testify, but defendants argue it was improper in this
> instance because Broussard testified as a prosecution witness. Defendants cite no authority,
> and we are aware of none, to the effect that the trial court should not instruct with
> CALCRIM No. 337 in cases in which an accomplice witness testifies for the prosecution.
> Whether use of the instruction in such circumstances is consistent with the rationale
> underlying Duran--preserving the presumption of innocence for the accused--is a question
> we need not answer, for under any standard any assumed error was nonprejudicial in this
> case.

> Defendants argue that because there was plenty of reason to doubt Broussard's testimony,
> and because he was a crucial prosecution witness, the jury should have been allowed to
> consider his shackling and custody status in evaluating his credibility. In fact, they argue
> the instruction so "fundamentally undercut the defense theory" that its inclusion violated
> the Fifth and Sixth Amendments to the federal Constitution, making a Chapman standard

applies the absolute impartiality rule. *Washington*, 388 U.S. at 18 (Sixth Amendment guarantees
accused right to have compulsory process for obtaining witnesses in his favor); *Gideon*, 372 U.S.
at 343 (Sixth Amendment right to counsel made obligatory on the states by the Fourteenth
Amendment).

of prejudice applicable. (*Chapman v. California* (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.)

We are convinced the shackling instruction had no effect adverse to defendants in the jury's weighing of the evidence under any standard. Importantly, the instruction did not tell the jury not to consider the reasons underlying Broussard's custody in assessing his credibility. [FN 45] The jury was explicitly told, via CALCRIM No. 316, that it could consider Broussard's convictions and wide-ranging misconduct in assessing his credibility. (*See* fn. 45 ante.) It was also told to view Broussard's testimony with caution because he was an accomplice to counts one, four, and five.

> FN 45: The instructions included the following modified version of CALCRIM No. 316: "If you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable. [¶] If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable. [¶] Evidence of Mr. Mackey's prior conviction of a felony may be considered also in determining whether Element # 3 in Instruction # 2510, as to Count Three, has been proven."

Fundamentally, defendants' argument confuses the credibility inferences properly drawn from Broussard's criminal conduct and conflicting stories with those that are not allowable on the basis of shackling or in-custody status alone. CALCRIM No. 337 expressly limits its application to the jury's consideration of the custodial status of a witness, without reference to the conduct underlying the custody. Further, the jury was instructed to apply the other jury instructions in evaluating a witness's testimony, which told the jurors they should consider various factors in assessing witness credibility, including:
• "Has the witness been convicted of a felony?"
• "Has the witness engaged in [other] conduct that reflects on his or her believability?" and
• "Was the witness promised immunity or leniency in exchange for his or her testimony?"

Under these circumstances, there is no reasonable possibility that the jury understood CALCRIM No. 337 to prevent or restrict it from applying CALCRIM No. 316, or any reason to believe the jury would not have treated with caution Broussard's accomplice testimony incriminating defendants, as instructed by CALCRIM No. 335.

Given the whole charge, not to mention the many reasons to doubt Broussard's credibility, we think it inconceivable the jury would have failed to view his testimony with caution or would have failed to consider the reasons underlying his custody status when evaluating his credibility. The strength of the evidence and the arguments of counsel about Broussard's credibility problems further reassure us that any assumed error in instruction was harmless under any standard.

*Mackey*, 182 Cal. Rptr. 3d at 467–69.

### a. Standard

As discussed *supra* in Section III.B.4.a, to obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial

1  that the resulting conviction violates due process. *Estelle*, 502 U.S. at 72. The instruction may not

2  be judged in artificial isolation, but must be considered in the context of the instructions as a

3  whole and the trial record. *See Estelle*, 502 U.S. at 72.

### b.   Analysis

5  Petitioners argue that the instruction regarding Broussard's shackling and custody

6  prevented the jury from properly assessing Broussard's credibility and properly assessing the

7  defense theory that Broussard lied, thereby violating petitioners' due process right to present a

8  complete defense.

9  After carefully reviewing the record, the Court finds that the state court's rejection of this

10  claim did not result in a decision that was based on an unreasonable determination of the facts in

11  light of the evidence presented in the State court proceeding. Nor was the state court's rejection of

12  the claim contrary to, or involve an unreasonable application of, clearly established federal law, as

13  determined by the Supreme Court of the United States.

14  As required by the Supreme Court, the Court has considered the challenged instruction in

15  the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. Petitioners'

16  argument conflates two separate portions of the instruction. The instruction prohibited the jurors

17  from speculating about the reason for the shackling. The instruction did not forbid the jurors from

18  considering the reason Broussard was in custody, but only instructed that Broussard's custodial

19  status did not, by itself, make him more or less believable. In fact, the state appellate court pointed

20  out that the trial court specifically omitted language from the pattern instruction that would have

21  told the jury not to speculate about the reason for custody (since the jury knew why the witnesses

22  were in custody). Furthermore, as the state appellate court also pointed out, the jurors were

23  instructed that they could consider Broussard's convictions and other misconduct in evaluating his

24  credibility, RT 6446–47 and that Broussard's testimony should be viewed with caution because he

25  was an accomplice to counts one, four, and five, RT 6459–50. Moreover, the verdict necessarily

26  reflected a rejection of certain parts of Broussard's testimony (for example, his testimony that

27  Mackey shot Wills), indicating that the jury carefully considered Broussard's credibility in

28  assessing guilt.

Accordingly, habeas relief is denied on this claim.

### 7. Instructions Regarding Corroboration

Bey alleges that the instructions regarding corroboration resulted in prejudicial error. The state court rejected this claim as follows:

> Bey argues, and Mackey joins in arguing, that the instructions given, taken together, allowed the jury to convict defendants on the basis of Broussard's testimony, corroborated only by his own pretrial statements.
>
> The two instructions primarily at issue are CALCRIM Nos. 318 and 335. CALCRIM No. 335 was given as the appropriate version of the accomplice testimony rule, which identified Broussard as an accomplice in the Bailey and Roberson murders, and identified Broussard, Siaw, and Dawud as accomplices in the Cook car shooting. The instruction told the jurors, among other things, that they could not convict defendants of the Bailey and Roberson murders or of the Cook car shooting unless the accomplice testimony was "supported by other evidence that you believe" that was "independent of the accomplice's testimony," and corroboration of the testimony "of one accomplice cannot be provided by the testimony of another accomplice." [FN 46]
>
>> FN 46: The actual instruction read as follows: "As to Counts One and Four, Devaughndre Broussard was an accomplice to those crimes. As to Count Five, Devaughndre Broussard, Dawud Bey and Jasmine Siaw were accomplices as to that crime. [¶] You may not convict a defendant in Counts One, Four and/or Five based on the testimony of an accomplice alone. You may use the testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's testimony; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crime. [¶] Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact about which the witness testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime. [¶] The evidence needed to support the evidence of one accomplice cannot be provided by the testimony of another accomplice. [¶] Any testimony of an accomplice that tends to incriminate a defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."
>
> The court also instructed the jury with CALCRIM No. 318, which in relevant part said: "You have heard evidence of statements that a witness made before the trial. [¶] If you decide that the witness made those statements, you may use those statements in two ways: [¶] 1. To evaluate whether the witness's testimony in court is believable, [¶] AND [¶] 2. as evidence that the information in those earlier statements is true."
>
> If we understand defendants' position correctly, they do not argue that either instruction misstates the law, but rather that, read together, "other evidence" as used in CALCRIM No. 335 could include that same accomplice's statements prior to trial and still be considered "independent" of the witness's testimony. Defendants base this in part on the fact that CALCRIM No. 222 defined "evidence" to include "anything else I told you to consider as evidence" and CALCRIM No. 318 included pretrial statements as "evidence."

72

Defendants argue these instructions could be read to mean the jury could consider Broussard's own pretrial statements to be "independent" "evidence" that could be used to evaluate whether he was "believable" on the witness stand. Thus, defendants argue, the instructions together allowed the jury to convict on the basis of Broussard's testimony alone, corroborated only by his own pretrial statements. And, they further argue, the prosecution was thereby allowed to circumvent the accomplice testimony rule, along with the beyond a reasonable doubt requirement. We are not persuaded.

To begin with, defendants did not object to the giving of those instructions at trial, nor did they request any modification or clarification. Nevertheless, defendants now claim that an improper combination of instructions resulted in misinforming the jury. To preserve the issue, they were required to request the additional language needed to complete or clarify the jury instructions. "'"'[A] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested an appropriate clarifying or amplifying language.'"'" (*People v. Spurlock* (2003) 114 Cal.App.4th 1122, 1130, 8 Cal.Rptr.3d 372, quoting *People v. Hill* (1992) 3 Cal.4th 959, 997, 13 Cal.Rptr.2d 475, 839 P.2d 984.) The lack of such a request forfeited the issue for review. (*Ibid.*; *see Tuggles*, *supra*, 179 Cal.App.4th at pp. 364–365, 100 Cal.Rptr.3d 820.)

In any event we reject defendants' arguments, finding *Tuggles*, *supra*, 179 Cal.App.4th 339, 100 Cal.Rptr.3d 820 directly on point. There, addressing the same argument, the Third Appellate District found the defendant's interpretation of the combined instructions to be a "tortured reading of CALCRIM Nos. 318 and 335" (*id.* at p. 365, 100 Cal.Rptr.3d 820), going on to hold "CALCRIM Nos. 318 and 335 did not inform the jury that it could use [an accomplice's] out-of-court statements to corroborate his later testimony at trial. With the additional consideration of CALCRIM No. 301, we find that no reasonable jury could have understood the instructions to allow an accomplice to corroborate himself." (*Tuggles*, *supra*, at p. 366, 100 Cal.Rptr.3d 820.)

We must give jury instructions a commonsense reading. (*Johnson v. Texas* (1993) 509 U.S. 350, 367–368, 113 S.Ct. 2658, 125 L.Ed.2d 290; *Boyde v. California*, *supra*, 494 U.S. at p. 381, 110 S.Ct. 1190.) And we agree with *Tuggles* that "[n]o reasonable jury would have understood CALCRIM Nos. 318 and 335 to allow [an accomplice] to corroborate his own testimony." (Tuggles, *supra*, 179 Cal.App.4th at p. 365, 100 Cal.Rptr.3d 820.) The two instructions considered together "caution[ed] the jury against blithe acceptance of testimony by an accomplice." (*Ibid.*) Moreover, CALCRIM No. 335 told the jury the corroboration had to be "independent" of the accomplice's testimony. Use of the word "independent" "eviscerates [the] claim that the instruction allowed [the accomplice] to corroborate his own testimony." (*Tuggles*, *supra*, at p. 365, 100 Cal.Rptr.3d 820.)

We further agree with *Tuggles* that, even if CALCRIM Nos. 318 and 335 were susceptible to the "tortured" interpretation advanced by defendants, any mistaken impression was dispelled--not exacerbated--by the court's giving of CALCRIM No. 301, which stated: "Except for the testimony of Devaughndre Broussard ... which require[s] supporting evidence, the testimony of a single witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all of the evidence...." (Italics added.) Given this explicit exception to the "one witness" rule, it is extremely unlikely the jury would have understood other instructions to allow Broussard's out-of-court statements to self-corroborate his trial testimony.

Finally, we reject defendants' argument that telling the jury "[t]he evidence needed to support the testimony of one accomplice cannot be provided by the testimony of another accomplice" worsened the situation. The jury clearly would have understood that Broussard's testimony could not be corroborated by his own out-of-court statements either.

> In so concluding, we apply the familiar rule that jury instructions "'"may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. [Citation.] In addition, in reviewing an ambiguous instruction, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. [Citation.] (*Estelle v. McGuire* [, *supra*](1991) 502 U.S. 62, 72–73 [112 S.Ct. 475, 116 L.Ed.2d 385].)'" (*Tuggles*, *supra*, 179 Cal.App.4th at p. 365, 100 Cal.Rptr.3d 820; *Rivas*, *supra*, 214 Cal.App.4th at p. 1429, 155 Cal.Rptr.3d 403.) There was no error, either under state law or the federal Constitution.

*Mackey*, 182 Cal. Rptr. 3d at 469–71.

### a.    Standard

As discussed *supra* in Section III.B.4.a, in reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & n.4. In order to show a due process violation, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt. *Waddington*, 555 U.S. at 190–91 (internal quotations and citations omitted).  A "meager 'possibility'" that the jury misapplied the instruction is not enough.  *Kansas*, 136 S. Ct. at 643.

### b.    Analysis

This claim is procedurally defaulted.  The state appellate court found that this claim was forfeited because Bey did not object to the challenged instruction at trial or request a modification at trial. *Mackey, et al.*, 182 Cal. Rptr. 3d at 461.  As discussed *supra* in Section III.B.4.b, a federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and that is adequate to support the judgment.  *Coleman*, 501 U.S. at 729–30.  California's contemporaneous objection rule is an "adequate and independent state ground" which bars federal habeas review of this claim.  *See, e.g.*, *Inthavong*, 420 F.3d at 1058; *Paulino*, 371 F.3d at 1092–93.[11]

---

[11] The "cause and prejudice" exception set forth in *Coleman*, 501 U.S. at 750, is inapplicable here where Bey has not suggested that there was cause for the procedural default, or that a miscarriage of justice would result absent the Court's review.

Regardless, this claim fails on the merits. There is no clearly established federal law requiring juries to be instructed on the corroboration of accomplice testimony. *United States v. Augenblick*, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions."); *accord Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) ("Section 1111 [of the California Penal Code ] . . . prevent convictions based on only uncorroborated accomplice testimony. As a state statutory rule, and to the extent that the uncorroborated testimony is not "incredible or insubstantial on its face," the rule is not required by the Constitution or federal law."). In addition, the state court reasonably concluded that there was no reasonable likelihood that the jury disregarded the trial court's specific instructions and used Broussard's pre-trial statements to corroborate his trial testimony. The challenged instruction must be viewed in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. Here, the trial court explicitly instructed, in two separate instructions, that Broussard's accomplice testimony required corroboration by other sources. RT 6443 ("Except for the testimony of Devaughndre Broussard to Counts 1 and/or 4 . . . which require[s] supporting evidence, the testimony of a single witness can prove any fact."); RT 6449 ("You may not convict a defendant in Counts 1, 4 and/or 5 based on the testimony of an accomplice alone.").

The state court's rejection of this claim was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, habeas relief is denied as to this claim.

### 8.     Ineffective Assistance of Counsel

Both Mackey and Bey allege that defense counsel rendered ineffective assistance by failing to request a limiting instruction with respect to Broussard's guilty plea. The state court rejected this claim as follows:

VIII. The Ineffective Assistance of Counsel Argument Has No Merit
As noted, Broussard entered a guilty plea to two counts of voluntary manslaughter in the Bailey and Roberson homicides in exchange for a 25-year sentence. Bey argues that his

trial attorney provided ineffective assistance of counsel by failing to request a limiting instruction telling the jury it could not rely on Broussard's guilty plea as substantive evidence of Bey's guilt. Mackey joins in the argument. Their argument stems from the premise that the guilty plea of an accomplice could not properly be used as substantive evidence of defendants' guilt, a proposition with which we do not quarrel.

During trial, evidence of Broussard's guilty plea was elicited by the prosecutor to explain his motive for testifying. It was not elicited in isolation, but rather as part of his testimony about his plea bargain. This testimony was relevant to the jury's credibility assessment of Broussard. "Admissibility of the plea turns on the purpose for which it is offered. When that purpose is to further the jury's difficult task of evaluating credibility, it is relevant and admissible without reference to the identity of the offering party." (*United States v. Halbert* (9th Cir.1981) 640 F.2d 1000, 1004.)

The Attorney General contends that an appropriate limiting instruction was given in that the jury was told that if a witness was "convicted" of a crime or the jury finds he "committed a crime or other misconduct," such evidence could be used "only in evaluating the credibility of the witness's testimony." As we understand defendants' argument, they now complain that the instruction did not tell the jury that if a witness was convicted "or pled guilty" that evidence could only be so used, and thus their attorneys provided constitutionally ineffective assistance of counsel when they failed to request such a modification.

A defendant claiming ineffective assistance of counsel must demonstrate both deficient performance and resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 691–692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218, 233 Cal.Rptr. 404, 729 P.2d 839.) On the first prong he must show that "counsel's representation fell below an objective standard of reasonableness ... [¶] ... under prevailing professional norms." (*Strickland*, *supra*, at p. 688, 104 S.Ct. 2052.) And under the second, he must show that in the absence of the error it is reasonably probable that a result more favorable to him would have obtained. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694, 104 S.Ct. 2052.) Defendants demonstrate neither.

Rather than reflecting ignorance or indefensible tactics, the defense attorneys' failure to request a more explicit limiting instruction most likely reflected their understanding that the instruction limiting the use of a conviction applied equally to evidence of Broussard's guilty plea. We cannot attribute their failure to request a different limiting instruction to ignorance of the law or indefensible tactics.

But even if we believed that counsel's conduct fell below an objective standard of reasonableness, we could not find it prejudicial under the second prong of Strickland. The whole of Broussard's testimony was so damning that if the jurors believed it--and their verdicts show they did--defendants' convictions of Bailey's murder were inevitable. This is especially true as to Bey, whose own statements on the San Leandro Police Department video showed he knew details of the Bailey murder. As to Roberson's murder, Mackey escaped conviction, and Bey would not have fared better if a stronger limiting instruction had been given. Broussard's testimony implicated Bey in knowing participation in the Roberson murder much more clearly than it implicated Mackey. And with respect to the Wills murder, since Broussard was not involved and entered no plea in connection with that crime, there is no reasonable likelihood the verdict and findings were improperly influenced.

Bey again points to the long deliberation. But even that does not indicate a jury improperly influenced by a testifying accomplice's guilty plea. If the jury had relied on Broussard's guilty plea to establish defendants' guilt, one would have expected a quick verdict, and

twin guilty verdicts on both the Bailey and Roberson murders. In light of the court's instruction that a conviction could only be used to assess Broussard's credibility, we do not believe the jury would have felt free to--and its verdicts show it did not-- place any reliance on Broussard's guilty pleas as substantive evidence of defendants' guilt. Any error by defense counsel, and we find none, would be harmless.

*Mackey*, 182 Cal. Rptr. 3d at 471–73.

### a. Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687–88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Williams (Terry) v. Taylor*, 529 U.S. 362, 404–08 (2000); *Daire v. Lattimore*, 812 F.3d 766, 767 (9th Cir. 2016). A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Pinholster*, 563 U.S. at 190. The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether

1   counsel's actions were reasonable.  The question is whether there is any reasonable argument that

2   counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, 562 U.S. 86, 105.

3                   **b.       Analysis**

4           Applying these legal principles to petitioners' ineffective assistance of counsel claim, the

5   state court's rejection of this claim was not contrary to, and did not involve an unreasonable

6   application of, Supreme Court precedent, and was not based on an unreasonable determination of

7   the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).

8   Petitioners' IAC claim rests upon the assumption that the jury would understand the limiting

9   instruction given to apply only to convictions, and not to apply to guilty pleas.  However,

10  immediately following the limiting instruction informing the jury that a witness' conviction could

11  only be considered in evaluating the credibility of the witness' testimony, the trial court went on to

12  instruct the jury that if it found that a witness committed a crime or other misconduct, that act

13  could also only be considered in evaluating the credibility of the witness' testimony.  RT 6446–47.

14  Considering the jury instructions as a whole, the Court finds that the state court reasonably

15  concluded that trial counsel's failure to seek a limiting instruction that specified that a guilty plea

16  should only be considered in evaluating the witness' credibility was not deficient performance.

17  The Court further agrees that the state court reasonably concluded that petitioners were not

18  prejudiced by trial counsel's failure to seek a limiting instruction with respect to Broussard's

19  guilty plea.  As the state court explained in detail, the verdict indicates that the jurors did not rely

20  on Broussard's guilty plea as substantive evidence of petitioners' guilt.  Broussard pled guilty to

21  voluntary manslaughter in the Bailey and Roberson homicides, but the jurors rejected his

22  testimony that Mackey was involved in the Roberson homicide.  In addition, there was substantial

23  evidence supporting Bey's guilt, including his statements on the San Leandro Police Department

24  video, and testimony by other witnesses.  Habeas relief is therefore denied as to this claim.

25          **9.       Insufficient Evidence Against Bey with Respect to Wills Murder**

26          Bey alleges that there was insufficient evidence to convict him of the murder of Wills.  The

27  state court rejected Bey's claim as follows:

28          Bey argues there was insufficient evidence to sustain a murder conviction on count two

                                                78

(the Wills murder) because there was no evidence he aided and abetted the murder before or during its commission. Bey claims that, even crediting Broussard's testimony, it showed at most that he drove Mackey away from the scene after the murder, and therefore was at most an accessory after the fact.

Concerning a claim of insufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.) To determine whether there was substantial evidence to support the judgment, we resolve all conflicts and draw all reasonable inferences in its support. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 528–529, 26 Cal.Rptr.2d 323.) "Substantial" evidence is that which is "'of ponderable legal significance ... reasonable in nature, credible, and of solid value.'" (*People v. Johnson* (1980) 26 Cal.3d 557, 576, 162 Cal.Rptr. 431, 606 P.2d 738.)

Broussard's testimony that the killing of Wills was race based traced back to Bey's preaching to his followers about "White devils," and Bakery literature calling White men "the skunk of the Planet Earth." And after the Wills murder, Bey justified the Zebra murders as appropriate payback for Whites, implicitly approving the killing of Wills. While neither racial hatred alone nor Bey's expression of approval of the murder after the fact would make Bey an aider and abettor, Bey's silence in the face of Mackey's story-- which story clearly implicated Bey in the killing--amounted to an adoptive admission. (Evid. Code, § 1221.) Accordingly, the jury was given CALCRIM No. 357.

The evidence as a whole showed that Bey held considerable power over his followers at the Bakery, that on several occasions he ordered them to commit criminal acts, and that they complied. The jury could infer that Wills was murdered at Bey's order or suggestion. Moreover, there was sufficient evidence to permit an inference that Bey supplied the murder weapon to Mackey: Broussard testified that Bey supplied the weapon that killed Bailey, and Joshua testified the SKS-20, i.e., the weapon that killed Wills, was regularly kept under Bey's bed in the Bakery. These facts could lead a reasonable juror to infer that Bey also supplied the SKS-20 assault rifle for the Wills murder.

By preaching that "White devils" should be killed, by supplying the assault rifle that killed Wills, by waiting in the car while Mackey or someone else killed Wills, by welcoming Mackey back into his Charger with the murder weapon in his possession, and by driving him back to the Bakery with the murder weapon, Bey aided and abetted the murder of Wills. This was not, as Bey claims, a situation where his only involvement was after the murder. The jury had a solid basis for the conviction.

*Mackey*, 182 Cal. Rptr. 3d at 473–74.

### a. Standard

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas

relief, *see id.* at 324.  The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ."  *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (court of appeals "unduly impinged on the jury's role as factfinder" and failed to apply deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that evidence insufficient to support petitioner's conviction).  A federal court collaterally reviewing a state court conviction does not decide whether it personally believes that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992); *see, e.g., Coleman*, 132 S. Ct. at 2065 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality").  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt has there been a due process violation.  *Jackson*, 443 U.S. at 324.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Jackson*, 443 U.S. at 326.  The court may not substitute its judgment for that of the jury.  *See Coleman*, 132 S. Ct. at 2065 (court of appeals erred in finding no reasonable basis for jury's conclusion that petitioner had specific intent to kill victim and force was used simply because there was no testimony describing physical action by petitioner).  Indeed, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)) (court of appeals erred by substituting its judgment for that of California jury as to which side's expert witnesses more persuasively explained cause of death)).  Under *Jackson*'s standard of review, a jury's credibility determinations are entitled to near-total deference.  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations.  *See id.* (credibility contest

between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination).

After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* to the facts of the case. *Coleman*, 132 S. Ct. at 2062. To grant relief, therefore, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964–65 (9th Cir. 2011).

### b.    Analysis

Applying these legal principles to Bey's allegations, the state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). There was evidence presented from which it could be reasonably inferred that Bey supplied both the motive and the means for the Wills murder. Broussard testified that Bey preached against "White devils," RT 3057-58, and, after the Wills murder, approvingly referred to the "Zebra murders," in which whites were killed as payback for the murdering and lynching of black people, RT 3131-35, 3898-902. Joshua testified that the weapon that killed Wills was regularly kept under Bey's bed. Broussard testified that when Mackey discussed the Wills murder in front of Bey, Bey responded, "It's good." RT 3123-27. There was also evidence that Bey had considerable sway over Bakery followers, including Mackey. RT 2990-93 (Bakery followers regularly attended meetings and trainings run by Bey), RT 3867-77 (Joshua discussing orders that he followed as a Bakery worker). Further, there was evidence that Bey regularly ordered them to commit criminal acts. RT 2925-26 (Broussard understood that part of working at Your Muslim Bakery involved committing crimes), RT 2947 and 2974-78 (Bey V organizing others to shoot up car at Bey's command), RT 3162-69 (Bey instructing Broussard and Mackey to kill Bailey).

81

After viewing the evidence presented at trial in the light most favorable to the prosecution and presuming that the jury resolved all conflicting inferences from the evidence against petitioner, the Court finds that a rational juror could reasonably have found beyond a reasonable doubt that Bey at a minimum aided and abetted the murder of Wills. *Jackson*, 443 U.S. at 325–26. Mindful of the "sharply limited nature of constitutional sufficiency review" and applying the "additional layer of deference" required by AEDPA, this Court finds that the California court's rejection of this claim was not objectively unreasonable. *Juan H.*, 408 F.3d at 1274–75; *see also Jackson*, 443 U.S. at 319, 326. Accordingly, Bey is not entitled to habeas relief on this claim.

### 10. Wills Murder Conviction Rested on Uncorroborated Accomplice Testimony

Mackey and Bey allege that the trial court's instructions allowed the jury to erroneously consider Broussard's testimony without corroboration to convict them for the murder of Wills. The state court rejected this claim as follows:

> X. The Claim That the Wills Murder Convictions Rested on Uncorroborated Accomplice Testimony Has No Merit
>
> Bey argues that the trial court's instructions erroneously allowed the jury to consider Broussard's testimony alone, without corroboration, to convict on count two, the Wills murder, an argument in which Mackey joins. At trial, Bey (joined by Mackey) objected to the court's giving its proposed version of CALCRIM No. 301, the single witness rule, on the basis that Antone and Joshua should have been treated as accomplices for purposes of the jury's factfinding with respect to the Lofton kidnapping. Defendants also objected to CALCRIM No. 335 (see fn. 46, *ante*) on the basis that Antone and Joshua were not named as accomplices whose testimony should be treated with caution. But counsel did not object to CALCRIM No. 335 on grounds that Broussard should have been declared an accomplice with respect to count two.
>
> The claimed impropriety of the version of CALCRIM No. 335 used by the court was raised again after trial by Mackey via a motion for a new trial, this time contending that Broussard should have been named as an accomplice in that instruction. The motion claimed that even if the state accomplice testimony statute (§ 1111) did not require corroboration, the state and federal Constitutions did. The court denied Mackey's motion, holding the statute did not require corroboration for a nonaccomplice, and the jury's consideration of Broussard's testimony, even without a corroboration requirement, did not violate the federal or state due process clause because the testimony was not in and of itself "incredible or insubstantial." The Attorney General makes the same argument here, an argument with which we agree.
>
> As indicated, defendants' argument about corroboration stems from section 1111, which requires the jurors to view the witness's testimony with caution, and requires corroboration for conviction. [FN 47] The reason for the rule is manifest: "Of course, an accomplice has a natural incentive to minimize his own guilt before the jury and to enlarge that of his cohorts; accordingly, the law requires an accomplice's testimony be viewed with caution to the extent it incriminates others." (*People v. Brown* (2003) 31 Cal.4th 518, 555, 3

Cal.Rptr.3d 145, 73 P.3d 1137.) In addition, and especially in a case such as this, the fact that an accomplice may have been promised a more lenient disposition if he testifies on behalf of the prosecution gives special reason to view his testimony with skepticism. (*People v. Guiuan* (1998) 18 Cal.4th 558, 571–573, 76 Cal.Rptr.2d 239, 957 P.2d 928 (conc. opn. of Kennard, J.).)

> FN 47: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)

As quoted in footnote 46, ante, the accomplice testimony rule was explained to the jury via CALCRIM No. 335—including naming Broussard as an accomplice—with respect to counts one, four, and five, respectively the Bailey and Roberson murders and the Cook car shoot-up. However, count two was omitted from that instruction, which in effect allowed the jury to convict both defendants of the Wills murder based on Broussard's testimony alone, without corroboration.

An accomplice is defined for purposes of the accomplice testimony rule as one who is "liable to prosecution for the identical offense charged against the defendant." (§ 1111.) The accomplice testimony rule does not apply, and accomplice testimony instructions need not be given, where the witness in question was involved in the crime but was not actually an accomplice, but only as an accessory after the fact. (§§ 31-33; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1353, 144 Cal.Rptr.3d 427, 281 P.3d 412; *People v. Daniels*, *supra*, 52 Cal.3d at p. 867, 277 Cal.Rptr. 122, 802 P.2d 906 ["mere accessories are not accomplices under section 1111"].) It is all the more clear that the instruction need not have been given as to count two in this case, where no evidence pointed to Broussard's involvement, as an accessory or otherwise. Thus, under state statutory law, there was no error in restricting the accomplice testimony instruction to the charges on counts one, four, and five.

The special concerns reflected in the accomplice corroboration requirement arise not only because accomplices have a special motive to minimize their own roles or to help convict the defendant in the hopes of leniency in their own sentencing, but also because of the especially compelling nature of accomplice testimony. When one who actually participated in the crime testifies about exactly how it occurred, it naturally tends to carry great weight with a jury. "[A]n accomplice's firsthand knowledge of the details of the criminal conduct allows for the construction of plausible falsehoods not easily disproved." (*People v. Guiuan*, *supra*, 18 Cal.4th at p. 575, 76 Cal.Rptr.2d 239, 957 P.2d 928, *In re Mitchell P.* (1978) 22 Cal.3d 946, 955, 151 Cal.Rptr. 330, 587 P.2d 1144; *People v. Tewksbury* (1976) 15 Cal.3d 953, 967, 127 Cal.Rptr. 135, 544 P.2d 1335.) The same cautionary instruction is not necessary when the witness does not claim firsthand knowledge of how the crime was committed, but merely testifies to what he or she saw or heard.

But, defendants argue, given Broussard's role in the other murders and the inducement of his plea bargain, his testimony on the Wills murder should have been subjected to the same cautionary treatment accorded accomplice testimony. They claim the accomplice testimony rule is so rooted in American jurisprudence that it should have been applied here as a matter of due process to guard against fabrication by Broussard in order to ensure himself a more favorable sentence.

Under federal law "the use of accomplice testimony is not catalogued with constitutional restrictions." (*United States v. Augenblick* (1969) 393 U.S. 348, 352–353, 89 S.Ct. 528, 21

United States District Court
Northern District of California

L.Ed.2d 537; *see Cummings v. Sirmons* (10th Cir.2007) 506 F.3d 1211, 1237 ["we and many of our sister circuits have specifically held that there is no ... constitutional requirement" "that the testimony of an accomplice-witness be corroborated*"]; Laboa v. Calderon* (9th Cir.2000) 224 F.3d 972, 979 ["to the extent that the uncorroborated [accomplice] testimony is not 'incredible or insubstantial on its face,' the rule is not required by the Constitution or federal law"].) Broussard's testimony was not incredible on its face and therefore could properly be used by the jury to convict. There was no due process violation.

But even if the court should have instructed on accomplice testimony with respect to count two, "'[a] trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record.' (*People v. Lewis* (2001) 26 Cal.4th 334, 370 [110 Cal.Rptr.2d 272, 28 P.3d 34].) 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.' (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271 [91 Cal.Rptr.2d 211, 989 P.2d 645].) The evidence is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' (*People v. Fauber* (1992) 2 Cal.4th 792, 834 [9 Cal.Rptr.2d 24, 831 P.2d 249].)'" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 302, 128 Cal.Rptr.3d 417, 256 P.3d 543 (*Gonzales*).)

There was sufficient corroboration to render any instructional error harmless as to Bey. Bey's brother Joshua testified the SKS-20 assault rifle used to kill Wills was normally kept under Bey's bed at the Bakery. Although this may constitute only slight corroboration that Bey provided the rifle for use in the Wills murder, slight corroboration is enough. (*Gonzales*, *supra*, 52 Cal.4th at p. 302, 128 Cal.Rptr.3d 417, 256 P.3d 543; *People v. Gurule* (2002) 28 Cal.4th 557, 628, 123 Cal.Rptr.2d 345, 51 P.3d 224.) There was also abundant evidence showing the influence Bey had over his followers at the Bakery, including that he gave orders, specifically orders to commit criminal acts, and those orders were followed. The phone log also showed Bey made a call to Broussard at 3:14 a.m. on July 12, 2007, which corresponded to the one Broussard testified about receiving when Bey asked him to open the back gate.

Mackey's admissions to Broussard, if believed, were sufficient to convict. Ballistics evidence corroborated Broussard's testimony that Mackey was carrying the same assault rifle after returning from the Wills shooting that he had handed to Broussard for the Roberson murder. The victim was White and was located in the place Mackey described to Broussard. The bullets from the Wills shooting were strewn along the path Wills had traveled, corroborating Broussard's testimony that Mackey said he had chased Wills down and shot him. Wills was not robbed, which tended to corroborate that there was a different motive, as Broussard testified.

Finally, even if we could agree that the accomplice testimony rule was violated, and even if the corroboration were insufficient, defendants have not demonstrated prejudice. (*Gonzales*, *supra*, 52 Cal.4th at p. 304, 128 Cal.Rptr.3d 417, 256 P.3d 543; *Watson*, *supra*, 46 Cal.2d at p. 836, 299 P.2d 243.) Failure to instruct regarding accomplice testimony is harmless where there are other circumstances that would cause the jury to distrust the accomplice testimony. Here, there were. Based upon the entire record it is not reasonably probable that defendants would have received a better result had the instructions been given. (*People v. Miranda* (1987) 44 Cal.3d 57, 101, 241 Cal.Rptr. 594, 744 P.2d 1127.)

The purpose of the accomplice testimony rule is to ensure the jury maintains a skeptical attitude about the witness. (*Guiuan*, *supra*, 18 Cal.4th at p. 570, 76 Cal.Rptr.2d 239, 957 P.2d 928 (conc. opn. of Kennard, J.).) The jury was made well aware of Broussard's past criminality; his central violent role in the current crimes; his conflicting stories after his arrest; his possible motive to lie in order to improve his own sentencing prospects; and his

possible grudges against Bey and Mackey. There was certainly no attempt by Broussard to minimize his role in connection with the Bailey and Roberson murders, as he admitted being the sole shooter in both.

Finally, the prosecutor by no means whitewashed Broussard before the jury, calling him a "sociopath," a "liar," a "sociopathic murderer," and a "stone cold killer." He was "not exactly the person that a district attorney wants to have as their main witness," the prosecutor said, but "sometimes you have to make a deal with a demon to get the devil." Because there is independent assurance that such an attitude was maintained in this case, the failure to instruct with CALCRIM No. 335 with respect to the Wills murder was not prejudicial, even assuming the instruction should have been given. (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 26, 44 Cal.Rptr.2d 796.)

Given the many reasons to do so, we think it virtually certain the jury would have viewed Broussard's testimony with caution in evaluating the evidence on count two, as with the other counts. It found "not true" the enhancement allegation that Mackey was the shooter, thereby suggesting that Mackey's denials and evidence about Lewis's possible role must have carried some weight. This demonstrated that the jury weighed the evidence critically.

*Mackey, et al.*, 182 Cal. Rptr. 3d at 474–77.

The Court agrees that the state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). As discussed *supra* in Section III.B.7.b., there is no clearly established Supreme Court precedent requiring the jury to be instructed regarding the corroboration of accomplice testimony. The state court also reasonably determined that the evidence presented failed to establish that Broussard was an accomplice. Petitioners do not point to any evidence that Broussard was involved in the Wills murder, and, having reviewed the record, the Court has not identified any such evidence. Petitioners' argument relies on the possibility that the jury considered Broussard an accomplice, Ex. O at 48 ("If the jury found that Broussard was an accomplice, with a motive to testify falsely for the state, it should have been precluded from relying on his testimony alone to convict on *any* of the charges.") (emphasis in original), but they provide no evidentiary support for such a possibility. Habeas relief is therefore denied on this claim.

## 11. Cumulative Error

Petitioners allege cumulative error. The state court rejected this claim as follows:

XI. Cumulative Error

Defendants argue that the cumulative error rule requires reversal. In light of our

conclusions above, we obviously find no reason to reverse on the basis of cumulative error.

Although there was a great deal of negative pretrial publicity, defendants were not denied a fair trial. A joint trial, presumptively preferred, was appropriate in this case. The evidence against defendants was strong and, while dependent on accomplice testimony, was sufficiently corroborated to comply with California law. Defendants were vigorously represented by counsel throughout the proceedings. The points now argued on defendants' behalf with regard to instructional errors were argued to the jury by counsel, for example, that the liquor store vandalism, Cook car shooting, and Lofton kidnapping occurred before Mackey came to live at the Bakery; that Lewis killed Wills; that Halfin killed Roberson; that Lewis may have been the driver in the Bailey shooting; that corroboration was required before Broussard's testimony could form the basis of a conviction; that the jury must avoid finding guilt by association; that the GPS evidence was of limited utility because it did not prove who was in the Charger at any given time; and that Broussard was fundamentally unreliable and biased.

Defendants' arguments were presented to a jury that had been rigorously screened by Judge Reardon for bias, a jury that persevered through a long deliberation until it reached a unanimous verdict on all but one of the charges and enhancements. And while it is true, as defendants point out, that the jury wrestled with the evidence for a long time, the long deliberation reflected a conscientious effort to consider all of the evidence presented during a two-month trial, to apply the court's instructions, to examine the record for corroboration as instructed--and, yes, to deliberate on the credibility of Broussard on each of the charges. The jury's ultimate ability to resolve its doubts about Broussard's credibility was due to its own dedication, industry, and thoroughness, not to any misinstruction or outside influence. (*Cf. People v. Houston* (2005) 130 Cal.App.4th 279, 300–301, 29 Cal.Rptr.3d 818; *People v. Walker* (1995) 31 Cal.App.4th 432, 439, 37 Cal.Rptr.2d 167 [long deliberation may simply have reflected jury's "conscientious performance of its civic duty"].)

*Mackey*, 182 Cal. Rptr. 3d at 477.

Petitioners claim they were prejudiced by the cumulative effect of the foregoing asserted errors. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). For the reasons discussed above, the Court has found no constitutional error exists, let alone multiple errors. Where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).

## C.      Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

86

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, neither petitioner has made such a showing. Accordingly, certificates of appealability will be denied.

### IV. CONCLUSION

For the reasons stated above, the petitions for a writ of habeas corpus are DENIED, and certificates of appealability are DENIED.

The Clerk shall entre judgment in favor of respondents and close the file.

**IT IS SO ORDERED.**

Dated:  9/28/2018

HAYWOOD S. GILLIAM, JR.
United States District Judge